UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-20613-CR-MARTINEZ

UNITED STATES OF AMERICA,

     Plaintiff,

v.

SAMUEL BAPTISTE,

     Defendant.

_____/

**MOTION TO COMPEL DISCOVERY IN
SUPPORT OF MOTION TO DISMISS FOR RACIALLY- AND
RELIGIOUSLY- SELECTIVE LAW ENFORCEMENT AND PROSECUTION
IN VIOLATION OF THE EQUAL PROTECTION CLAUSE**

Defendant, Samuel Baptiste, through undersigned counsel, and pursuant to the Fifth and Fourteenth Amendments of the United States Constitution, respectfully petitions this Court to compel the discovery that is exclusively within the government's control and purview in support of his motion to dismiss for selective law enforcement and prosecution.

**FACTUAL BACKGROUND**

Mr. Baptiste is a 26-year-old Black male born in Miami. Mr. Baptiste is also a devout Muslim; he began practicing his faith as a teenager.

The charges in this case stem from a years-long FBI investigation of Mr. Baptiste, his social media activity, and his contacts and conduct in the community. FBI first initiated an investigation into Mr. Baptiste's online social media accounts in April 2014. Criminal Complaint, dated Nov. 8, 2016, 1:16-cr-20907-MGC (D.E. 1)

("Complaint"), at 2, ¶ 4. As FBI Agent Timothy Dietz alleged in the Complaint leading to Mr. Baptiste's arrest, during this period of monitoring, Mr. Baptiste "posted numerous online statements expressing his encouragement and approval of violent jihad, the killing of non-believers, and the perpetration of 'lone wolf' style attacks against Westerners for their perceived aggression against Muslims." Complaint at 5, ¶ 11. The FBI's surveillance of Mr. Baptiste during this period was not limited to passive monitoring of his alleged online activity. Rather, several undercover FBI employees and informants (confidential human sources) allegedly actively engaged and communicated with Mr. Baptiste from mid-2016 on. This contact took various forms, and was conducted by several individuals in person, over the phone, and on different social-media platforms.

Mr. Baptiste was arrested on November 9, 2016. He was subsequently indicted in December 2016 on one count of attempting to export firearms to Haiti, in violation of 18 U.S.C. § 554(a), and two counts of felon in possession of a firearm, based on conduct that allegedly occurred on October 23, 2016 and November 5, 2016, in violation of 18 U.S.C. § 922(g)(1). *See* 2016 Indictment, dated Dec. 1, 2016, 1:16-cr-20907-MGC (D.E. 17). Mr. Baptiste pleaded guilty to one count of felon in possession on March 31, 2017; the remaining counts against him were dismissed. He was sentenced to 80 months in custody, followed by three years of supervised release, on June 21, 2017.

In July 2018, while serving his sentence, Mr. Baptiste was indicted again, based on the alleged online activity that had been outlined in the November 2016

Complaint.  He was charged with four counts of distributing information pertaining to explosives, in violation of 18 U.S.C. § 842(p)(2)(A); one count of attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1); and one count of attempting to provide material support to terrorists, in violation of 18 U.S.C. § 2339A(a).  *See* 2018 Indictment, dated July 19, 2018 (D.E. 1).  All six counts pertain to information that Mr. Baptiste allegedly posted on a social media channel.  These are the charges before the Court today.  This motion specifically concerns the two material support counts.

## ARGUMENT

1. **The legal standard to obtain discovery pertaining to a potential claim of selective law enforcement and/or prosecution requires the defense to present "some evidence tending to show" each element of the claim.**

As recognized by former Associate Justice of the United States Supreme Court Robert H. Jackson, who had previously served as United States Solicitor General, United States Attorney General, and Chief United States Prosecutor at the Nuremberg Trials of Nazi war criminals following World War II, the federal prosecutor "has more control over life, liberty and reputation than any other person in America" because

> If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted.

> With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who

3

has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.

It is in this realm—in which the prosecutor picks some person whom he dislikes or desires to embarrass or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies.

It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself.

In times of fear of hysteria political, racial, religious, social, and economic groups, often from the best of motives, cry for the scalps of individuals or groups because they do not like their views.

In the enforcement of laws which protect our national integrity and existence, we should prosecute any and every *act* of violation, but only overt acts, not the expression of opinion, or activities such as the holding of meetings, petitioning of Congress, or dissemination of news or opinions. Only by extreme care can we protect the spirit as well as the letter of our civil liberties, and to do so is a responsibility of the federal prosecutor.

Robert H. Jackson, THE FEDERAL PROSECUTOR, 31 Am. Inst. Crim. L. & Criminology 3, 5-6 (1940-1941) (excerpt of speech delivered at the Second Annual Conference of United States Attorneys by then-Attorney General Robert H. Jackson, in Washington, D.C., Apr. 1, 1940).

It follows therefore that law enforcement agencies and the United States Attorneys do not enjoy unfettered discretion to enforce federal criminal laws—the Constitution constrains them. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). In particular, the Fifth and Fourteenth Amendments prohibit discriminatory

enforcement of criminal laws. U.S. Const. amend. V; U.S. Const. amend. XIV; *see also Wayte v. United States*, 470 U.S. 598, 608 (1985).

One such constraint—located in the Equal Protection Clause of the Fifth Amendment's Due Process Clause—is that the decision to prosecute, like the decision to investigate or arrest, "may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 464 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)); *see also Brown v. City of Syracuse*, 673 F.3d 141, 151-52 (2d Cir. 2012) (requiring that "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."). Accordingly, an Equal Protection challenge exists where a defendant shows that a particular law enforcement policy is "'directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive' that the system of prosecution amounts to a 'practical denial' of equal protection of the law." *Armstrong*, 517 U.S. at 464-65 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886)).

Selective law enforcement and selective prosecution challenges both draw on ordinary Equal Protection standards. *See, e.g., Armstrong*, 517 U.S. at 465 (selective prosecution); *Whren v. United States*, 517 U.S. 806, 813 (1996) (selective enforcement). To prevail on the merits on either challenge, a defendant must show that a given federal enforcement policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465 (citation omitted).

Defendants seeking discovery in support of an Equal Protection challenge enjoy a lower burden than that required to prevail on the merits. *See, e.g., United States v. Jones*, 159 F.3d 969, 978 (6th Cir. 1998) ("Obviously, a defendant need not prove his case in order to justify discovery on an issue.").

To obtain discovery in support of either a selective law enforcement or selective prosecution challenge, defendants need only present "some evidence tending to show" that a given federal law enforcement or prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. *Armstrong*, 517 U.S. 456, 465, 468 (quoting *Wayte*, 470 U.S. at 608).[1]

To be entitled to discovery, the claimants bear the "burden of making a credible showing of 'some evidence' on each element [of an Equal Protection defense]." *United States v. Olvis*, 97 F.3d 739, 746 (4th Cir. 1996) (quoting *Armstrong*, 517 U.S. at 468-69). To be clear, the standard is even lower than "some evidence"—the Supreme Court in *Armstrong* held that to obtain discovery on a selective prosecution claim, the defense must only present "*some evidence tending to show* the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468 (emphasis added); *accord United States v. Alameh*, 341 F.3d 167, 174 (2d Cir. 2003) (defendants must establish less stringent standard of "some evidence tending to show the existence of the essential elements" of an equal protection defense to obtain discovery); *United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001) ("In light of *Armstrong*'s seemingly less stringent "some evidence

---

1. The defense seeks discovery to analyze both selective law enforcement and selective prosecution challenges. Though occasionally conflated in the caselaw, the two challenges are distinct.

tending to show" standard, the defendants need not establish a prima facie case of selective prosecution to obtain discovery on these issues.").

But the Supreme Court has instructed that lower federal courts should not make this "some evidence tending to show" threshold "an insuperable task." *Armstrong*, 517 U.S. at 470. Thus, "[i]f discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim." *Id.* at 468.

### 2. The legal standard required to obtain discovery on a selective law enforcement claim is less rigorous than that required for a selective prosecution claim.

Mr. Baptiste is advancing Equal Protection challenges to selective law enforcement and selective prosecution. As discussed below, an Equal Protection Challenge to selective law enforcement involves an even less rigorous standard to obtain discovery.

While federal courts have recognized that the "presumption of regularity" applies to prosecutors, that same presumption is not afforded to law enforcement agencies. *Armstrong*, 517 U.S. at 464.

In the context of fictitious stash house robbery cases conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") between 2006 to present, the ATF employed undercover agents or confidential sources to "identify persons and infiltrate groups that . . . focus their criminal activities on executing robberies, by means of force, for personal gain." *Investigation: ATF drug stings targeted minorities*, USA Today, July 20, 2014 (USA Today Investigation) (quoting Melvin King, ATF

Deputy Assistant Director for Field Operations), http://www.usatoday.com/story/news/nation/2014/07/20/atfstash-house-stings-racial-profiling/12800195/. As an investigation by USA Today reported, "the nation's top gun enforcement agency overwhelmingly targeted racial and ethnic minorities as it expanded its use of controversial drug sting operations . . . At least 91% of the people agents have locked up using those stings were racial or ethnic minorities." *Id.*

The fictitious sting was virtually the same every time. *See, e.g. United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014) (observing that the ATF "has a standard playbook" for its Stash House Operations; "the facts between cases are frequently nearly identical"). The ATF undercover agent or confidential informant offers a target an attractive opportunity to rob a stash house that contains large quantities of drugs worth thousands of dollars. *See* Eda Katharine Tinto, UNDERCOVER POLICING, OVERSTATED CULPABILITY, 34 Cardozo L. Rev. 1401, 1446–47 (2013). The stash house, of course, is fictitious, and when the targets gather to "hit" the house, the agents arrest them. *Id.*

The ATF's Stash House Operation is a wholly fictitious crime created, managed, and orchestrated by the ATF for the ostensible purpose of "identifying persons and infiltrating groups that . . . focus their criminal activities on executing robberies, by means of force, for personal gain." Brad Heath, Investigation: ATF Drug Stings Targeted Minorities, USA Today, July 20, 2014, http://www.usatoday.com/story/news/nation/2014/07/20/atfstash-house-stings-racial-profiling/12800195/ (quoting ATF guidelines 3250.1B.12.a(1) and 3250.1A.52). The

investigation by USA Today found that these stings target racial or ethnic minorities at a "rate . . . far higher than among people arrested for big-city violent crimes, or for other federal robbery, drug and gun offenses." *Id.* (quoting Melvin King, ATF Deputy Assistant Director for Field Operations). Notably, this type of ATF operation – where agents are creating, rather than investigating crime – "raises particular concerns because they seek to enlist suspected criminals in new crimes rather than merely solving old ones, giving agents and their underworld informants unusually wide latitude to select who will be targeted." *Id.*

Indeed, the Seventh Circuit pointedly observed that "[a]gents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior . . . . [T]he sort of considerations [about prosecutors] that led to the outcome in *Armstrong* do not apply to a contention that *agents of the FBI or ATF* engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution." *United States v. Davis*, 793 F.3d 712, 720–21 (7th Cir. 2015). Federal courts, therefore, apply a greater degree of scrutiny to the criteria employed by law enforcement in the selection of targets for investigation and arrest. The legal threshold for production of discovery into their investigative techniques, targeting methods and criteria, and instructions to confidential sources is lower than that required to peek behind the curtain of prosecutorial charging decisions.

    **3. A selective law enforcement claim is cognizable; the less stringent threshold for discovery has been met to permit Mr. Baptiste to analyze the merits and present the merits of his substantive claim; and the remedy, if his substantive claim is proven, is dismissal.**

The "Constitution prohibits selective enforcement based on considerations such as race . . . . [T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause . . . ." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1996) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of justice is still within the prohibition of the constitution."); *see also Armstrong*, 517 U.S. at 464 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962) (the decision to prosecute, like the decision to investigate or arrest, may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification.").

Racially or religiously selective action by law enforcement "inflicts . . . substantial injury on the victim and society: in addition to violating the victim's rights to equality and liberty, such discriminatory conduct impugns the integrity of the criminal justice system and compromises public confidence therein." *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1055, 159 (N.D. Cal. 2016) (granting discovery in support of racially selective law enforcement and prosecution Equal Protection challenges and recognizing dismissal as "the proper remedy" if movant succeeded on merits of underlying selective enforcement and prosecution challenges).

Every federal circuit that has addressed a motion to dismiss for selective enforcement has addressed the merits of the claim—and all have held that dismissal

10

is the proper remedy. *See, e.g., United States v. Washington*, 869 F.3d 193, 223 (2017) ("If discovery is granted, and if it leads to a successful selective enforcement claim, then [the defendant's] constitutional rights can be vindicated . . . by striking the indictment in whole or in part."); *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (en banc) ("If the [law enforcement] agencies do [discriminate], they have violated the Constitution – and the fact that the United States Attorney may have prosecuted every case the agencies presented, or chosen 25% of them in a race-blind lottery, would not matter, since the constitutional problem would have preceded the prosecutor's role and could not be eliminated by the fact that things didn't get worse at a later step."); *United States v. Alcarez-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (noting that appellate review of district court's denial of motion to dismiss indictment due to selective prosecution was for abuse of discretion and decision about discovery was under clearly erroneous standard); *Gibson v. Superintendent of New Jersey Dep't of Law & Pub. Safety – Div. of State Police*, 411 F.3d 427, 441 (3d Cir. 2005) (Black male arrestee, whose subsequent conviction on drug charges was vacated due to alleged racial profiling, brought civil rights action; "[I]f a person can demonstrate that he was subjected to selective enforcement in violation of his Equal Protection rights, his conviction will be invalid."); *Mumphrey*, 193 F. Supp. 3d at 1055 (concluding that dismissal of indictment is proper remedy for selective enforcement claim, if proven).

   **4. Courts have granted discovery in cases presenting similar or weaker evidence of selective law enforcement than that presented in this case.**

There is precedent for issuance of discovery orders on this issue, even in cases lacking the strength of evidence that Mr. Baptiste has set forth in this Motion. Courts in the Third, Seventh, Ninth, and Tenth Circuits have granted motions for discovery in support of selective law enforcement and prosecution claims so that defendants could access evidence exclusively within the purview of the government.

Last year, in *United States v. Washington*, the Third Circuit issued a remand for the district court to reconsider a discovery motion based on an anticipated claim of selective enforcement and prosecution. 869 F.3d 193 (3d Cir. 2017). The district court had denied the defendant's pretrial discovery motion, finding that the defendant had not met his evidentiary burden under *Armstrong* and *Bass*—that is, that he had not presented "some evidence" of discriminatory effect and intent. *Id.* at 214–15 (citing *Armstrong*, 517 U.S. at 469 and *United States v. Bass*, 536 U.S. 862, 863 (2002)). But as the appellate court explained, for claims of selective enforcement, a lesser burden than *Armstrong*'s must apply. While defendants must still proffer "'some evidence' of discriminatory effect," the Court held that "a defendant need not, at the initial stage, provide 'some evidence' of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement." *Id.* at 221. On such a showing, the district court may then conduct "limited inquiries" to "determine whether there was reason to believe that race played a role in the investigation." *Id.* at 221, 218. "If the inquiry gave the

district court reason to believe that similarly situated persons would not have been pursued by law enforcement, in camera disclosure of targeting criteria might be called for. If the trail of breadcrumbs continued, additional targeted inquiries might be justified; and if the obtained information crossed the *Armstrong/Bass* threshold, the discovery could be 'extended to the prosecutor's office.'" *Id.* at 218 (citing *Davis*, 793 F.3d at 722–23).

And just three months ago in *United States v. Sellers*, the Ninth Circuit followed suit. 906 F.3d 848 (9th Cir. 2018). Like the appellate courts in *Davis* and *Washington*, the Ninth Circuit held that "claims of selective enforcement are governed by a less rigorous standard than that applied to claims of selective prosecution under" *Armstrong. Id.* at 850. Thus, in a selective enforcement claim, "a defendant must have *something* more than mere speculation to be entitled to discovery," but "what that *something* looks like will vary from case to case." *Id.* at 855. Other district courts in the Ninth Circuit had already reached the same conclusion and ordered discovery accordingly. *See, e.g., United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1063, 1065 (N.D. Cal. 2016) (ordering discovery based on a statistical showing that was "probative of discriminatory intent," and finding that "[c]ontrary to what the government suggests," "just because a supervisory DEA agent was not aware of any racism is hardly enough to say that there was no race-based selective enforcement claim" because "the supervisory DEA agents do not describe how targeting decisions were actually made in the field").

Meanwhile, within the Seventh Circuit, district courts have applied a similar analysis and reached a similar result of ordering discovery. To begin with, in *United States v. Paxton*, the district court recognized that "there is no defined pool of individuals who are charged and subsequently prosecuted differently to whom defendants may compare themselves" and "[b]ecause the analogous crime of 'phony stash house ripoffs' is wholly dependent on the involvement of the ATF, defendants cannot generate information about similarly situated Caucasian individuals." Case No. 13-CR-103-RWG, 2014 WL 1648746, at *1, *5 (N.D. Ill. Apr. 17, 2014). The district court found that the defendants' statistical data that "involved undercover operations by ATF agents in circumstances largely similar to the instant case," "appear[ed] to be reliable because they are corroborated, in part, by the lists of cases provided by the government, and there is no assertion that the information collected by defendants as to race is inaccurate." *Id.* at *5. It then granted defendants' motion for discovery on the basis that the data was sufficient to show both discriminatory effect and intent, "because 'the inexorable zero' may be evidence of discriminatory intent." *Id.* at *5-6 (quoting at *5-6 (quoting *Yick Wo*, 118 U.S. at 373-74).

In *United States v. Brown*, the district court granted the defendant's motion to compel discovery because "the defendants have made a strong showing of potential bias in the history of the prosecution of so called 'phony drug stash house rip off cases'" by "identif[ying] 17 phony stash house rip off cases," which "show[s] that the overwhelming targets of those investigations were African Americans." Case No. 1:12-CR-00632-RC, DE 153 (Order Compelling Discovery) at 1 (N.D. Ill. July 31,

2013) (noting that "since 2011, 19 African Americans and 7 Latino defendants have been charged in these cases" and "[a]ccording to the defense, none of the defendants during this time period, were non-minorities"). In so doing, it noted the tension between "the limited nature of judicial review of executive department decisions" and "history [which] has shown a continuing difficult intersection between the issue of race and the enforcement of our nation's criminal laws." *Id.* at 1. It then ordered the government to provide to the defense: (1) "[a] list by case name, number and race of each defendant of all phony stash house rip off cases brought by the U.S. Attorney's Office in this district from 2006 to present;" (2) [a]ll documents containing instructions given from 2006 to the present by any supervisors employed by the U.S. Attorney for the Northern District of Illinois about the responsibilities of AUSA's to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which Bureau of Alcohol, Tobacco and Firearms ("ATF") was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendants' race, color, ancestry or national origin;" and (3) "[a]ny document prepared by the ATF which summarizes how to investigate and prosecute phony stash house rip off cases, including any guidelines for selecting appropriate targets for these cases including but not limited to the Home Invasion Operations Bulletin referenced in USA Today." *Id.* at 2.

That district court subsequently not only denied the government's motion for reconsideration of the discovery order, but ordered additional discovery in the form of "all racial and ethnic data which relates to the use of confidential informants by the ATF from 2006 to the present" because it "concluded that such information is necessary to make a full determination of discriminatory intent in this case." DE 171 (Order Denying Government's Motion for Reconsideration and Compelling Additional Discovery) at 1-2 (N.D. Ill. Nov. 8, 2013).

A year later, that same district court granted defendant's motion, over government objection, for additional discovery related to the confidential informants used in those cases by the ATF. DE 261 (Order Compelling Additional Discovery Regarding Confidential Informants) at 12. It ordered the government to produce additional discovery in the form of: (1) "[w]hether the ATF agents made an attempt to verify the confidential informant's claim that Defendant Jones told the confidential informant that he and others were looking for a location where drugs were stored to conduct a robbery;" (2) "[w]hat, if anything, the confidential informant was told about the criteria being used to target individuals for participation in the sting;" (3) "[w]hat training, if any, the confidential informant was given regarding the information he should seek and what he should convey to a potential target;" (4) "[w]hat, if anything, the confidential informant was told regarding what he should say to a potential target who indicated that he wanted to commit a robbery;" (5) "[i]nformation regarding why the confidential informant was de-activated as an informant;" and (6) "[a]ny report or other document authored by an ATF employee pertaining to the investigation in this

case and describing or detailing a lack of compliance with ATF protocols in effect at the time of the investigation." *Id.* It ordered as such because "[a] significant failure by the agents to follow protocols in connection with the stings could suggest an improper purpose in targeting Defendants." *Id.* at 11.

In *United States v. Williams*, the chief district judge (the identical judge as in *Brown*) granted defendants' request and ordered the same initial production by the government as in *Brown* above. 1:12-CR-00887-RC, DE 70 (Order Compelling Discovery) at 2. For expediency's sake, the court then consolidated the matters and, in doing so, ordered the same two additional discovery disclosures as it had in *Brown*. *See Brown*, DE 261 (Order Compelling Additional Discovery Regarding Confidential Informants) at 1, 13 (noting that defendants in *Williams* "have joined the present motions" in *Brown* and introductory sentence of order explaining that its order applied to *Brown* and *Williams*).

Following the lead of the chief district judge in *Brown* and *Williams*, another judge in that identical judicial district granted defendants' motion for discovery "to the same extent [Chief] Judge Castillo granted a similar motion." *See United States v. Elias*, Case No. 1:13-CR-00476-HDL, DE 272 (Minute Entry Granting In Part Subsequent Motion for Discovery) at 1 (N.D. Ill. Dec. 4, 2014); *see also* DE 189 (Minute Entry granting defendants' initial motion for discovery "[f]or the reasons stated in open court.").

Yet another judge in that identical judicial district granted defendants' motion for discovery and "direct[ed] the government to provide to the defense in this case the

additional discovery that Chief Judge Castillo ordered the government to produce to the defense in U.S. v. Antonio Williams, 12 CR 887." *See United States v. Jackson*, Case No. 1:13-CR-00636-, DE 114 (Minute Entry Granting Motion for Discovery) at 1 (N.D. Ill. Feb. 5, 2015); *see also* DE 58 (Minute Entry granting defendants' initial motion for discovery).

The Seventh Circuit, sitting en banc, endorsed and affirmed a decision of one district court below in ordering the government to produce discovery related to the ATF's stash house selection criteria when that defendant relied exclusively on statistical evidence to make a *prima facie* showing of racially selective law enforcement. *See United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc). In so doing, the en banc Seventh Circuit reiterated that "agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior" because their credibility—that is, how they enforce the laws—are subject to discovery as agents are likely to testify in the cases which they take part in. *Id.* at 721. It further admonished that "[t]he racial disproportion in stash-house prosecutions remains troubling . . . and it is a legitimate reason for discovery . . . ." *Id.* at 722. Indeed, the en banc Seventh Circuit declined to review, on jurisdictional grounds, the district court's order granting discovery where "[a]n examination of the limited information available to the Defendants indicates that since 2006, the prosecution in this District has brought at least twenty purported phony stash house cases, with the overwhelming majority of the defendants named being individuals of color." *Id.* at 725.

Finally, within the Tenth Circuit, in *United States v. Casanova*, the district court granted the defense's request for discovery because "the statistical evidence provided by Defendant constitutes reliable demographic information demonstrating that the operation resulted in a much higher percentage of Black defendants than the usual rate of occurrence, in the District of New Mexico, of drug and firearm arrests among that group" and "the methods used by ATF in conducting this operation were likely to lead to a higher percentage of minority defendants, but that ATF declined to make use of any policies or training designed to counteract that effect." Case No. 1:16-cr-02917-JAP, DE 57 at 4 (D.N.M. 2017). The defense proffered statistics that demonstrated that "twenty-six percent of the defendants arrested as a result of this ATF operation were Black, although Black Americans represent only 3.4 percent of the population of Albuquerque and, in the District of New Mexico, generally comprise approximately 5.4 percent of the defendants in drug cases and 5.9 percent of the defendants in firearms cases." *Id.* at 2.

### 5. The defense has presented "some evidence tending to show" each element of a selective law enforcement claim.

Mr. Baptiste has surpassed his legal burden of presenting "some evidence tending to show" discriminatory effect and discriminatory intent to merit discovery on the issue of selective law enforcement for the reasons that follow.

### a. Nationwide and International Criticism of the FBI's Fictitious Terrorism Stings

Similar to the ATF's fictitious drug stash house stings the FBI has shifted its focus to proactively initiate the ensnarement of Americans suspected of backing ISIS.

*See The FBI is 'Manufacturing Terrorism Cases' on a Greater Scale than Ever Before*, Business Insider, June 9, 2016, http://www.businessinsider.com/fbi-is-manufacturing-terrorism-cases-2016-6. According to the FBI, "law enforcement officials cannot afford to wait for a terrorist plot to mature before they break it up." David J. Gottfried, J.D., FBI, Avoiding Entrapment Defense in a Post-9/11 World (Jan. 2012), https://leb.fbi.gov/2012/january/avoiding-the-entrapment-defense-in-a-post-9-11-world. In the terrorism context, the FBI has instructed law enforcement to, "in a controlled manner, divert someone determined to harm the United States and its people into a plot bound to fail from the outset, instead of one that might succeed." *Id.*

In July 2014, the Human Rights Watch, in conjunction with Columbia Law School's Human Rights Institute, published a study that shed light on the FBI's use of informants and undercover agents to incite and entrap individuals into plots to potentially aid terror organizations like ISIS. *See* Human Rights Watch, Illusion of Justice: Human Rights Abuses in U.S. Terrorism Prosecutions (2014), *available at* https://www.hrw.org/sites/default/files/reports/usterrorism0714_ForUpload_1_0.pdf (hereinafter "Human Rights Watch Report"). It closely reviewed twenty-seven (27) federal prosecutions that involved seventy-seven (77) total defendants by examining publicly-available court documents recovered from public databases or defense counsel records, as well as conducting personal interviews with forty-two (42) of the seventy-seven (77) defendants. Human Rights Watch Report at 1-2. What it found was that in those cases, "the informants and agents often seemed to choose targets

based on their religious or political beliefs. They often chose targets who were particularly vulnerable—whether because of mental disability, or because they were indigent and needed money that the government offered them." *Id.* at 22; *see, e.g., United States v. Siraj*, 468 F. Supp. 2d 408, 415-16 (E.D.N.Y. 2007) (where, at the FBI's direction, the informant discussed the war in Iraq and inflamed the defendant's anger against the United States and its treatment of Muslims by showing defendant photos of the prisoners at Abu Ghraib); *United States v. Cromitie*, No. 7:09-cr-0558-CM-1 (S.D.N.Y July 8, 2011), *aff'd*, 727 F.3d 194, 199-204 (2d Cir. 2013) (FBI paid confidential informant's goal was to "locate disaffected Muslims who might be harboring terrorist designs on the United States" thus began "attending services at a mosque in Newburgh at the direction of the FBI" from which he "cultivated a friendship" with defendant, who was "an impoverished man" previously diagnosed as schizophrenic by several doctors over the last 10 years).

In addition to selectively choosing targets based on religion and vulnerability, the Human Rights Institute found that in the cases it reviewed, "the FBI frequently used informants with criminal records who were known to be unreliable witnesses who engaged in highly questionable tactics." Human Rights Watch Report at 54. As noted in a University of Pennsylvania Law Review publication, these informants are "frequently pressured into the role and pushed to secure results," and may not realize how fine the line between clever expedients and implantation is in the context of material support to terrorism. Jon Sherman, A PERSON OTHERWISE INNOCENT: POLICING ENTRAPMENT IN PREVENTATIVE, UNDERCOVER COUNTERTERRORISM

INVESTIGATIONS, 11:5 U. Pa. L. Rev. 1475, 1487. The most notable example is Shahed Hussain, an informant for the Newburgh Four and Yassin Aref cases, who admitted in court that by the time he was recruited by the FBI he had committed no fewer than fifty (50) fraud scams. Human Rights Watch Report at 55.

### b. The racial and religious composition of Miami, the Southern District of Florida, and the United States.

As of the 2010 census, the city of Miami had 399,457 residents. Of those residents, 30.0% were White (non-Hispanic or non-Latino), 19.2% were African-American (non-Hispanic or non-Latino), and 70.0% were Hispanic or Latino. United States Census Bureau, Community Facts – Miami, Florida, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml. According to the Census Bureau's estimates for July 1, 2017, Miami has seen a population increase from 2010 to a new total of 463,347 residents.

A total of 6,340,305 people lived in the counties comprising the Southern District of Florida as of the 2010 census.[2] Of those residents, 39.13% were White

---

2. The total population for the Southern District of Florida was calculated by adding together the 2010 census data figures for the nine counties comprising the Southern District–Broward, Highlands, Indian River, Martin, Miami-Dade, Monroe, Okeechobee, Palm Beach, and St. Lucie. *See* United States Census Bureau, Quick Facts – Broward County, Florida, https://www.census.gov/quickfacts/fact/table/browardcountyflorida/PST045216; United States Census Bureau, Quick Facts – Highlands County, Florida, https://www.census.gov/quickfacts/fact/table/highlandscountyflorida/PST045216; United States Census Bureau, Quick Facts – Indian River County, Florida, https://www.census.gov/quickfacts/fact/table/indianrivercountyflorida/PST045216; United States Census Bureau, Quick Facts – Martin County, Florida, https://www.census.gov/quickfacts/fact/table/martincountyflorida/PST045216; United States Census Bureau, Quick Facts – Miami-Dade County, Florida, https://www.census.gov/quickfacts/fact/table/miamidadecountyflorida/PST045216; United States Census Bureau, Quick Facts – Monroe County, Florida, https://www.census.gov/quickfacts/fact/table/monroecountyflorida/PST045216; United States Census Bureau, Quick Facts – Okeechobee County, Florida, https://www.census.gov/quickfacts/fact/table/okeechobeecountyflorida/PST045216; United States

(non-Hispanic or non-Latino), 19.83% were African-American (non-Hispanic or non-Latino), and 38.40% were Hispanic or Latino.[3] The population of the Southern District of Florida swelled to 6,903,466 residents according to the Census Bureau's estimates for July 1, 2016.[4]

As of the 2010 census, 18,801,310 people lived in the state of Florida. United States Census Bureau, Quick Facts – Florida https://www.census.gov/quickfacts/FL. Of those residents, 77.4% were white (non-Hispanic or non-Latino), 16.9% were African-American (non-Hispanic or non-Latino), and 25.6% were Hispanic or Latino. According to the Census Bureau's estimates for July 1, 2018, 21,299,325 people lived in the state of Florida.

In the United States nationwide, as of the 2010 census, 63.7% were White (non-Hispanic or non-Latino), 12.6% were Black (non-Hispanic or non-Latino), and 16.3% were Hispanic or Latino. United States Census Bureau, 2010 Census Briefs, The White Population: 2010    3 at Table 1 (Sept. 2011), *available at* https://www.census.gov/prod/cen2010/briefs/c2010br-05.pdf; United States Census

---

Census Bureau, Quick Facts – Palm Beach County, Florida, https://www.census.gov/quickfacts/fact/table/palmbeachcountyflorida/PST045216; United States Census Bureau, Quick Facts – St. Lucie County, Florida, https://www.census.gov/quickfacts/fact/table/stluciecountyflorida/PST045216.

3. The percentage of each major racial category out of the total number of residents of the Southern District of Florida was calculated by taking the 2010 census data for each of the nine counties in the Southern District, multiplying those population totals by the percentage of each major racial category to arrive at an approximate number of residents of each major racial category in each county, adding those populations together and dividing by the total population of the Southern District of Florida, referred to *supra*. *See id.*

4. The total estimated population for the Southern District of Florida was calculated by adding together the July 1, 2016 census estimates for the nine counties comprising the Southern District– Broward, Highlands, Indian River, Martin, Miami-Dade, Monroe, Okeechobee, Palm Beach, and St. Lucie. *See id.*

Bureau, 2010 Census Briefs, <u>The Black Population: 2010</u>  3 at Table 1 (Sept. 2011), *available at* <u>https://www.census.gov/prod/cen2010/briefs/c2010br-06.pdf</u>;  United States Census Bureau, 2010 Census Briefs, <u>The Hispanic Population: 2010</u>  3 at Table 1 (Sept. 2011), *available at* <u>https://www.census.gov/prod/cen2010/briefs/c2010br-04.pdf</u>.

The 2010 census did not specifically measure religion, but the federal census bureau links to a 2008 study conducted by the American Religious Identification Survey ("ARIS") that replicated a 2001 and 1990 survey based on random-digit-dialing telephone surveys of residential households in the continental United States (48 states), in which respondents were asked to describe themselves in terms of religion with open-ended questions.  In the 2008 survey, 0.6 % self-identified as Muslim.  Barry A. Kosmin & Ariela Keysar, American Religious Identification Survey (ARIS 2008) Summary Report 5 Table 3 (Self-Identification of U.S. Adult Population by Religious Tradition 1990, 2001, 2008) (March 2009), *available at* <u>http://commons.trincoll.edu/aris/files/2011/08/ARIS_Report_2008.pdf</u>.

In 2010, the Association of Statisticians of American Religious Bodies ("ASARB"), conducted a study measuring religious entities in the United States, which provided county-by-county information on congregations, members, adherents, and attendance for 236 different faith groups, as the survey differentiated between specific denominations within the same tradition. ASARB, U.S. Religion Census 1952 to 2010, 2010 Ranking by Individual Religious Group (Muslim Estimate) by State,

*available at* http://www.rcms2010.org/compare.php. Florida has the seventh[5] highest population of Islamic adherents, as measured at 877 per 100,000. *Id.*

### c. The Estimated Universe of Federal Material Support Prosecutions Under 18 U.S.C. §§ 2339A and 2339B

Much like defense counsel in the fictitious stash house robbery cases, Mr. Baptiste has attempted to estimate the number of cases involving the federal charges alleged against him and to discern the race (and religion) of other defendants who have been so charged. Using publicly-available CM/ECF and Pacer information, news articles, and internet searches, Mr. Baptiste has been able to summarize the publicly available information on material support prosecutions in the Southern District of Florida involving 18 U.S.C. §§ 2339A and 2339B. *See* Ex. A Attached hereto.

As the Court can see from a plain reading of Exhibit A, of the 53 cases that involve a § 2339A or § 2339B charge, almost all (37) were brought against people of color, with approximately 50% of these prosecutions being brought against Black defendants (14). *See id.* Only Four (4) defendants were identified as non-Hispanic, non-Latino White defendants. To be sure, there were six (6) cases in which the race of the defendant could not be discerned based upon publicly available information so it is unclear whether the race of those individuals would contribute to or lessen the

---

5. The other states ranked in descending order of Islam adherents per 100,000 are: Illinois (2,800); Virginia (2,663); New York (2,028); New Jersey (1,827); Texas (1,678); Michigan (1,218); Delaware (793); California (732); District of Columbia (670); Pennsylvania (634); Maryland (632); Georgia (543); Connecticut (375); Nebraska (337); Colorado (333); Massachusetts (332); Minnesota (317); Ohio (290); Washington (284); North Carolina (273); Kansas (271); Wisconsin (259); Kentucky (256); Tennessee (242); Indiana (225); Louisiana (216); Alabama (215); Iowa (214); New Mexico (200); Oklahoma (197); Missouri (195); Utah (181); Mississippi (169); South Dakota (164); Rhode Island (137); Arizona (134); Alaska (130); Arkansas (128); Wyoming (127); South Carolina (125); New Hampshire (123); Idaho (110); Oregon (104); West Virginia (103); Maine (100); North Dakota (95); Nevada (48); Vermont (48); Hawaii (45); and Montana (34).

disparity. *See id.* Nonetheless, this does not change the fact that the statistics involving Black and non-Black other minorities are striking. *Id.*

Likewise, material support charges have been brought against Muslims in this District at a rate far disproportionate to their share in the general population. As the data show, 32 of the 53 material support cases in this District have been brought against people who identify as Muslim—almost 60%.

These stark statistics on the combined racial and religious makeup of the defendants targeted and prosecuted in these material support cases, by themselves, justify Mr. Baptiste's discovery request, as they are impossible to attribute to chance and constitute evidence of both discriminatory effect and intent.

### d. Discovery Sought in Mr. Baptiste's Case.

The defense now seeks discovery to analyze the troubling likelihood that the FBI and the USAO unconstitutionally targeted and prosecuted defendants in these undercover material support stings nationwide.

In order for any expert that the defense would hire to construct an appropriate similarly situated comparison group for the discrimination argument and to perform the legally required comparison of the two groups, it is necessary to understand whether and to what extent Mr. Baptiste meets the government's purported selection criteria for investigation and prosecution.

As a threshold matter, however, the government's purported selection criteria for investigation and prosecution is wholly and exclusively within the government's purview. Based upon the defense's attempt to summarize the universe of material

support cases, it does not appear that the government's purported selection criteria are, in fact, the actual methods by which they select targets. Indeed, the ultimate motion to dismiss will argue that the intersection of race and religion is involved in selecting targets for investigation by confidential informants, and that many of the purported criteria are mere pretext. However, to make that showing the defense must rebut the government's claims, and the only way to do that is to obtain discovery about them. Accordingly, the defense uses the term "selection criteria" as a term of art throughout, without conceding that the government's purported criteria are, in fact, the actual criteria employed.

Mr. Baptiste has been able to cobble together a preliminary universe of all defendants charged under the federal material support statutes, 18 U.S.C. §§ 2339A and 2239B, from publicly available information on CM/ECF to reports from various organizations. However, he cannot be sure that he has listed all of them or whether the race/ethnicity data is correct as in many cases it is not publicly available. Furthermore, Mr. Baptiste does not have access to the FBI's selection criteria, much less whether or to what extent the universe of defendants fulfill the FBI's selection criteria. To compile the data necessary for any expert to perform a statistical comparison, Mr. Baptiste needs additional information about the universe of defendants charged under the material support statute both nationwide, by district, and in this judicial district. These data are essential to understanding how the universe of material support defendants fulfill (or do not fulfill) the FBI's selection criteria, as well as to constructing an appropriate comparison group.

Without this information, it will be impossible for any expert to ensure that the comparison group is in fact "similarly situated" to Mr. Baptiste and the material support defendants—*i.e.,* to be sure we are comparing apples to apples, not apples to oranges. The requested discovery is thus necessary for any expert to perform the similarly situated analysis for the motion to dismiss, including constructing an appropriate comparison group. The information sought is solely and exclusively in the possession and control of the government and will not be unduly burdensome to produce.

Similar to the court-ordered discovery in the fictitious drug stash house robbery cases, Mr. Baptiste seeks information on the FBI's selection criteria, to what extent he, other material support defendants, and the similarly situated comparator group fulfill that criteria, what screening the FBI employed to ensure that its informants or agents did not harbor explicit or implicit bias, what training the FBI provided to its agents and informants to protect against explicit or implicit racial bias, what safeguards the FBI instituted to ensure its agents and informants were operating within the protocols and procedures of authorized activity, whether those protocols were followed in Mr. Baptiste's case as well as in the cases of other material support defendants and the similarly situated comparator group.

Any concerns about publishing sensitive law enforcement investigative techniques can be mitigated by a protective order. Accordingly, Mr. Baptiste respectfully requests that this Court order the government to disclose the following information, which is based wholly on the discovery ordered in the fictitious drug

stash cases but modified to reflect Mr. Baptiste's charges, the investigative agency

involved, and the need for nationwide data since 2001 given the small sample size of

material support cases.

(1) A list by case name, number, and race of each defendant of all material support cases brought by the U.S. Attorney's Office in this district and nationwide from 2001 to present;

(2) All documents containing instructions given from 2001 to the present by any supervisors employed by the U.S. Attorney for the Southern District of Florida about the responsibilities of AUSA's to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Southern District of Florida have not been targeted due to their race, color, ancestry, or national origin and specifically that those persons who are defendants in material support cases in which the Federal Bureau of Investigation was the investigatory agency have not been targeted due to their race, color, ancestry, or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendants' race, color, ancestry, or national origin;

(3) Any document prepared by the FBI which summarizes how to investigate and prosecute material support cases, including any guidelines for selecting appropriate confidential informants as well as targets for these cases;

(4) All racial and ethnic data which relates to the use of confidential informants by the FBI from 2001 to the present;

(5) What, if anything, the confidential informants(s) or UCE(s) in this case was/were told about the criteria being used to target individuals;

(6) What training, if any, the confidential informant(s) or UCE(s) was/were given regarding the information he/she should seek and what he/she should convey to a potential target;

(7) What, if anything, the confidential informant(s) or UCE(s) was/were told regarding what he should say to a potential target who indicated that he wanted to provide material support to ISIS;

(8) Information regarding whether the confidential informant or UCE(s) was ever de-activated as an informant or prosecution was declined;

(9) Any report or other document authored by an FBI or USAO or DOJ employee pertaining to the investigation in this case and describing or detailing a lack of compliance with FBI, USAO, or DOJ protocols in effect at the time of the investigation.

*Brown*, Case No. 1:12-CR-00632-RC, DE 153 at 1-2, DE 171 at 1-2 (district court stating it had "concluded that such information is necessary to make a full determination of discriminatory intent in this case."), DE 161 at 11-12 (ordering additional discovery because "[a] significant failure by the agents to follow protocols in connection with the stings could suggest an improper purpose in targeting Defendants."); *accord Batson v. Kentucky*, 476 U.S. 79, 93 (1986) (holding that discriminatory intent can be demonstrated by either direct or circumstantial evidence); *Castaneda v. Partida*, 430 U.S. 482, 494 (striking down Texas's highly discretionary grand jury venire process under the Equal Protection Clause becauase "a selection procedure that is susceptible to abuse . . . supports the presumption of discrimination raised by [a] statistical showing."); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("The specific sequence of events leading up [to] the challenged decision also may shed some light on the decisionmaker's purposes . . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

## CONCLUSION

Undercover stings may well be a valid law enforcement technique, but they must be deployed, and their alleged participants prosecuted, in conformance with the Constitution.

Mr. Baptiste seeks to vindicate these principles, has amply satisfied his burden, and has presented "some evidence tending to show" that law enforcement and prosecution's actions in this sting ran afoul of Constitutional Equal Protection principles. At a minimum, Mr. Baptiste has surpassed the less stringent legal threshold necessary to warrant an order to compel discovery to further analyze this most pressing issue. Wherefore, Mr. Baptiste requests that this Court order the disclosure of the above-listed items pertaining to the issues of selective law enforcement and prosecution.

Counsel for the government opposes the relief sought in this motion.

Respectfully submitted,

THE MALONE LAW FIRM, P.A.
701 BRICKELL AVENUE, SUITE 1550
MIAMI, FLORIDA 33131
Telephone: (305)728-5134
Facsimile: (305)728-5288
Email: omar@malonelawfirm.com

By: _____ /S/_____
T. OMAR MALONE, ESQ.
Florida Bar No.: 697796

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record this 27th day of August 2019.

By: _____ /S/_____
T. OMAR MALONE, ESQ.

31