UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-20613-CR-MARTINEZ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

SAMUEL BAPTISTE,

      Defendant.

_____/

## MOTION TO DISMISS INDICTMENT FOR PRE-INDICTMENT DELAY

Samuel Baptiste, through undersigned counsel, moves this Court for an order dismissing the above-captioned indictment based on the government's pre-indictment delay, and in support states:

### MEMORANDUM OF LAW

**I.**    **Constitutional Grounds to Dismiss: the Supreme Court's two-part test for pre-indictment delay as articulated in *Marion* and elaborated upon in *Lovasco*.**

Though the ceiling on pre-indictment delay is "usually set by the statute of limitations," *United States v. Foxman*, 87 F.3d 1220, 1222 (11th Cir. 1996), the limitations period "does not fully define [a defendant's] rights." *See United States v. Marion*, 404 U.S. 307, 324–25 (1971). As the Supreme Court established almost half a century ago in *Marion*, the Due Process Clause of the Fifth Amendment provides an additional layer of protection for defendants facing punishment after an inordinate "passage of time between crime and arrest or charge," *id.* at 322, and this constitutional check can result in dismissal of charges even when the indictment is

brought within the limitations period.

Under *Marion*, pre-indictment delay violates due process—and requires dismissal under the Fifth Amendment—if: (1) "the pre-indictment delay . . . caused substantial prejudice to the [defendant's] rights to a fair trial," and (2) "the delay was an intentional device to gain tactical advantage over the accused." *Id.* at 324.

Six years later, in *United States v. Lovasco*, the Supreme Court again considered the due process implications of pre-indictment delay, and it elaborated on these two prongs. 431 U.S. 783, 788 (1977). First, the Court clarified that "proof of prejudice is generally a necessary but not sufficient element of a due process claim." *Id.* at 790. Second, the Court explained that "the due process inquiry must consider the reasons for the delay." *Id.* When the reasons for the delay do not deviate from "elementary standards of fair play and decency," *id.* at 795—such as, for example, when pre-indictment delay follows a "good faith," reasonable investigation—due process has not been violated. *Stoner v. Graddick*, 751 F.2d 1535, 1541 (11th Cir. 1985). However, when the delay has been "undertaken by the Government solely to gain tactical advantage over the accused," *id.*, or perhaps, as the Court cited the government's brief, when a "showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense," *id.* at 795 n.17, delay may require dismissal.

After *Marion* and *Lovasco*, the Eleventh Circuit articulated a similar constitutional standard. Under the law of this Circuit, the Due Process Clause of

the Fifth Amendment "requires dismissal of an indictment" for pre-indictment delay where: (1) the delay caused actual substantial prejudice to the defense; and (2) the delay was the product of deliberate action by the government designed to gain a tactical advantage. *See United States v. Foxman*, 87 F.3d 1220, 1222 (11th Cir. 1996); *United States v. Lindstrom*, 698 F.2d 1154, 1157–58 (11th Cir. 1983).

## A. Prejudice

A showing of substantial prejudice stemming from government-created delay in bringing formal charges is required for dismissal. *See Stoner*, 751 F.2d at 1541. While "the loss of alibi witnesses, the destruction of material evidence, and the blurring of memories"—that is, the ability to mount a strong defense at trial—may be one means by which a prospective defendant may be prejudiced by delays, *Marion*, 404 U.S. at 331 (Douglas, J., concurring), other courts within this Circuit have also looked to sentencing prejudice when analyzing whether a defendant has been prejudiced by pretrial delay. For example, in *United States v. Johnston*, 2013 WL 3777315 (M.D. Ala. 2013) (Thompson, J.), the district court found that "the loss of the option of a concurrent sentence" that resulted from a post-indictment delay in prosecution was sufficient to establish that the defendant had "suffered actual prejudice." *Id.* at *11.

In *Johnston*, the defendant was arrested after robbing a bank in Georgia; once in police custody, he admitted to having robbed another bank two months prior in Alabama. *Id.* at *1. The defendant was indicted by a grand jury in Alabama a few weeks after his arrest in Georgia, but he was not haled into court to be arraigned on

3

the Alabama charges for over two years. *Id.* at *2. In the meantime, the defendant pleaded guilty in Georgia and began serving his sentence for the Georgia robbery in federal prison. *Id.* By the time he was sentenced on the Alabama case, the defendant had "served all but nine months and 20 days of the Georgia sentence." *Id.* at *9.

The Court concluded that this two-year delay between indictment and arraignment for the Alabama robbery violated the defendant's rights under the Sixth Amendment's Speedy Trial Clause, *id.* at *11—which, like pre-indictment delay under the Fifth Amendment, requires a showing of "actual prejudice" to warrant dismissal. As the Court explained, the prejudice here was the effective denial of the defendant's right to ask for, or receive, a concurrent sentence for the Georgia and Alabama charges, as "district courts have no authority to order a retroactive concurrent sentence." *Id.* at *9 (citing 18 U.S.C. §§ 3585(a) & (b)). And the Court emphasized that this prejudice "was not merely hypothetical." *Id.* For this defendant, delay had resulted in the "irrevocable loss" of possible concurrent time, which he would have had a "strong likelihood" of receiving; to compensate, the defendant was put in the "daunting position" of asking for a dramatic downward variance from his guideline sentence, which the Court recognized to be the advisory "starting point" in its sentencing determination. *Id.* at *9–*10.

Thus, though the Court noted that it had "discretion to vary downward and compensate for the lost concurrent time," it nonetheless rejected that remedy, explaining that "discounting a term of years to compensate for governmental delay is

4

an inappropriate safeguard of constitutional rights." *Id.* at *10; *see also Strunk v. United States*, 412 U.S. 434, 438 (1973) (after finding speedy trial violation, rejecting possible remedy of crediting defendant's sentence to make up for period of unreasonable pretrial delay, and instead dismissing the indictment, because "severe remedies are not unique in the application of constitutional standards"). Further, as the Court explained, "concurrent sentencing is a wholly different sentencing mechanism from a downward variance"; "the length of a sentence reflects the court's appraisal of the severity of the crime committed," and varying downward to a "sentence of mere months" might improperly signal that the court had determined "that the crime was not serious." *Johnston*, 2013 WL 3777315, at *10. The Court ultimately determined that because it was "not the court's job to compensate for egregious governmental negligence and delay," the "loss of [the defendant's] right to ask for concurrent time" established actual prejudice. *Id.*

## B. Reason for the Delay

In addition to establishing prejudice, a defendant claiming unconstitutional pre-indictment delay must also show that the reason for the delay violates our "fundamental conceptions of justice." *Lovasco*, 431 U.S. at 790-91; *see also Marion*, 404 U.S. at 324. The Eleventh Circuit has interpreted this standard to require that the delay was the "product of a deliberate act by the government designed to gain a tactical advantage." *United States v. Foxman*, 87 F.3d 1220, 1223 (11th Cir. 1996); *see also United States v. Hayes*, 40 F.3d 362, 365 (11th Cir. 1994); *United States v.*

*Young*, 906 F.2d 615, 620 (11th Cir. 1990); *United States v. Benson*, 846 F.2d 1338, 1342–43 (11th Cir. 1988).

As the Eleventh Circuit set out in *Foxman*, delay resulting from "bad faith" government acts—that is, where the government has intentionally delayed indictment to cause the prejudice to the defendant that will flow from delay—clearly satisfies the test for "tactical advantage." *Foxman*, 87 F.3d at 1223, n.2. But bad faith in "the sense of a subjective sinister motive is not critical to a due process violation for preindictment delay." *Id.* at 1223, n.2. Instead, "[t]he critical element is that the government makes a judgment about how it can best proceed with litigation to gain an advantage over the defendant and, as a result of that judgment, an indictment is delayed. Then, the question becomes whether that delay caused the defendant actual substantial prejudice." *Id.* (explaining that "intentional government acts designed to obtain a tactical advantage which only *incidentally* cause delay have never been ruled out as a potential basis for due process violations") (emphasis in original)).

However, "not every delay which is the result of a need for further investigation gives rise to a due process violation." *Foxman*, 87 F.3d at 1223 n.2; *see Lovasco*, 431 U.S. at 796 ("[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."); *Hayes*, 40 F.3d at 365 (finding no due process violation where it was "undisputed that the investigation was ongoing" during the three-year pre-indictment delay). As the Supreme Court has explained, investigative delay is

unlike delay undertaken for tactical advantage because "investigative delay is not so one-sided." *Lovasco*, 431 U.S. at 795. This is because criminal investigation often involves interaction and coordination between many different officials, agencies, and potential witnesses. *See, e.g., United States v. Reme*, 738 F.2d 1156, 1163 (11th Cir. 1984) (nine-month investigative delay not unreasonable "in light of the complexity of the case," which involved "multiple defendants, most of whom went by nicknames," and 77 potential witnesses who "had been warned" by one of the defendants "not to tell the authorities anything"); *United States v. Lindstrom*, 698 F.2d 1154, 1158 (11th Cir. 1983) (no due process violation, despite three-year pre-indictment delay, in a "complex case involving numerous documents and records," where "two successive grand juries participated in the preindictment investigation," "[t]argets of investigation were afforded opportunities to appear before the grand jury and time to consider the offers," and the government needed to locate 199 potential witnesses). Yet the mere fact of an ongoing investigation will not immunize improper delay. As the Eleventh Circuit has explained, "where an investigation is itself delayed by the government for tactical reasons, the fact that an investigation was involved" does not bar a due process violation. *Foxman*, 87 F.3d 1223 n.2.

### C. Mr. Baptiste has satisfied the Supreme Court's two-part test, and dismissal of the indictment is warranted.

The record here supports a finding that (1) Mr. Baptiste's defense has been prejudiced by the almost 20-month delay between the Complaint and his arrest in 2016, and his second indictment in 2018; and (2) the government's delay in indicting Mr. Baptiste was not an accident or a mistake, or the product of excusable

investigative delay, but rather the result of deliberate action by the government designed to gain a tactical advantage. *Cf. Foxman*, 87 F.3d at 1123 n.2 (defining the government's "tactical advantage" as "judgment about how it can best proceed with litigation to gain an advantage over the defendant").

### 1. Background of Mr. Baptiste's case

These criminal proceedings against Mr. Baptiste began more than two years ago. On November 8, 2016, a Complaint was filed against Mr. Baptiste; he was arrested the next day. In the Complaint, FBI Agent Timothy Dietz set out that the FBI had initiated an investigation into Mr. Baptiste's online social media accounts in April 2014, and that it had been monitoring him since that time. Criminal Complaint, dated Nov. 8, 2016, 1:16-cr-20907-MGC (D.E. 1) ("Complaint"), at 2, ¶ 4. The Complaint alleged that during this period of monitoring, Mr. Baptiste "posted numerous online statements expressing his encouragement and approval of violent jihad, the killing of non-believers, and the perpetration of 'lone wolf' style attacks against Westerners for their perceived aggression against Muslims." Complaint at 5, ¶ 11. The Complaint also alleged that in October 2016, Mr. Baptiste "opened a new online communications platform" called "Jihadi Gear," where he posted images of weapons and reposted several instructional videos from YouTube dealing with weapon-making. *Id.* at 6–7, ¶ 18. In addition to those allegations, the Complaint also alleged that Mr. Baptiste possessed firearms on two separate occasions: once at a gun range on October 23, 2016, and once while visiting a shipping container with a friend on November 5, 2016. *Id.* at 5, ¶ 14 and 8, ¶ 23.

Following his arrest, Mr. Baptiste was indicted in December 2016 on one count of attempting to export firearms to Haiti, in violation of 18 U.S.C. § 554(a), and two counts of felon in possession of a firearm, based on conduct that allegedly occurred on October 23, 2016 and November 5, 2016, in violation of 18 U.S.C. § 922(g)(1). *See* 2016 Indictment, dated Dec. 1, 2016, 1:16-cr-20907-MGC (D.E. 17).

During the government's investigation of Mr. Baptiste in 2016, it sought several different search warrants of Mr. Baptiste's property. Each application outlined the violations of law it believed that Mr. Baptiste had committed. First, in March 2016, the government sought permission to subpoena records from the social networking company Tumblr relating to Mr. Baptiste's Tumblr account. In its application, the government alleged that the search related to a violation of 18 U.S.C. § 2339B, "Attempting to Provide and Providing Material Support or Resources to a Designated Foreign Terrorist Organization." Search Warrant Application, dated March 3, 2016. Exh. 1.[1] Then, in November 2016, on the day Mr. Baptiste was arrested, the government sought authorization to search Mr. Baptiste's automobile and residence. In both search warrants, the government again alleged violations of 18 U.S.C. § 2339B, the material support statute; it also alleged a violation of 18 U.S.C. § 922(g)(1), "Possession of a firearm by a convicted felon." Search Warrant Applications, dated Nov. 9, 2016. Exh. 3.[2] Later that month, the government requested permission to search Mr. Baptiste's cell phone, again alleging violations of

---

1. Tumblr provided the government with the responsive records on April 21, 2016. *See* Tumblr Letter, Exh. 2.

2. The search of Mr. Baptiste's residence was conducted November 9, 2016; the search of the automobile was conducted the following day, November 10, 2016. *See* Property Receipts, Exh. 4.

18 U.S.C. §§ 922(g)(1) and 2339B.   Search Warrant Application, dated Nov. 21, 2016. Exh. 5.   Finally, in January 2017, the government sought a warrant for Mr. Baptiste's Facebook account.   In addition to alleging violations of the material support and felon-in-possession statutes, the government also cited violations of 18 U.S.C. §§ 371 and 554, "Conspiracy to Smuggle Goods from the United States." Search Warrant Application, dated Jan. 27, 2017.   Exh. 6.[3]

Mr. Baptiste pleaded guilty to one count of felon in possession on March 31, 2017; the remaining counts against him were dismissed.   He was sentenced to 80 months in custody, followed by three years of supervised release, on June 21, 2017. Not long after he was sentenced, Mr. Baptiste was designated to a Communications Management Housing Unit ("CMU") of the Bureau of Prisons ("BOP").   The CMU is a special BOP facility designed to "more effectively monitor" the communications of certain inmates with the outside world.   28 C.F.R. § 540.200(c).   To "achieve the goal of total monitoring," CMU regulations restrict the "volume, frequency, and methods" of an inmate's contact with the community.   *Id.*   Mr. Baptiste spent ten months in the CMU prior to indictment on the instant charges.

In July 2018, while serving his sentence in the CMU, Mr. Baptiste was indicted again.   This time, he was charged with four counts of distributing information pertaining to explosives, in violation of 18 U.S.C. § 842(p)(2)(A); one count of attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1); and one count of attempting to provide material support

---

3. Facebook generated the responsive records on February 20, 2017, though it is not clear on what day these records were provided to the government.   *See* Facebook Business Record Page 1, Exh. 7.

to terrorists, in violation of 18 U.S.C. § 2339A(a).   *See* 2018 Indictment, dated July 19, 2018 (D.E. 1).   All six counts pertain to information that Mr. Baptiste allegedly posted on a social media channel, "Jihadi Gear(Private)," on November 6, 2016— almost two years before he was indicted.   This channel was discussed in the Complaint discussed above, and the government was aware of these posts before Mr. Baptiste was first arrested.   Yet, the government waited until almost two years after Mr. Baptiste was indicted on the first set of charges, and long after he pleaded guilty and was sentenced in that first case, to indict him on the second set of charges.   In the meantime, Mr. Baptiste had been placed in the BOP's CMU.

## 2. Prejudice

As to the first prong of the due process test, Mr. Baptiste has been actually prejudiced by the almost 20-month delay between the Complaint and his arrest in November 2016, and his second Indictment in July 2018.   The prejudice to Mr. Baptiste that results from this delay—and the government's failure to bring the second indictment against him in a timely manner, even though it swiftly pursued the first—is substantial, as it will necessarily enhance his sentencing exposure on the instant case in two ways.   First, as a result of the government's delay, Mr. Baptiste has lost the right to request fully concurrent sentencing with any new conviction that arises from the instant case, even though both sets of charges arise from the same investigation and involve related conduct.   Thus, because Mr. Baptiste has already served more than 24 months on his earlier conviction—time that cannot retroactively be run concurrent—Mr. Baptiste will likely serve a substantially longer time in prison due to this delay should he be convicted of the instant charges.   Second, as a result

11

of his earlier conviction, Mr. Baptiste's guideline computation will include three additional criminal history points, a difference that will raise him from Category V to Category VI.[4]

This sentencing prejudice is "not merely hypothetical," even though it involves charges that have yet to be proved, and a sentence that has yet to be meted out. *Johnston*, 2013 WL 3777315 at *9. Though the sentencing guidelines are not mandatory, district courts are "obliged to consult [them] and take [them] into account" in sentencing. *United States v. Crawford*, 407 F.3d 1174 (11th Cir. 2005) (citations and emphasis omitted). Thus, because Mr. Baptiste will now fall in a different criminal history category due to the government's delay, the starting point for Mr. Baptiste's sentence—and the sentencing range that many courts consider to "usually be reasonable," *Rita v. United States*, 551 U.S. 338, 351 (2007)—will be higher. Further, though the district court has the power under the guidelines to vary downward to compensate for concurrent time that has been "lost,"[5] "concurrent sentencing is a wholly different sentencing mechanism from a downward variance." *Johnston*, 2013 WL 3777315, at *10. Thus, even when the district court might find

---

4. If Mr. Baptiste is convicted, he will likely to be subject to the terrorism enhancement under USSG § 3A1.4, which raises any defendant's criminal history category to Category VI for the purposes of calculating the sentence. *See* USSG § 3A1.4(b). Nevertheless, because a defendant's baseline criminal history category is always a relevant factor when seeking a downward variance or petitioning for other sentencing relief, Mr. Baptiste remains prejudiced by the upward shift.

5. It is important to note that *if* Mr. Baptiste's conviction on the 2016 charge is found to be relevant conduct to the instant offense, the guidelines require the sentencing court to make a downward adjustment so that the term of imprisonment is not unduly lengthened.

Under USSG § 5G1.3, if "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction," the court is required to: (1) "adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment," and (2) impose a sentence on the instant offense that will "run concurrently to the remainder of the undischarged term of imprisonment." USSG § 5G1.3(b).

12

the individual defendant deserving of such a radical downward variance—as the Court indicated it was so inclined in *Johnston*—a defendant's loss of the right to ask for concurrent sentencing remains prejudicial.

In short, because of the preindictment delay in the instant case, Mr. Baptiste has both lost the right to request a fully concurrent sentence, and will now face a higher guideline sentencing range on the second set of charges.   For both reasons, Mr. Baptiste has been actually prejudiced by the government's delay.

### 3. Tactical Advantage

As the government acknowledges, the investigation into Mr. Baptiste began in 2014.   Complaint at 2, ¶ 4.   Over the two-year period between the start of the investigation and Mr. Baptiste's arrest, the government alleges that Mr. Baptiste "posted numerous online statements expressing his encouragement and approval of violent jihad, the killing of non-believers, and the perpetration of 'lone wolf' style attacks against Westerners for their perceived aggression against Muslims."   *Id.* at 5, ¶ 11.   The government also alleges that starting in October 2016, Mr. Baptiste used the social media platform "Telegram" to post images of weapons, and that he reposted several instructional videos from YouTube dealing with weapon-making. *Id.* at 6–7, ¶ 18.   Indeed, the instant charges are based *solely and entirely* on four online posts that Mr. Baptiste made on his Telegram channel on November 6, 2016. *See* 2018 Indictment, at 1–5.   Thus, the government could have charged Mr. Baptiste with the identical charges he is currently facing at the time it pursued the first indictment.   Yet Mr. Baptiste was not charged for the conduct relating to these posts until two years later, in July 2018.

At least for a short time after Mr. Baptiste was arrested, the government does seem to have continued its investigation into Mr. Baptiste's online conduct. It sought a warrant for Mr. Baptiste's Facebook records in January 2017; on March 10, 2017, the FBI internally submitted two laboratory reports confirming that the weapon-making instructions allegedly posted by Mr. Baptiste in November 2016 were viable. Yet at least among the evidence turned over in discovery, no additional evidence closely related to these charges seems to have been gathered after March 2017. And this is not surprising: the charges Mr. Baptiste faces today are based entirely on alleged conduct that occurred online in October and November 2016, and the government was fully aware of that conduct at the time it was occurring. Put differently, these charges are based on a closed universe of information, and there have been no developments in this case—investigative or otherwise—for quite some time.

Thus, even though the government did not act on it, the evidence against Mr. Baptiste sufficient to support these charges has been in the government's hands since before Mr. Baptiste pleaded guilty on the first case. In fact, the government cited Mr. Baptiste's alleged online activity as a basis for his arrest two years ago. And the government continued to rely upon the activity alleged in *this* case as an aggravating factor in Mr. Baptiste's first case—in ways that were entirely unrelated to his charges for firearm possession or exporting firearms. For example, at Mr. Baptiste's detention hearing in November 2016, the government argued that Mr. Baptiste "has promoted violent jihad, admiration for ISIS, Al-Qaeda, their leaders as well as terrorist attacks on this country." Exh. 8, Detention Hearing Transcript, Nov. 16,

2016, 1:16-cr-20907-MGC-1, at 12.   Likewise, at Mr. Baptiste's sentencing hearing
in the previous case, the government argued that Mr. Baptiste "is an individual who
praises Osama Bin Ladin and ISIS leaders.   He disseminates extremist propaganda,
encourages and approves of violent crimes and attacks against westerners.   He
praises attacks by Al Qaeda, and he promotes travel to Syria for violent Jihad."
Sentencing Hearing Transcript, June 21, 2017, 1:16-cr-20907-MGC-1 (D.E. 60), at 8.
And for the purposes of the Presentence Investigation Report, the government
provided information outlining its allegations that Mr. Baptiste "operated numerous
social media accounts" and used these accounts "to disseminate extremist
propaganda, to praise attacks conducted or inspired by Al Qaeda, and to promote
travel to Syria for 'jihad' (which is a struggle or fight against the enemies of Islam)."
Presentence Investigation Report, 1:16-cr-20907-MGC-1 (D.E. 56) at 4–5, ¶ 5.

Perhaps in anticipation of these constitutional concerns, the government
recently represented to this Court that "in no way shape or form was [the previous
case] a terrorist prosecution."   Response in Opposition to Motion to Transfer, (D.E.
14), at 2.   Certainly, this statement is belied by the government's arguments
throughout the previous case, as outlined above.   But the government's insistence
that Mr. Baptiste's previous case was not a "terrorist prosecution" also flags the
constitutional problem before the Court today.   When Mr. Baptiste was arrested in
November 2016, the government already possessed the evidence of Mr. Baptiste's
alleged crimes relating to terrorism.   It used these allegations to strengthen its case
on Mr. Baptiste's first set of charges.   Yet it did not actually pursue the
terrorism-related charges in the instant case until well after Mr. Baptiste pleaded

15

guilty and was sentenced on the prior case, and after he had begun to serve his sentence. Why? The answer—that is, the "tactical advantage" that the government obtained—lies in Mr. Baptiste's placement at the CMU.

As the D.C. Circuit recently explained, when an inmate is designated to a CMU, "family visits and communications with the outside world [are] curtailed." *Aref v. Lynch*, 833 F.3d 242, 246 (D.C. Cir. 2016). Designation to a CMU facility is "indefinite," and often lasts years, if not the entire duration of one's sentence. *Id.* at 257. The resulting deprivations are coercive and impose severe hardships. As the Court explained, these deprivations "necessarily increase in severity over time"; as inmates are "denied contact with their loved ones" and have "diminished ability to communicate with them," "relationships with the outside become more difficult to maintain." *Id.* And though the Circuit found that CMU confinement involved "less deprivation" than administrative segregation, it ultimately determined that placement within a CMU was sufficiently "atypical and significant" to provide the basis for a due process claim. *Id.* (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In short, CMU placement is a hardship that far outpaces "the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

Mr. Baptiste's designation to a CMU was foreseeable to anyone who knew the relevant details of his first case. Though "CMU designation is not based on any formal status as a 'terrorist,'" these facilities are "known as 'terrorist units.'" *Aref*, 833 F.3d at 267. Indeed, CMUs were designed to address a "deficiency" within the BOP "in the monitoring of inmate communications that allowed several inmates with terrorism-related convictions to communicate with extremist groups outside the

16

prisons." *Id.* at 247. As such, placement in a CMU results from, among other criteria, a "conviction, or offense conduct . . . related to international or domestic terrorism," including terrorism-related communications, or "offense conduct" that "indicates a substantial likelihood that the inmate will encourage, coordinate, facilitate, or otherwise act in furtherance of illegal activity." 28 C.F.R. §§ 540.201(a) and (b). Thus, Mr. Baptiste's background, and the conduct that the government attributed to him, made him an extremely likely candidate for CMU designation. Further, the government directly assisted in this placement. For example, it offered information about Mr. Baptiste's alleged terrorism-related conduct for the Presentence Investigation Report—including that Mr. Baptiste "used his social media accounts to disseminate extremist propaganda, to praise attacks conducted or inspired by Al Qaeda, and to promote travel to Syria for 'jihad'"; as outlined above, the prosecution also argued the same at sentencing. As such, the government would have been well aware that Mr. Baptiste would be placed in this closely monitored, coercive environment shortly after he was convicted. And this presents a basis for its decision to delay indictment.

Further, by electing to delay indictment on the second set of charges until Mr. Baptiste had spent considerable time in the CMU, the government sought a "tactical advantage"—that is, it "ma[de] a judgment about how it can best proceed with litigation to gain an advantage over the defendant." *Foxman*, 87 F.3d at 1223 n.2.

There are two clear advantages that the government gained through its actions. First, after monitoring every communication Mr. Baptiste engaged in for almost a year, the government would have a trove of information about Mr. Baptiste's

personal background to use against him at trial—an undeniable advantage.   Second, after spending almost a year in such a coercive environment, Mr. Baptiste was likely to emerge more cooperative, and perhaps more cowed, before any subsequent prosecution.

Such surveillance tactics are not fairly characterized as "investigation," as the data the government is gathering has little to do with the charges Mr. Baptiste is facing.   Instead, the government was provided access to Mr. Baptiste's most intimate thoughts and relations.   Nor is this similar in scope to the monitoring of pretrial inmate communications that the government routinely engages in as it prepares for trial—where an inmate knowingly communicates with the outside world at his own risk.   The length of the post-indictment, pretrial period is cabined by statute and the Constitution, under the Speedy Trial Act and the Speedy Trial Clause; an individual who is concerned about such monitoring could, theoretically, withhold communication for this period.   But by the time he was confined in the CMU, Mr. Baptiste was post-trial, and he was likely to spend the entirety of his 80-month sentence there.   As *Aref* found, communication with one's family and loved ones plays a critical role in prison life; cutting off *all* communications with the outside world for more than half a decade, to avoid government surveillance and possible manipulation of one's personal information by the government, is unreasonable.

Further, the government's delay in bringing the terrorism-related charges cannot be chalked up to a permissible "investigative delay" of the kind contemplated by the Supreme Court in *Lovasco*.   As a preliminary matter, the government was in possession of the evidence relating to these charges before Mr. Baptiste was even

arrested in November 2016.   Both an undercover employee and two government informants were monitoring the online activity with which Mr. Baptiste is charged as it occurred; thus, the government was aware of the four posts on which the charges are entirely based on the day they were allegedly published, November 6, 2016.   Of course, as noted above, some limited investigation on Mr. Baptiste's case continued after Mr. Baptiste's arrest, including searches of Mr. Baptiste's personal belongings and Facebook activity, and an FBI laboratory investigation into the viability of the posted instructions.   But, as outlined above, the searches of Mr. Baptiste's residence and automobile were executed in November 2016; Facebook had generated its responsive records in February 2017, and the FBI laboratory investigation was complete in March 2017.   And the investigation into Mr. Baptiste's case seems to have concluded as soon as Mr. Baptiste pleaded guilty to the first indictment at the end of March 2017.

In cases where the government's pre-indictment delay has been excused due to ongoing investigation, this Circuit has been clear that the investigation was unusually complex—and thus some pre-indictment delay was reasonable.   For example, the Court has permitted investigative delay in cases involving multiple defendants, numerous uncooperative witnesses, voluminous records, and successive grand juries.   *See, e.g., Reme*, 738 F.2d at 1163 (nine-month investigative delay not unreasonable "in light of the complexity of the case," which involved "multiple defendants, most of whom went by nicknames," and 77 potential witnesses who "had been warned" by one of the defendants "not to tell the authorities anything"); *Lindstrom*, 698 F.2d at 1158 (no due process violation, despite three-year pre-

indictment delay, in a "complex case involving numerous documents and records," where "two successive grand juries participated in the preindictment investigation," "[t]argets of investigation were afforded opportunities to appear before the grand jury and time to consider the offers," and the government had to locate 199 potential witnesses). These are not the circumstances before the Court today. The evidence against Mr. Baptiste is drawn from a limited, closed universe: four posts he allegedly made online on November 6, 2016. Within this context, there is no legitimate *investigative* reason why the charges were so delayed.

Rather, the decision to delay indictment on the instant charges can only be chalked up to a *tactical* decision. The government took this tack even though it had sufficient evidence to charge Mr. Baptiste for these crimes more than two years ago, before the first indictment; indeed, to the extent any investigation of the terrorism-related charges continued in the first few weeks after Mr. Baptiste's arrest, the government could have brought this case, or superseded his prior indictment, at any time in early 2017. Instead, the government decided to wait. In the meantime, the government's actions, along with its arguments in the prior case, all but ensured that Mr. Baptiste would be placed in a CMU while in BOP custody, and that he would remain there until it decided to pursue *this* case.

In short, the government's decision to wait almost 20 months to bring these charges—and to subject Mr. Baptiste to the coercive and closely monitored CMU in the meantime—can only be explained as part of a litigation strategy designed to gain a tactical advantage. And because, as outlined above, the government's delay actually and substantially prejudiced Mr. Baptiste's case, it is unconstitutional. As

the Eleventh Circuit has cautioned, it has Alittle difficulty in permitting the foreseeable consequences of a deliberately chosen litigation strategy to be visited upon the government.@ *Foxman*, 87 F.3d at 1223. This Court should do the same, and dismiss this indictment.

## II. Statutory Grounds to Dismiss: Federal Rule of Criminal Procedure 48(b)

Aside from the Constitutional violation in this case, there is also a procedural violation that should result in dismissal. Under Federal Rule of Criminal Procedure 48(b), this "Court may dismiss an indictment, information, or complaint if unnecessary delay occurs in (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Fed. R. Crim. P. 48(b). Though this Rule "is governed by the same general considerations as the Sixth Amendment," *United States v. DeLuna*, 763 F.2d 897, 923 (8th Cir. 1985), it "places a stricter requirement of speed on the prosecution and permits dismissal of an indictment even though there has been no constitutional violation." *Mathies v. United States*, 374 F.2d 312, 314 (D.C. Cir. 1967). Rule 48(b) "is a restatement of the inherent power of the court to dismiss a case for want of prosecution," *United States v. Correia*, 531 F.2d 1095, 1099 (1st Cir. 1976) (quoting 8A Moore, Federal Practice, ¶ 48.01(2) at 48-2 (quoting Advisory Committee Note to Fed. R. Crim. P. 48(b))), and it "vests much discretion in the trial court." *United States v. Edwards*, 577 F.2d 883, 887 n.1 (5th Cir. 1978); *see United States v. Butler*, 792 F.2d 1528, 1533–1534 (11th Cir. 1986).

Thus, even if this Court were to find that Mr. Baptiste does not satisfy the

constitutional requirements for dismissal of the indictment under *Marion* and *Lovasco*, this Court may and should find that Mr. Baptiste has met the lower standard of demonstrating that there was "unnecessary delay" in either "presenting [the] charge[s] to a grand jury" or "filing an [indictment] against [him]," *see* Fed. R. Crim. P. 48(b), based upon the "stricter requirement of speed on the prosecution." *See Mathies*, 374 F.2d at 314.

## CONCLUSION

The government's almost 20-month delay in bringing its second indictment against Mr. Baptiste violated his rights under the Due Process Clause of the Fifth Amendment.   That delay has actually and substantially prejudiced Mr. Baptiste's defense, and it was the result of deliberate action by the government designed to gain a tactical advantage.   Accordingly, Mr. Baptiste respectfully requests that this Court dismiss the indictment against him for the government's pre-indictment delay and requests a hearing on this motion.

Counsel for the government opposes the relief sought in this motion.

Respectfully submitted,

THE MALONE LAW FIRM, P.A.
701 BRICKELL AVENUE, SUITE 1550
MIAMI, FLORIDA 33131
Telephone: (305)728-5134
Facsimile: (305)728-5288
Email: omar@malonelawfirm.com

By: _____/S/_____
T. OMAR MALONE, ESQ.
Florida Bar No.: 697796

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record this 28th day of August 2019.

By: _____/S/_____
T. OMAR MALONE, ESQ.