# EXHIBIT 3

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.  16-3534-WCT |
| | ) |
| An automobile Florida license GTCL21. | ) |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:

As described in attachment B,

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment "C"

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____11/19/16_____
                                                                                    *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.    ☑ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Duty U.S. Magistrate Judge_____.
                                    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
                                                    ☐until, the facts justifying, the later specific date of _____

Date and time issued: _____11/9/16_____                        _____
                                                                                    *Judge's signature*

                                                                    William C. Turnoff, U.S. Magistrate Judge
City and state:   Miami, Florida_____                          *Printed name and title*

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By_____
        Deputy Clerk
Date  11/9/16

254

## ATTACHMENT B

### Target Auto

A vehicle registered to Samuel Baptiste described as a **2001 white Ford Crown Victoria**, bearing **Vehicle Identification Number (VIN)** 2FAFP71W31X138092 **and displaying Florida tag number** GTCL21.

Photographs of Target Auto are below:





## ATTACHMENT C

## DESCRIPTION OF THE ITEMS TO BE SEIZED

All evidence, contraband, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2339B, Providing or Attempting to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Convicted Felon, including:

A.      Documents pertaining to the purchase, sale, or possession of firearms and/or ammunition;

B.      Handwritten items, contact lists, letters from prisoners relating to the violations listed above;

C.      All publications regarding jihad, martyrdom, ISIL, explosives, tactical guides

D.      Photographs/videos of firearms and/or ammunition, including photographs/videos of BAPTISTE posing with firearms and/or ammunition;

E.      Any and all firearms, as well as and any and all frames, receivers, silencers, magazines, speed loaders, or other firearm components and accessories, other weapons, knives, crossbows, arrows or machetes;

F.      Any and all holsters, boxes, or containers utilized to contain and/or transport firearms and/or ammunition;

G.      Ammunition;

H.      Weapons of mass destruction and any components thereof, including any videos or other instructional materials or manuals.

I.      Evidence, to include correspondence, writings, manuals, books, instruction pamphlets, manuscripts, receipts, or other writings, papers, and evidence that relate to the use,

manufacture, production, dissemination, purchase, sale, or otherwise relate to a weapon of mass destruction.

J.      Any and all documents or materials, including magazines, in either electronic or hard copy printed format, related to ISIL, Al-Qaida, or other known terrorist organizations, as well as any other documents, materials, newspapers, web pages, or magazines dealing with firearms, weapons of mass destruction, or the reporting of or the advocacy of violence.

K.      Indicia of occupancy, residency, use or ownership of the Target Premises or Target Auto identified in Attachments A and B, including wallets, drivers licenses, address books, car registrations, receipts, handwritten notes, bank statements, credit card statements, correspondence, utility and telephone bills, delivered mail, keys, financial documents and records, maps, GPS devices, and other electronic devices including computers, iPads, and other electronic devices located within the Target Premises described in Attachment A.

L.      Computer equipment, digital storage devices, any magnetic, electronic and optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROM's, CD-R, CD-RW's, DVD's, optical disks, printers, or memory buffers, zip drives, smart cards, PC cards, memory calculators, other memory devices, as well as electronic dialers, electronic notebooks, cell phones, iPods, iPads, and other personal digital assistants which could contain data, information, records, or documents identified in this Attachment.

M.      Computer equipment and digital media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, routers, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

N.      Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, software or hardware;

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )    Case No.  16- 3534- W CT
An automobile Florida license GTCL21.             )
                                                   )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

As described in attachment B,

located in the _____Southern_____ District of _____Florida_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "C"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2339B | Attempt/Provision of Material Support or Resources to a Designated Foreign Terrorist Organization; and |
| 18 U.S.C. 922(g)(1) | Possession of a firearm by a convicted felon. |

The application is based on these facts:

See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Timothy Dietz, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____
       Deputy Clerk
Date _____

Date: ____11/ 9 /16____

City and state: Miami, Florida

_____
*Judge's signature*

William S. Turnoff, U.S. Magistrate Judge
*Printed name and title*

259

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

Your affiant, Timothy Dietz, first being duly sworn, does hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      Based on information set forth in this Affidavit, there is probable cause to believe that at 950 NW 95th Street apartment #204 Miami, FL 33150 (Target Premises), the residence of Samuel Baptiste, there exists evidence, contraband, fruits, and instrumentalities relating to violations of:   Title 18, United States Code, Section 2339B, Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person.   I am hereby requesting authority to search the entire Target Premises for the items specified in Attachment C, which constitute evidence, contraband, fruits, and instrumentalities of the foregoing violations.

2.      Based on information set forth in this Affidavit, there is also probable cause to believe that in a white Ford Crown Victoria with Florida license GTCL21 (Target Automobile) registered to SAMUEL BAPTISTE (BAPTISTE) there exists evidence, contraband, fruits, and instrumentalities relating to violations of: Title 18, United States Code, Section 2339B, Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person.   I am hereby requesting authority to search the entire Target Automobile for the items specified in Attachment C, which constitute evidence, contraband, fruits, and instrumentalities of the foregoing violations.

1

3.      I am a Special Agent with the United States Federal Bureau of Investigation (FBI) and have been since 2009.  Among my duties as an FBI Special Agent, I am responsible for the investigation of violations of federal law, including federal laws related to national security.  I am currently assigned to the FBI's Joint Terrorism Task Force (JTTF), where my primary responsibilities include the investigation of international terrorism.

4.      I am familiar with the facts and circumstances set forth in this affidavit based on: my participation in the investigation; my experience, training, and background as a Special Agent with the FBI and with the JTTF; personal observations and examination of relevant evidence; and information provided to me by other law enforcement officers and witnesses.  The information contained in this affidavit does not constitute all the facts of the investigation, and is provided for the limited purpose of establishing probable cause to obtain a search warrant.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that BAPTISTE has committed violations of Title 18, United States Code, Section 2339B, relating to the crime of Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization.  There is also probable cause to search the Target Premises described in Attachment A and Target Automobile described in Attachment B for evidence of this crime, as described in Attachment C.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that BAPTISTE has committed violations of Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person.  There is also probable cause to search the Target Premises described in Attachment A and Target Automobile described in Attachment B for evidence of this crime, as described in Attachment C.

2

7.   On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

8.   On May 15, 2014, the Secretary of State amended the designation of AQI as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham (ISIS), the Islamic State of Iraq and Syria (ISIS), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS. To date, ISIL remains a designated FTO. Beginning in 2014, using social media, ISIL has called for attacks against citizens -- civilian and military -- of the countries participating in the United States-led coalition against ISIL. For instance, on September 21, 2014, ISIL released a speech of Abu Muhammed Al-Adnani, a senior leader and official spokesman of ISIL, prior to his death. In this speech, entitled, "Indeed Your Lord is Ever Watchful," Al-Adnani called on Muslims who support ISIL from around the world to "defend the Islamic State" and to "rise and defend your state from your place where you may be:"

## PROBABLE CAUSE

### BAPTISTE's Criminal History

9.   BAPTISTE was arrested on December 17, 2010 for his involvement in an armed robbery of a convenience store in Miami, Florida. BAPTISTE was originally released from prison on November 2, 2012, and received a scheduled term of Community Control until

3

November 2, 2014. However, BAPTISTE violated his community control on multiple occasions, including removing his GPS monitoring device, and was ultimately remanded to state prison when he was re-arrested by the Miami-Dade Police Department on September 26, 2013. BAPTISTE remained incarcerated until his release on November 11, 2015.

10. In late April 2014, agents with the Federal Bureau of Investigation initiated an investigation of BAPTISTE after law enforcement learned that he operated numerous social media accounts (including the Social Media Account 1 account "Khilafahaiti" and the Social Media Account 2 "Abdul Jalil Rashid Imarah") praising Al Qaeda terrorists Usama bin Laden and Anwar Al-Awlaki, in addition to encouraging jihad and referencing becoming a martyr. The FBI assessed that BAPTISTE used his social media accounts since at least 2013 to disseminate extremist propaganda, to praise attacks conducted or inspired by Al Qaeda, and to promote travel to Syria for jihad.

11. The FBI investigation specifically revealed that BAPTISTE's Social Media Account 1, since inception in 2013, contained, and continues to contain extensive radical content including, but not limited to, extensive support for violent jihad; admiration for ISIL, Al-Qaeda, Anwar Awlaki, Usama bin Laden and previous terrorist events like the September 11, 2001 attacks; promotion of travel to Syria for jihad; updates on the status of ISIS battles; justification for killing women and children; the glorification of martyrdom, and indications of a desire to die as a martyr.

12. On December 18, 2015, while reviewing BAPTISTE's Social Media Account 1 page, agents with the FBI observed two photos of what appeared to be a gun next to a Quran, sunglasses, and a kufi (Muslim prayer cap). These photos had been posted on or about November 27, 2015, and bore the following hashtags: #Jihad #Train #Fisabilillah #Tawheed #Mujahid. The sunglasses and kufi appeared identical to those previously worn by BAPTISTE.

4

263

13.     The FBI thereafter immediately notified the Florida Department of Corrections (FDOC) about finding the gun, due to the fact that BAPTISTE was on active conditional release supervision stemming from his previous sentence on probation violations from his armed robbery conviction.

14.     On or about December 21, 2015, personnel from the Florida Department of Corrections with the assistance of the FBI, conducted an administrative search of the BAPTISTE residence in Miami, Florida, in an effort to find the above mentioned gun. During the search, an airsoft gun (a BB gun) in a holster was found which appeared identical to the gun depicted in the photo of the gun found online. A machete was also found.

15.     Based upon these findings, officers with the Florida Department of Corrections took BAPTISTE into custody for a violation of his conditional release, and he remained incarcerated until approximately March 24, 2016.

16.     During the December 21, 2015 FDOC search, the items seized included hand-written documents by BAPTISTE. One writing was entitled, "A refutation and proof against this strange [unintelligible] that they design concerning Al-Jihad" was written under the alias Abdul-Jalil Rashid Imarah al-Haiti ibn Baptiste. BAPTISTE writes in part, "I began this work on 22nd of April 2014...I write this from the prison of the kuffar [non-believers] in the despicable country of America...After being harassed and threatened until I cant take no more I attempted to flee from such oppression. I turned to many ikhwan [brethren] and even different Imamah [Shia Islamic doctrine] of masajid [mosque]to aid me in making hijrah [religious journey] so that I can reach the safety and comforts of Darul-Islam but none were willing." BAPTISTE continued, "...so upon the encouraging words of my wife and a few close brothers I chose the lesser of the two evils and turned myself into the courts." The phrase "Darul-Islam" is a term used by ISIL to describe the territory which they control in Iraq and Syria.

### Baptiste's On-Line Activity - Social Media Account 1

17.     BAPTISTE maintains a publically available Social Media Account 1.  On the that page, BAPTISTE uses various aliases including "Abdul-Jaleel Rashid Imarah Al-Haiti (Khilafahaiti)", "Abdul Jaleel Rashid Imarah Al-Haiti bin Baptiste (Khilafahaiti)" and "Abdul-Jalil Rashid Al-Imarah".  The Social Media Account 1 appeared to have started on or about May 30, 2013, and bears a subtitle of "Insha'Allah I'll be the Rifle of Allah".

18.     The Social Media Account 1 description includes:

"...Imam Anwar Al-Awlaki is a speaker and da'ee to me I don't consider him a Shaykh but a firm propagator of fiqhul-jihad and a knowledgeable akh who is an example to model after, a learned one and insha'Allah a shahid. Our "Sayyid" Ibn Ladin (rahimahullah) is one of the bravest man a noble and a prince of this ummah... *Ad-Dawlatul-Islamiiyah is our khilafah and Abu Bakr Al-Baghdadi is our Khalifa, undisputed fact by those with untainted faith nor desires and nifaq."* [Emphasis added].

19.     Since its inception in 2013, a review of BAPTISTE's Social Media Account 1 has revealed extensive radical content including (but not limited to): extensive support for violent jihad; admiration for ISIL, Al-Qaeda, Anwar Awlaki, Usama bin Laden and previous terrorist events like the September 11, 2001 attacks; promotion of travel to Syria for jihad; updates on status of ISIS battles; justification for killing women and children; glorification of martyrdom and indications of a desire to die as a martyr.

20.     For example, on September 3, 2013, BAPTISTE posted a poem on Social Media Account 1 which he claimed to have written, entitled "The Rifle points (Searching for me my war zone)".

*If only I could find my way to the battlefield, than I'd know for sure my parting would be with smiles, label my death heroic, death of a shaheed [martyr], how noble is it to die in the path of Allah, yet death may be aim, we don't treat the fight as a game, I suffer than they must suffer, and suffer they will and must, yet mines will be the blessed nose to inhale the dust fi sabilillah [for the sake of Allah], watch as Allah's Rifle takes aim, and send His enemies to His dungeon, Hell is a terrible abode and to arrive at that destination disbelievers are sure bold,*

6

hears the sparks, crackles and pops of a story never told, millions of corpses, decapitated heads of infidels, life purchased by a bullet since to the falsehood they quickly sailed, so they must fail, illegal commerce must always fail, imagine a bullet prayed over by the angels, heading straight between the eyes of our enemy, to purge this world of evil and send him quick to hell. [Emphasis added].

21.     After BAPTISTE's release from prison on November 8, 2015, BAPTISTE's Social Media Account 1, had a post titled, "Back after a pause..." The content of the post reads in part, "Just wanted to say that I am back and looking to get in contact with those whom I was straight with. 2 ½ of captivity now liberated. I know some of the smart ones changed accounts but hit me up". This post suggests that BAPTISTE intends to contact former inmates.

22.     On or about November 27, 2015, BAPTISTE posted on the Social Media Account 1, in part, "know that jihad is not to escape this world but to purify it. Know there are two outcomes and one is greater than the other. Victory or martyrdom. Victory is greater because through it institutions and programmes are established, Islam is elevated, and kuffar disgraced but that ultimately it leads to the next, which is martyrdom. Martyrdom leads to the akhirah [the end of time], which is where the mujahid [holy warrior] will find his Rabb [Lord] well pleased with him for his efforts and sacrifice . . . ."

23.     On or about December 3, 2015, BAPTISTE posted on the Social Media Account 1 what the FBI assesses to be a story written by him entitled "the Last Shahid" [Martyr], wherein he is on a "jihad expedition", tasked to clear the way forward for the army of the "amir". He describes a "bloodbath" as he and another brother kill many "kuffar" marines with guns, crossbows, and a machete. BAPTISTE added the hashtags "#daesh #khilafah #jihad #shaheed #abu bakr al-baghdadi #isis #ad dawlatu al islamiyyah #martyr #martyrdom #shuhadah #mujahideen."

24.     On or about December 14, 2015, Baptiste reposted on the Social Media Account 1 ten photographs with the caption "#islamic state of Iraq and sham." The photographs were of armed fighters in combat and bearing the ISIL flag.

25.     In or around early/mid December 2015, BAPTISTE reposted on the Social Media Account 1 multiple photographs and articles such as: How to Make Ballistic Plates for Body Armor; A Comprehensive Intro to Night Vision Devices; weapon concealment devices; various silencers; various automatic weapons; shotguns; handguns; knives; daggers; and ammunition. BAPTISTE also made various comments that indicated a love for, and a desire to have, guns.

26.     On or about October 22, 2016, BAPTISTE reposted on the Social Media Account 1 an article entitled "Combatants and Non-Combatants in al-Islam". It sought to answer the question of whether Islam allowed for the targeting of "civilians" in countries at war with Muslims. It stated, "If combatants and con-combatants are mixed together and integrated, it is allowed for the Muslims to attack them even if women, children, the elderly, farmers, merchants, and slaves get killed…" It further argued that "with all the aggression the West is committing against the Muslims this additional evidence leaves no room for those who argue on behalf of the general populations of the West."

27.     On or about October 26, 2016, BAPTISTE posted on the Social Media Account 1 ISIS imagery and wrote "[t]he shari'ah is established by force and whoever opposes is hit in the head with the sword and disposed in the trash as rubbish of history… and all those who oppose it are liars to their claim of concern for ummah." He added regarding the Khilafah, "if such shall be dismantled then it shall return even stronger and quicker than in the blinking of an eye. They shall be killed while we shall be martyred, they shall be disgrace while we are honored. And our Khaliph has promised us that such a time will come for the muwahid to walk upright with dignity in the face of the kuffar".

8

267

### BAPTISTE's Social Media Account 2 Online Activity

28.  BAPTISTE maintains a publically available Social Media Account 2 page in the name "Abdul Jalil Rashid Imarah (Al-Haiti Baptiste bin Baptiste)" (the Social Media Account 2 Page), bearing Social Media Account 2 ID 100004603302262.  The page was created in November 2012.  Investigation has revealed that some content is available only to "friends", while some is openly available to anyone.

29.  The openly available Social Media Account 2 Page contains many photos of BAPTISTE, including numerous photos from September 2016 wherein BAPTISTE is posing with knives.

30.  In late June 2016, BAPTISTE reached out to an undercover persona utilized by an FBI undercover employee (UCE).  As a result, BAPTISTE and the UCE became Social Media Account 2 "friends".  Using such "friendship", the FBI reviewed the "friends only" version of BAPTISTE's Social Media Account 2 Page, revealing that from BAPTISTE's most recent prison release date, March 25, 2016, to June 12, 2016, his posts were largely benign concentrating on love, lost love, marriage, the search for a wife, Haiti, and various Islamic issues.  However, on June 12, 2016, after the deadly terrorist attack on the Pulse nightclub in Orlando by Omar Mateen, BAPTISTE made numerous posts wherein he decried political correctness of "homo sympathizers" and asked "whose blood is more sacred, his [Mateen's] or theirs [victims]".  BAPTISTE also referred to the victims as "those who have earned His wrath" and "infidel casualties".  After June 12, 2016, BAPTISTE did not post again until June 24, 2016, at which time the FBI assesses that the tone of the posts became markedly more extreme. The following summarizes some of the most concerning Social Media Account 2 activity on BAPTISTE's page in late June 2016:

9

- On or about June 29, 2016, BAPTISTE shared a post indicating that homosexuality was a crime against humanity.
- On or about June 28, 2016, BAPTISTE posted a comment about former President George W. Bush, "With the establishment of Dawlah [ISIL] I think he fears assassination more now".
- On or about June 26, 2016, BAPTISTE posted a photo with the words "You go, I go with you, You ride, I ride with you, If you die, I die with you". He added the comment, "Where are the muwahiddah who are the embodiment of such? Either in Sham [region near and including Syria] or on their way."
- On or about June 25, 2016, BAPTISTE shared a friend's post, which stated "If you hear about my death, please don't get sad... Know that this dunya pushed me to the edge; as far as I could go and now im finally at peace."
- On or about June 25, 2016, Baptiste shared a friend's post which stated "We live in a modern world where the enemies of Islam ask the Muslims to destroy their own Caliphate".
- On or about June 25, 2016, Baptiste shared a friend's post which depicts ISIL leader Abu Bakr Al Baghdadi and the quote, "Soon, by Allah's permission, a day will come when the Muslim will walk everywhere as a master, having honor, being revered, with his head raised high and his dignity preserved. Anyone who dares to offend him will be disciplined and any hand that reaches out to harm him will be cut off."

31.     On or about June 28, 2016, the FBI searched Social Media Account 2 for photos and stories that Abdul Jalil Rashid Imarah (BAPTISTE's Social Media Account 2 name) "liked" on the pages of others. On or about June 22, 2016, BAPTISTE "liked" a photo bearing the words "Don't consult anyone in killing Americans, going ahead and remember your reward from Allah... killing them is the core of Tawheed and core of Islam." The quote was attributed to Usama Bin Laden.

32.     On or about July 14, 2016, BAPTISTE "liked" the comment "truck run over kufr and killed many" regarding the truck attack on a crowd celebrating Bastille Day in Nice, France which killed over 80 people. ISIL declared responsibility for the attack. BAPTISTE also liked a comment indicating it was a "truck delivery for human parts... spare parts anyone?" BAPTISTE added his own comment, "Persona delivery of a hazardous load".

33.    On various dates in August and September 2016, BAPTISTE posted comments and poems written by him on his Social Media Account 2 Page relating to violence and killing. On or about August 29, 2016, BAPTISTE wrote "My blade is more dear to me than your neck." On or about September 5, 2016, BAPTISTE wrote "…I swear by Allah the blade and the neck shall meet for they were created for one another and the forehead and the bullet shall meet for they were created for one another…"   On or about September 7, 2016, BAPTISTE wrote "Instead of waiting on your beloved… Let's take a pact to wait on death… No lover's test or fantasies which causes stress… Meet on the other side of peek a boo explosives."

34.    On or about September 24, 2016, BAPTISTE posted on the Social Media Account 2 Page "Benefits" with a link to BAPTISTE's Messaging Application 1 Channel.

### BAPTISTE's Contacts With Undercover Employee (UCE)

35.    On or about June 26, 2016, BAPTISTE and UCE had contact via Social Media Account 2 messenger, where they discussed BAPTISTE's desire to leave the U.S. for Syria in 2013 and that he had "7 ikhwan [brothers] go to Sham before Ad-Dawlah, 4 killed (Masha'Allah) and Allahu'alam on rest".

36.    On or about July 04, 2016, BAPTISTE and UCE had contact via Social Media Account 2 instant message feature where BAPTISTE commented on his view of death and martyrdom. BAPTISTE explained that the goal is not solely martyrdom: "The path is that victory is sought and if not attained one achieves shadah by one efforts which is still a victory. Double win. The goal is not shahadah. If everyone wants to die then who will rule? Who will teach? Who will build? You rather kill one kafir and meet your Rabb or kill a hundred and still be provided more chance to elevate this deen?"

37.    On or about July 06, 2016, BAPTISTE and UCE had contact via Social Media Account 2 instant message feature where BAPTISTE explained, "Plus Im not a basic thinker and

nor can I waste my life as the average civilian. I want to make a difference and leave behind a legacy. Not fight ignorantly or die as such. I want the firdaus not first level of jannah. I have too much sins to place my faith lightly by aiming low. Gots to shoot high. I want to be in the ranks of the Sahabah. I don't want to be a lion, I'm a wolf. It's easy to hunt a lion because they all present themselves as mighty and majestic. It's difficult to hunt the lonesome, alpha, noble elusive wolf who leads a pack and can strike as one. And wolves are better hunters any day."

38.   On or about July 08, 2016, BAPTISTE and UCE had contact via Social Media Account 2 instant message feature where BAPTISTE explained his visions of a successful terrorist attack on the United States. BAPTISTE wrote, "If one could conquer a portion of Darul-Kufr [referring to the United States] and raise flag of Islam here do you know that such conquerer would be greatest Muslim of our times? Even if they have control of such portion for only a week. It will be like when we struck Constantinople after several attempts of failure. That would be the greatest service a muwahid could do to the khilafah and ummah." Baptiste additionally wrote, "Imagine let's say 15 Muslims take over 6 buildings on one block and cordoned off exits. What is that? Hostage situation. If they last for 2 weeks til last man and black flag raised in heart of kafir then that is something major."

39.   On August 26, 2016 BAPTISTE and UCE had contact via Social Media Account 2 audio call where BAPTISTE discussed previous possession of firearms and desire to go to a shooting range.  Specifically, BAPTISTE indicated that when he was "on the run" in 2013, he had "two firearms, like I had a knife for myself and my ex-wife had like a 22." At the time, BAPTISTE had a friend that often went to the shooting range and who assured him that they only check ID, but BAPTISTE ultimately did not go.  However, BAPTISTE told UCE that he recently made plans with another individual who offered to take him to the range, but that BAPTISTE was hesitant because he had just gotten out of prison and he could be watched.

12

BAPTISTE described discussing the matter with another associate who told him not to take the risk of going shooting. BAPTISTE told UCE that he would cancel the plans to go shooting, considering that he was probably being watched by the kuffar [U.S. law enforcement]. However, BAPTISTE indicated that he would "hit up" some felons he knows and see what shooting range they go to, then he would be willing to go to a shooting range like that. Regarding firearms, BAPTISTE said that he could easily get a gun in someone else's name, but could not get one in his own name because of his criminal record. BAPTISTE said that it was not difficult to get a weapon in the U.S. and that he knew people that sold "stuff like that".

40.     On or about August 28, 2016, BAPTISTE and UCE had contact via Social Media Account 2 audio call where BAPTISTE described his close relationship with Abu Daim, a prison inmate with whom BAPTISTE was previously incarcerated. BAPTISTE discussed writing letters to and receiving letters from Abu Daim. BAPTISTE described writing Abu Daim a letter a few weeks ago wherein he told Abu Daim that "the caravans are gone" [believed to be a reference to joining the mujahideen]. In response, Abu Daim wrote BAPTISTE a letter, which BAPTISTE had in his car during conversation with UCE. BAPTISTE read from the letter, which asked "You still here? Or you gone!". Abu Daim wrote that he understood that the caravans were gone, but "I still feel the urge for battle, I don't read too many articles anymore, just enough to stay abreast, as it stirs inside of me a feeling I can't get rid of unless I talk about it and get my frustrations out but once again there is no one to talk to so I just keep my feeling in check for the time being." BAPTISTE told UCE that he wanted to print some Islamic reading material in order to send them to Abu Daim.

41.     Personnel at the Dade Correctional Institution advised that on September 30, 2016, five separate envelopes were intercepted from inmate Deven Cooper, aka Abu Daim. The envelopes contained ISIL propaganda. All of the envelopes bore the return address of "Your

46.     Using UCE's membership, the FBI reviewed the Messaging Application 1 channel Dhikrul-jihad wal-qasas on or about September 22, 2016, revealing that it was created on September 21, 2016. The channel includes content previously posted on BAPTISTE's Social Media Account 1 Khilafahaiti. BAPTISTE also forwarded content from Messaging Application 1 channel named "Diary of a Muhajirah", including a post titled "JIHAD and HIJRAH", which stated [in part] "...regardless of where you are, know that pledging allegiance is an obligation upon you, as is listening to your leader, the Caliph, and obeying his command." It also advises that anyone who is capable should make hijrah to the Islamic State, but if one is not capable they should wage jihad behind enemy lines. Further, it states "the blood of the disbelievers is obligatory to spill by default. The command is clear. Kill the disbelievers... if the tawaghit have shut the door of hijrah in your faces, then open the door of jihad in theirs..."

47.     FBI review of the Messaging Application 1 channel Dhikrul-jihad wal-qasas on or about September 24, 2016, revealed that on or about September 23, 2016, BAPTISTE posted an extensive discussion of the "lone wolf". The post includes, "[w]hen a wolf is outside by himself and sees some prey, he will try to attack it. Then he will return home; victorious, injured or killed. The results with be that other wolves will be inspired by him...The lone wolf believer is always looking for an opportunity to get hold of something to use to attack his enemy severely. He ideally will use a weapon, but if he cannot – he will use something like a knife or a car to crash into the enemy... A few minutes before carrying out his attack, the lone wolf will claim responsibility for the attack on social media (saying his group did it, and showing what his claim of allegiance is to, i.e. the Caliphate)... Small cells [or 'wolf packs'] (of 1 to 5 individuals who trust each other) will do 'hit and run' tactics against the police enemy. If many independent small cells form, an insurgency can begin...before any insurgency begins, it starts off with small attacks. Lone wolf attacks and Small cell attacks is how it all begins. These attacks can include

soft targets to 'steal' money or get weapons. Once these become the norm, a gradual insurgency will begin." The post then goes on to provide links to the "best guide available on this topic" called "MujSecurity".

48.    On or about October 5, 2016, BAPTISTE told UCE that he got a new phone and "switched from Cricket to Metro". BAPTISTE told UCE that he has started using Virtual Private Networks for security purposes, noting that he doesn't use his regular browser anymore on his phone and his laptop. BAPTISTE said that he downloaded an application called "Chat Secure" and that, from now on, they will be using Chat Secure and Messaging Application 1 for anything important. Later, via Messaging Application 1, BAPTISTE told UCE that he kept his old phone and can still access Messaging Application 1 on that one with wifi. BAPTISTE added that he hasn't allowed Google to sync his contacts to his new phone because the kuffar can infiltrate his phone through Google.

49.    On or about October 10, 2016, BAPTISTE and the UCE spoke on the phone about an Imam from Haiti, subsequently identified as "Abdul Jabar", true name Jose Noel (Noel), whom BAPTISTE has known since 2013. UCE asked whether BAPTISTE and Noel had spoken about dawah efforts in Haiti. BAPTISTE responded, "yeah, we've talked about that... but we've talked about you know, there's some other stuff that the type of stuff we usually talk about but I have to wait until we are on Telly and what not to talk about but you know inshaAllah Taala we are on the same page."

50.    On October 18, 2016 BAPTISTE sent UCE $50 to hold for him via Western Union. BAPTISTE provided his address on the Western Union receipt as 950 NW 95th Street, Apt 204, Miami Florida 33150. His cell phone was listed as 305-793-2397, a known phone number of BAPTISTE.

16

275

51.     On or about October 23, 2016, BAPTISTE told UCE that he was nervous because Noel wanted to go to a range to shoot guns with another individual, who unbeknownst to BAPTISTE is an FBI confidential human source (CHS). BAPTISTE was not sure he wanted to do this, saying he trusted Noel but was unsure if he could trust the other individual. BAPTISTE told UCE that he had called a brother of his that works for an airline to check if BAPTISTE was on the No-Fly list. Shortly thereafter, BAPTISTE indicated that his source at the airline indicated BAPTISTE was not on the list. As a result, BAPTISTE left UCE a message on Messaging Application 1 indicating that he would go to the range and asked that UCE "make duaa for me, lots and lots of duaa." Later on October 23, 2016, BAPTISTE sent UCE a series of pictures of himself loading a gun, pointing two handguns, as well as a video of himself shooting. BAPTISTE indicated that he did not have any problems at the range and promised to teach UCE how to shoot.

52.     On October 23, 2016, during a secure chat with UCE on Messaging Application 1, BAPTISTE indicated that he was laying foundations for future plans that he could not discuss with UCE. He stated, "this doesn't only involve me but the fate of other people... And I can't betray the trust of others. No excuse. Only if you were my zawjah [wife] would there be an exception."

53.     On or about October 27, 2016, BAPTISTE and UCE spoke by phone. BAPTISTE said that he was sitting in the car in the parking lot at his residence. When UCE asked BAPTISTE why he was sitting in his car, he said "I've got some work, I'm, I'm checking, just checking a couple of stuff on line." UCE asked BAPTISTE if he could do that at home and he said "Yes I could . . . ." UCE commented that he/she found it strange that BAPTISTE was sitting in his car in front of his house to which he replied "I do that a lot . . . ." During earlier contact on same day, BAPTISTE commented that he had spent three hours in his car the evening

17

before "because I was doing stuff on the phone". The FBI believes that BAPTISTE was referring to the Target Automobile.

## Contacts With FBI Confidential Source

54.     In mid-October 2016, agents with the Federal Bureau of Investigation launched an investigation of Noel based on information provided by a FBI Miami Confidential Human Source (CHS). The CHS was first introduced to Noel through his associate, BAPTISTE, on or about October 10, 2016. On October 11, 2016, in a meeting, Noel told the CHS about a security company he was trying to establish in Haiti and his desire to obtain guns for this company. Noel told the CHS he would like to obtain a T-56 rifle which Noel explained was similar to an AR-15 assault rifle. Noel told the CHS that he had previously obtained illegal guns from family members in Pompano, Florida and further claimed to have transported concealed weapons to Haiti in the past. Noel then described how he had concealed weapons in the past by secreting them in CD players, radios, and cars, which were then exported to Haiti. During this meeting, Noel further explained his plans to marry a U.S. citizen for the sole purpose of obtaining legal status in the U.S., as well as revealed his ideological support for the killing of attendees at a LGBT (Lesbian, Gay, Bisexual, and Transgender) parade in Haiti.

55.     On October 20, 2016, the CHS, in a conversation that was audio recorded, had a separate discussion with BAPTISTE about going to a gun range. The CHS informed BAPTISTE that Noel has indicated to him that he wanted to go to a gun range. BAPTISTE then told the CHS that he did not know of a gun range that did not require ID or report to the police, but asked the CHS if he knew of any gun ranges that did not run records checks, or where they could just go and show ID, as BAPTISTE wanted to go there.

56.     On October 23, 2016, Baptiste was observed by FBI surveillance departing his apartment building at 950 NW 95th Street, Miami Florida 33150 in a white Crown Victoria,

18

277

known by the FBI from previous surveillance and meetings with CHS as a white Crown Victoria

bearing Florida license plate GTCL21 (Target Automobile). He traveled to the residence of Noel

and then on to the Florida Gun Center in Hialeah, Florida.

57.    Later on October 23, 2016, Noel, BAPTISTE, and the CHS entered the Florida

Gun Center located at 1770 West 38th Place, Hialeah, Florida 33012.  Once inside, BAPTISTE,

Noel, and the CHS were captured on video surveillance by the Florida Gun Center as well as by

members of the FBI Miami JTTF, renting, possessing, and thereafter shooting multiple firearms

inside the facility.

58.    Later that day, an employee of the Florida Gun Center provided the FBI with the

original liability form signed by BAPTISTE as well as a copy BAPTISTE's identification

presented to employees.  This liability form, signed by Noel and BAPTISTE indicated the use of

two boxes of 9mm ammunition and two boxes of .223 ammunition as well as the rental of

various firearms: "1 Sig 320", "1 M9", "1 Sig 229", and "1 AR15".  The Florida Gun Center

thereafter voluntarily turned over the weapons utilized by and BAPTISTE and Noel which were

formally identified by the FBI Miami JTTF as follows:

> 1 Sig Sauer 320 9mm pistol with serial number 58A070264
> 1 Beretta 9mm M9 pistol with serial number M9-183745
> 1 Sig Sauer P226 9mm pistol with serial number 47A169579
> 1 Smith & Wesson Sport M&P Sport rifle with serial number SX01461

59.    Moreover, agents received a purchase receipt obtained from the Florida Gun

Center bearing customer name SAMUEL BAPTISTE, home phone 305-793-2397, and displays

in part the rental of one Sig Sauer P320, one Sig Sauer P226, one Beretta M9, and one Smith and

Wesson M&P Sport as well as ammunition and targets.

### Use of Computers in Terror Related Offenses

60.     Based on your affiant's training and experience and discussions with other law enforcement officers, persons committing or intending to commit terrorism related offenses often utilize computers, data storage devices (*e.g.*, external storage devices, ZIP disks, and CD-ROMs), and other electronic communications equipment. These persons often use computers and peripheral devices to search the internet and communicate with co-conspirators or other sympathizers in terrorism related activities.

### Seizure of Computers and Computer-Related Equipment

61.     Based on my training, experience, and my own personal knowledge and use of computers, your affiant knows the following:

a.     Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units and self-contained "laptop" or "notebook computers); internal and peripheral storage devices (such as fixed disks, floppy disks, external hard disks, floppy disk drives and diskettes, tape drives and optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical lock and keys).

b.     Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic,

magnetic, optical or other digital form.  It commonly includes programs to run operating systems, applications, utilities, compilers, interpreters, and communications programs.

      c.      Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

      d.      Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (which is a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

      e.      Computer hardware and computer software may be utilized to store information or data in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer related equipment including visual depictions.  This media includes but is not limited to fixed hard drives and removable hard drive cartridges, laser disks, tapes, floppy disks, CD ROMs and any other media capable of storing magnetic coding.

      f.      Searching and seizing information from computers often requires agents to seize most or all electronic storage devices, along with related peripherals, to be searched later by a qualified expert in a laboratory or other controlled environment.  This is true because of the following:

(1)     The volume of evidence.  Computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of thousands of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he might store it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime.  This sorting process can take weeks, depending on the volume data stored, and it would be impractical to attempt this kind of data search on site.  However, an attempt by a qualified expert will be made on site to create an "image" of the computers to be searched in order to lessen the impact on the subject business.  If the computer expert is unable to create the image onsite, the computer will be seized and imaged in a laboratory or other controlled environment.  In this instance, every effort will be made to return the computers as soon as possible.

(2)     Technical Requirements.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

g.     Searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the computer's data in a laboratory or other controlled environment.  This is true because of the following:

22

(1)     The peripheral devices which allow the users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.   Many systems storage devices require particular input/output devices in order to read the data on the system.   It is important that the analyst be able to properly re-configure the computer as it now operates in order to accurately retrieve the evidence.

(2)     In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on drives or on external media), as well as all related instruction manuals, or other documentation and data security devices.

## CONCLUSION

62.     Based on the forgoing facts, I respectfully submit that there is probable cause to believe that at 950 NW 95th Street apartment #204 Miami, FL 33150 (Target Premises), the residence of BAPTISTE, there exists evidence, contraband, fruits, and instrumentalities of violations of:   Title 18, United States Code, Section 2339B, Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person.   These facts also establish probable cause to believe that in a white Ford Crown Victoria with Florida license GTCL21 (Target Automobile) registered to BAPTISTE there exists evidence, contraband, fruits, and instrumentalities relating to violations of: Title 18, United States Code, Section 2339B, Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person.   I am hereby requesting authority to search the entire Target Premises and Target Automobile for the items specified in Attachment

C, which constitute evidence, contraband, fruits, and instrumentalities of the foregoing violations.

## REQUEST FOR SEALING

63.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

*FURTHER YOUR AFFIANT SAYETH NAUGHT.*


TIMOTHY DIETZ, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed to and sworn before me in
Miami, Florida this ____ day
of November, 2016.


Honorable William C. Turnoff
U.S. Magistrate Judge

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____ Deputy Clerk

Date __11/9/16__

24

## ATTACHMENT B

### Target Auto

A vehicle registered to Samuel Baptiste described as a **2001 white Ford Crown Victoria, bearing Vehicle Identification Number (VIN) 2FAFP71W31X138092 and displaying Florida tag number** GTCL21.

Photographs of Target Auto are below:





## ATTACHMENT C

## DESCRIPTION OF THE ITEMS TO BE SEIZED

All evidence, contraband, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2339B, Providing or Attempting to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Convicted Felon, including:

A.      Documents pertaining to the purchase, sale, or possession of firearms and/or ammunition;

B.      Handwritten items, contact lists, letters from prisoners relating to the violations listed above;

C.      All publications regarding jihad, martyrdom, ISIL, explosives, tactical guides

D.      Photographs/videos of firearms and/or ammunition, including photographs/videos of BAPTISTE posing with firearms and/or ammunition;

E.      Any and all firearms, as well as and any and all frames, receivers, silencers, magazines, speed loaders, or other firearm components and accessories, other weapons, knives, crossbows, arrows or machetes;

F.      Any and all holsters, boxes, or containers utilized to contain and/or transport firearms and/or ammunition;

G.      Ammunition;

H.      Weapons of mass destruction and any components thereof, including any videos or other instructional materials or manuals.

I.      Evidence, to include correspondence, writings, manuals, books, instruction pamphlets, manuscripts, receipts, or other writings, papers, and evidence that relate to the use,

manufacture, production, dissemination, purchase, sale, or otherwise relate to a weapon of mass destruction.

J.     Any and all documents or materials, including magazines, in either electronic or hard copy printed format, related to ISIL, Al-Qaida, or other known terrorist organizations, as well as any other documents, materials, newspapers, web pages, or magazines dealing with firearms, weapons of mass destruction, or the reporting of or the advocacy of violence.

K.     Indicia of occupancy, residency, use or ownership of the Target Premises or Target Auto identified in Attachments A and B, including wallets, drivers licenses, address books, car registrations, receipts, handwritten notes, bank statements, credit card statements, correspondence, utility and telephone bills, delivered mail, keys, financial documents and records, maps, GPS devices, and other electronic devices including computers, iPads, and other electronic devices located within the Target Premises described in Attachment A.

L.     Computer equipment, digital storage devices, any magnetic, electronic and optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROM's, CD-R, CD-RW's, DVD's, optical disks, printers, or memory buffers, zip drives, smart cards, PC cards, memory calculators, other memory devices, as well as electronic dialers, electronic notebooks, cell phones, iPods, iPads, and other personal digital assistants which could contain data, information, records, or documents identified in this Attachment.

M.     Computer equipment and digital media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, routers, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

N.     Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, software or hardware;

O.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

P.     Electronic data, including call logs, contacts and their associated names and phone numbers, all stored videos and photographs, all metadata associated with the above, GPS location data, text messaging data and associated messaging applications, and any other records and data tending to show not only dominion and control over the target items listed in Attachment C, but all evidence, contraband, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 2339B, Providing or Attempting to Provide Material Support to a Foreign Terrorist Organization; or Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Convicted Felon.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-3534-WCT

IN THE MATTER OF THE SEARCH OF           )
AN AUTOMOBILE                            )
                                         )           FILED UNDER SEAL
                                         )

SEALED ORDER

The United States of America, having applied to this Court for an order sealing the application for a search warrant associated with an automobile described in Attachment B, and this order and the Court finding good cause:

IT IS HEREBY ORDERED that the application for a search warrant associated with an automobile described in Attachment B, the Warrant, any related documents and this order, shall be filed under seal until further order of this Court, however, the United States Attorney's Office may obtain copies of any sealed document for purposes of arrest, extradition, or any other necessary cause.

DONE AND ORDERED in chambers at Miami, Florida, this ____ day of November, 2016.

HONORABLE WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____

Date 11/7/14         Deputy Clerk

288

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  16 - 3533-WCT |
| A residence located at 950 N.W. 195th Street, Apt. 204, Miami, Florida 33150. | ) ) ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ Florida _____ *(identify the person or describe the property to be searched and give its location)*:

As described in attachment A,

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment "C"

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ 11/9/11 _____
*(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.       ☑ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_Duty U.S. Magistrate Judge_
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.

_____ until, the facts justifying, the later specific date of _____

Date and time issued:  11/9/11 _____                          _____ *Judge's signature*

City and state:   Miami, Florida _____     _____     William C. Turnoff, U.S. Magistrate Judge
                                                    *Printed name and title*

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date  11/9/11

289

## ATTACHMENT A

### Target Residence

<u>950 N.W. 95th Street, Apartment #204, Miami, Florida 33150</u>

The residence of Samuel Baptiste, **950 N.W. 95th Street, Apartment #204, Miami, Florida 33150**, is an apartment on the second floor of a circular shaped apartment building.

Photographs of the premises are below:





**ATTACHMENT C**

**DESCRIPTION OF THE ITEMS TO BE SEIZED**

All evidence, contraband, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2339B, Providing or Attempting to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Convicted Felon, including:

    A.       Documents pertaining to the purchase, sale, or possession of firearms and/or ammunition;

    B.       Handwritten items, contact lists, letters from prisoners relating to the violations listed above;

    C.       All publications regarding jihad, martyrdom, ISIL, explosives, tactical guides

    D.       Photographs/videos of firearms and/or ammunition, including photographs/videos of BAPTISTE posing with firearms and/or ammunition;

    E.       Any and all firearms, as well as and any and all frames, receivers, silencers, magazines, speed loaders, or other firearm components and accessories, other weapons, knives, crossbows, arrows or machetes;

    F.       Any and all holsters, boxes, or containers utilized to contain and/or transport firearms and/or ammunition;

    G.       Ammunition;

    H.       Weapons of mass destruction and any components thereof, including any videos or other instructional materials or manuals.

    I.       Evidence, to include correspondence, writings, manuals, books, instruction pamphlets, manuscripts, receipts, or other writings, papers, and evidence that relate to the use,

291

manufacture, production, dissemination, purchase, sale, or otherwise relate to a weapon of mass destruction.

J.      Any and all documents or materials, including magazines, in either electronic or hard copy printed format, related to ISIL, Al-Qaida, or other known terrorist organizations, as well as any other documents, materials, newspapers, web pages, or magazines dealing with firearms, weapons of mass destruction, or the reporting of or the advocacy of violence.

K.      Indicia of occupancy, residency, use or ownership of the Target Premises or Target Auto identified in Attachments A and B, including wallets, drivers licenses, address books, car registrations, receipts, handwritten notes, bank statements, credit card statements, correspondence, utility and telephone bills, delivered mail, keys, financial documents and records, maps, GPS devices, and other electronic devices including computers, iPads, and other electronic devices located within the Target Premises described in Attachment A.

L.      Computer equipment, digital storage devices, any magnetic, electronic and optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROM's, CD-R, CD-RW's, DVD's, optical disks, printers, or memory buffers, zip drives, smart cards, PC cards, memory calculators, other memory devices, as well as electronic dialers, electronic notebooks, cell phones, iPods, iPads, and other personal digital assistants which could contain data, information, records, or documents identified in this Attachment.

M.      Computer equipment and digital media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, routers, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

N.      Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, software or hardware;

O.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

P.      Electronic data, including call logs, contacts and their associated names and phone numbers, all stored videos and photographs, all metadata associated with the above, GPS location data, text messaging data and associated messaging applications, and any other records and data tending to show not only dominion and control over the target items listed in Attachment C, but all evidence, contraband, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 2339B, Providing or Attempting to Provide Material Support to a Foreign Terrorist Organization; or Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Convicted Felon.

(2)     Technical Requirements.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

g.      Searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the computer's data in a laboratory or other controlled environment.  This is true because of the following:

(1)     The peripheral devices which allow the users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.  Many systems storage devices require particular input/output devices in order to read the data on the system.  It is important that the analyst be able to properly re-configure the computer as it now operates in order to accurately retrieve the evidence.

(2)     In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on drives or on external media), as well as all related instruction manuals, or other documentation and data security devices.

22

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A residence located at 950 N.W. 195th Street, Apt. 204, Miami, Florida 33150.

)
)
)
)
)

Case No. 16 - 3533 WCT

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

As described in attachment A,

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "C"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2339B | Attempt/Provision of Material Support or Resources to a Designated Foreign Terrorist Organization; and |
| 18 U.S.C. 922(g)(1) | Possession of a firearm by a convicted felon. |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Timothy Dietz, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/9/16

City and state: Miami, Florida

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____

Deputy Clerk

Date 11/9/16

_____
*Judge's signature*

William S. Turnoff, U.S. Magistrate Judge
*Printed name and title*

295

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

Your affiant, Timothy Dietz, first being duly sworn, does hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     Based on information set forth in this Affidavit, there is probable cause to believe that at 950 NW 95th Street apartment #204 Miami, FL 33150 (Target Premises), the residence of Samuel Baptiste, there exists evidence, contraband, fruits, and instrumentalities relating to violations of: Title 18, United States Code, Section 2339B, Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person. I am hereby requesting authority to search the entire Target Premises for the items specified in Attachment C, which constitute evidence, contraband, fruits, and instrumentalities of the foregoing violations.

2.     Based on information set forth in this Affidavit, there is also probable cause to believe that in a white Ford Crown Victoria with Florida license GTCL21 (Target Automobile) registered to SAMUEL BAPTISTE (BAPTISTE) there exists evidence, contraband, fruits, and instrumentalities relating to violations of: Title 18, United States Code, Section 2339B, Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person. I am hereby requesting authority to search the entire Target Automobile for the items specified in Attachment C, which constitute evidence, contraband, fruits, and instrumentalities of the foregoing violations.

1

3.      I am a Special Agent with the United States Federal Bureau of Investigation (FBI) and have been since 2009.  Among my duties as an FBI Special Agent, I am responsible for the investigation of violations of federal law, including federal laws related to national security.  I am currently assigned to the FBI's Joint Terrorism Task Force (JTTF), where my primary responsibilities include the investigation of international terrorism.

4.      I am familiar with the facts and circumstances set forth in this affidavit based on: my participation in the investigation; my experience, training, and background as a Special Agent with the FBI and with the JTTF; personal observations and examination of relevant evidence; and information provided to me by other law enforcement officers and witnesses.  The information contained in this affidavit does not constitute all the facts of the investigation, and is provided for the limited purpose of establishing probable cause to obtain a search warrant.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that BAPTISTE has committed violations of Title 18, United States Code, Section 2339B, relating to the crime of Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization.  There is also probable cause to search the Target Premises described in Attachment A and Target Automobile described in Attachment B for evidence of this crime, as described in Attachment C.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that BAPTISTE has committed violations of Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person.  There is also probable cause to search the Target Premises described in Attachment A and Target Automobile described in Attachment B for evidence of this crime, as described in Attachment C.

2

297

7.      On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

8.      On May 15, 2014, the Secretary of State amended the designation of AQI as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham (ISIS), the Islamic State of Iraq and Syria (ISIS), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS. To date, ISIL remains a designated FTO. Beginning in 2014, using social media, ISIL has called for attacks against citizens – civilian and military – of the countries participating in the United States-led coalition against ISIL. For instance, on September 21, 2014, ISIL released a speech of Abu Muhammed Al-Adnani, a senior leader and official spokesman of ISIL, prior to his death. In this speech, entitled, "Indeed Your Lord is Ever Watchful," Al-Adnani called on Muslims who support ISIL from around the world to "defend the Islamic State" and to "rise and defend your state from your place where you may be."

## PROBABLE CAUSE

### BAPTISTE's Criminal History

9.      BAPTISTE was arrested on December 17, 2010 for his involvement in an armed robbery of a convenience store in Miami, Florida. BAPTISTE was originally released from prison on November 2, 2012, and received a scheduled term of Community Control until

3

November 2, 2014.   However, BAPTISTE violated his community control on multiple occasions, including removing his GPS monitoring device, and was ultimately remanded to state prison when he was re-arrested by the Miami-Dade Police Department on September 26, 2013. BAPTISTE remained incarcerated until his release on November 11, 2015.

10.   In late April 2014, agents with the Federal Bureau of Investigation initiated an investigation of BAPTISTE after law enforcement learned that he operated numerous social media accounts (including the Social Media Account 1 account "Khilafahaiti" and the Social Media Account 2 "Abdul Jalil Rashid Imarah") praising Al Qaeda terrorists Usama bin Laden and Anwar Al-Awlaki, in addition to encouraging jihad and referencing becoming a martyr.   The FBI assessed that BAPTISTE used his social media accounts since at least 2013 to disseminate extremist propaganda, to praise attacks conducted or inspired by Al Qaeda, and to promote travel to Syria for jihad.

11.   The FBI investigation specifically revealed  that BAPTISTE's Social Media Account 1, since inception in 2013, contained, and continues to contain extensive radical content including, but not limited to, extensive support for violent jihad; admiration for ISIL, Al-Qaeda, Anwar Awlaki, Usama bin Laden and previous terrorist events like the September 11, 2001 attacks; promotion of travel to Syria for jihad; updates on the status of ISIS battles; justification for killing women and children; the glorification of martyrdom, and indications of a desire to die as a martyr.

12.   On December 18, 2015, while reviewing BAPTISTE's Social Media Account 1 page, agents with the FBI observed two photos of what appeared to be a gun next to a Quran, sunglasses, and a kufi (Muslim prayer cap).   These photos had been posted on or about November 27, 2015, and bore the following hashtags: #Jihad #Train #Fisabilillah #Tawheed #Mujahid.  The sunglasses and kufi appeared identical to those previously worn by BAPTISTE.

4

299

13.    The FBI thereafter immediately notified the Florida Department of Corrections (FDOC) about finding the gun, due to the fact that BAPTISTE was on active conditional release supervision stemming from his previous sentence on probation violations from his armed robbery conviction.

14.    On or about December 21, 2015, personnel from the Florida Department of Corrections with the assistance of the FBI, conducted an administrative search of the BAPTISTE residence in Miami, Florida, in an effort to find the above mentioned gun.  During the search, an airsoft gun (a BB gun) in a holster was found which appeared identical to the gun depicted in the photo of the gun found online.  A machete was also found.

15.    Based upon these findings, officers with the Florida Department of Corrections took BAPTISTE into custody for a violation of his conditional release, and he remained incarcerated until approximately March 24, 2016.

16.    During the December 21, 2015 FDOC search, the items seized included hand-written documents by BAPTISTE.  One writing was entitled, "A refutation and proof against this strange [unintelligible] that they design concerning Al-Jihad" was written under the alias Abdul-Jalil Rashid Imarah al-Haiti ibn Baptiste.  BAPTISTE writes in part, "I began this work on 22nd of April 2014...I write this from the prison of the kuffar [non-believers] in the despicable country of America...After being harassed and threatened until I cant take no more I attempted to flee from such oppression. I turned to many ikhwan [brethren] and even different Imamah [Shia Islamic doctrine] of masajid [mosque]to aid me in making hijrah [religious journey] so that I can reach the safety and comforts of Darul-Islam but none were willing." BAPTISTE continued, "...so upon the encouraging words of my wife and a few close brothers I chose the lesser of the two evils and turned myself into the courts." The phrase "Darul-Islam" is a term used by ISIL to describe the territory which they control in Iraq and Syria.

5

**Baptiste's On-Line Activity - Social Media Account 1**

17.     BAPTISTE maintains a publically available Social Media Account 1.  On the that page, BAPTISTE uses various aliases including "Abdul-Jaleel Rashid Imarah Al-Haiti (Khilafahaiti)", "Abdul Jaleel Rashid Imarah Al-Haiti bin Baptiste (Khilafahaiti)" and "Abdul-Jalil Rashid Al-Imarah".  The Social Media Account 1 appeared to have started on or about May 30, 2013, and bears a subtitle of "Insha'Allah I'll be the Rifle of Allah".

18.     The Social Media Account 1 description includes:

"…Imam Anwar Al-Awlaki is a speaker and da'ee to me I don't consider him a Shaykh but a firm propagator of fiqhul-jihad and a knowledgeable akh who is an example to model after, a learned one and insha'Allah a shahid. Our "Sayyid" Ibn Ladin (rahimahullah) is one of the bravest man a noble and a prince of this ummah… *Ad-Dawlatul-Islamiiyah is our khilafah and Abu Bakr Al-Baghdadi is our Khalifa, undisputed fact by those with untainted faith nor desires and nifaq."* [Emphasis added].

19.     Since its inception in 2013, a review of BAPTISTE's Social Media Account 1 has revealed extensive radical content including (but not limited to): extensive support for violent jihad; admiration for ISIL, Al-Qaeda, Anwar Awlaki, Usama bin Laden and previous terrorist events like the September 11, 2001 attacks; promotion of travel to Syria for jihad; updates on status of ISIS battles; justification for killing women and children; glorification of martyrdom and indications of a desire to die as a martyr.

20.     For example, on September 3, 2013, BAPTISTE posted a poem on Social Media Account 1 which he claimed to have written, entitled "The Rifle points (Searching for me my war zone)".

*If only I could find my way to the battlefield, than I'd know for sure my parting would be with smiles, label my death heroic, death of a shaheed [martyr], how noble is it to die in the path of Allah, yet death may be aim, we don't treat the fight as a game, I suffer than they must suffer, and suffer they will and must, yet mines will be the blessed nose to inhale the dust fi sabilillah [for the sake of Allah], watch as Allah's Rifle takes aim, and send His enemies to His dungeon, Hell is a terrible abode and to arrive at that destination disbelievers are sure bold,*

6

301

hears the sparks, crackles and pops of a story never told, millions of corpses, decapitated heads of infidels, life purchased by a bullet since to the falsehood they quickly sailed, so they must fail, illegal commerce must always fail, imagine a bullet prayed over by the angels, heading straight between the eyes of our enemy, to purge this world of evil and send him quick to hell. [Emphasis added].

21.     After BAPTISTE's release from prison on November 8, 2015, BAPTISTE's Social Media Account 1, had a post titled, "Back after a pause..." The content of the post reads in part, "Just wanted to say that I am back and looking to get in contact with those whom I was straight with. 2 ½ of captivity now liberated. I know some of the smart ones changed accounts but hit me up". This post suggests that BAPTISTE intends to contact former inmates.

22.     On or about November 27, 2015, BAPTISTE posted on the Social Media Account 1, in part, "know that jihad is not to escape this world but to purify it. Know there are two outcomes and one is greater than the other. Victory or martyrdom. Victory is greater because through it institutions and programmes are established, Islam is elevated, and kuffar disgraced but that ultimately it leads to the next, which is martyrdom. Martyrdom leads to the akhirah [the end of time], which is where the mujahid [holy warrior] will find his Rabb [Lord] well pleased with him for his efforts and sacrifice . . . ."

23.     On or about December 3, 2015, BAPTISTE posted on the Social Media Account 1 what the FBI assesses to be a story written by him entitled "the Last Shahid" [Martyr], wherein he is on a "jihad expedition", tasked to clear the way forward for the army of the "amir". He describes a "bloodbath" as he and another brother kill many "kuffar" marines with guns, crossbows, and a machete. BAPTISTE added the hashtags "#daesh #khilafah #jihad #shaheed #abu bakr al-baghdadi #isis #ad dawlatu al islamiyyah #martyr #martyrdom #shuhadah #mujahideen."

7

302

24.    On or about December 14, 2015, Baptiste reposted on the Social Media Account 1 ten photographs with the caption "#islamic state of Iraq and sham." The photographs were of armed fighters in combat and bearing the ISIL flag.

25.    In or around early/mid December 2015, BAPTISTE reposted on the Social Media Account 1 multiple photographs and articles such as: How to Make Ballistic Plates for Body Armor; A Comprehensive Intro to Night Vision Devices; weapon concealment devices; various silencers; various automatic weapons; shotguns; handguns; knives; daggers; and ammunition. BAPTISTE also made various comments that indicated a love for, and a desire to have, guns.

26.    On or about October 22, 2016, BAPTISTE reposted on the Social Media Account 1 an article entitled "Combatants and Non-Combatants in al-Islam". It sought to answer the question of whether Islam allowed for the targeting of "civilians" in countries at war with Muslims. It stated, "If combatants and con-combatants are mixed together and integrated, it is allowed for the Muslims to attack them even if women, children, the elderly, farmers, merchants, and slaves get killed…" It further argued that "with all the aggression the West is committing against the Muslims this additional evidence leaves no room for those who argue on behalf of the general populations of the West."

27.    On or about October 26, 2016, BAPTISTE posted on the Social Media Account 1 ISIS imagery and wrote "[t]he shari'ah is established by force and whoever opposes is hit in the head with the sword and disposed in the trash as rubbish of history… and all those who oppose it are liars to their claim of concern for ummah." He added regarding the Khilafah, "if such shall be dismantled then it shall return even stronger and quicker than in the blinking of an eye. They shall be killed while we shall be martyred, they shall be disgrace while we are honored. And our Khaliph has promised us that such a time will come for the muwahid to walk upright with dignity in the face of the kuffar".

8

303

**BAPTISTE's Social Media Account 2 Online Activity**

28.    BAPTISTE maintains a publically available Social Media Account 2 page in the name "Abdul Jalil Rashid Imarah (Al-Haiti Baptiste bin Baptiste)" (the Social Media Account 2 Page), bearing Social Media Account 2 ID 100004603302262.   The page was created in November 2012.   Investigation has revealed that some content is available only to "friends", while some is openly available to anyone.

29.    The openly available Social Media Account 2 Page contains many photos of BAPTISTE, including numerous photos from September 2016 wherein BAPTISTE is posing with knives.

30.    In late June 2016, BAPTISTE reached out to an undercover persona utilized by an FBI undercover employee (UCE).   As a result, BAPTISTE and the UCE became Social Media Account 2 "friends".   Using such "friendship", the FBI reviewed the "friends only" version of BAPTISTE's Social Media Account 2 Page, revealing that from BAPTISTE's most recent prison release date, March 25, 2016, to June 12, 2016, his posts were largely benign concentrating on love, lost love, marriage, the search for a wife, Haiti, and various Islamic issues.   However, on June 12, 2016, after the deadly terrorist attack on the Pulse nightclub in Orlando by Omar Mateen, BAPTISTE made numerous posts wherein he decried political correctness of "homo sympathizers" and asked "whose blood is more sacred, his [Mateen's] or theirs [victims]".   BAPTISTE also referred to the victims as "those who have earned His wrath" and "infidel casualties".   After June 12, 2016, BAPTISTE did not post again until June 24, 2016, at which time the FBI assesses that the tone of the posts became markedly more extreme. The following summarizes some of the most concerning Social Media Account 2 activity on BAPTISTE's page in late June 2016:

9

- On or about June 29, 2016, BAPTISTE shared a post indicating that homosexuality was a crime against humanity.
- On or about June 28, 2016, BAPTISTE posted a comment about former President George W. Bush, "With the establishment of Dawlah [ISIL] I think he fears assassination more now".
- On or about June 26, 2016, BAPTISTE posted a photo with the words "You go, I go with you, You ride, I ride with you, If you die, I die with you". He added the comment, "Where are the muwahiddah who are the embodiment of such? Either in Sham [region near and including Syria] or on their way."
- On or about June 25, 2016, BAPTISTE shared a friend's post, which stated "If you hear about my death, please don't get sad... Know that this dunya pushed me to the edge; as far as I could go and now im finally at peace."
- On or about June 25, 2016, Baptiste shared a friend's post which stated "We live in a modern world where the enemies of Islam ask the Muslims to destroy their own Caliphate".
- On or about June 25, 2016, Baptiste shared a friend's post which depicts ISIL leader Abu Bakr Al Baghdadi and the quote, "Soon, by Allah's permission, a day will come when the Muslim will walk everywhere as a master, having honor, being revered, with his head raised high and his dignity preserved. Anyone who dares to offend him will be disciplined and any hand that reaches out to harm him will be cut off."

31.     On or about June 28, 2016, the FBI searched Social Media Account 2 for photos and stories that Abdul Jalil Rashid Imarah (BAPTISTE's Social Media Account 2 name) "liked" on the pages of others. On or about June 22, 2016, BAPTISTE "liked" a photo bearing the words "Don't consult anyone in killing Americans, going ahead and remember your reward from Allah... killing them is the core of Tawheed and core of Islam." The quote was attributed to Usama Bin Laden.

32.     On or about July 14, 2016, BAPTISTE "liked" the comment "truck run over kufr and killed many" regarding the truck attack on a crowd celebrating Bastille Day in Nice, France which killed over 80 people. ISIL declared responsibility for the attack. BAPTISTE also liked a comment indicating it was a "truck delivery for human parts... spare parts anyone?" BAPTISTE added his own comment, "Persona delivery of a hazardous load".

33.     On various dates in August and September 2016, BAPTISTE posted comments and poems written by him on his Social Media Account 2 Page relating to violence and killing. On or about August 29, 2016, BAPTISTE wrote "My blade is more dear to me than your neck." On or about September 5, 2016, BAPTISTE wrote "...I swear by Allah the blade and the neck shall meet for they were created for one another and the forehead and the bullet shall meet for they were created for one another..."   On or about September 7, 2016, BAPTISTE wrote "Instead of waiting on your beloved... Let's take a pact to wait on death... No lover's test or fantasies which causes stress... Meet on the other side of peek a boo explosives."

34.     On or about September 24, 2016, BAPTISTE posted on the Social Media Account 2 Page "Benefits" with a link to BAPTISTE's Messaging Application 1 Channel.

**BAPTISTE's Contacts With Undercover Employee (UCE)**

35.     On or about June 26, 2016, BAPTISTE and UCE had contact via Social Media Account 2 messenger, where they discussed BAPTISTE's desire to leave the U.S. for Syria in 2013 and that he had "7 ikhwan [brothers] go to Sham before Ad-Dawlah, 4 killed (Masha'Allah) and Allahu'alam on rest".

36.     On or about July 04, 2016, BAPTISTE and UCE had contact via Social Media Account 2 instant message feature where BAPTISTE commented on his view of death and martyrdom. BAPTISTE explained that the goal is not solely martyrdom: "The path is that victory is sought and if not attained one achieves shadah by one efforts which is still a victory. Double win. The goal is not shahadah. If everyone wants to die then who will rule? Who will teach? Who will build? You rather kill one kafir and meet your Rabb or kill a hundred and still be provided more chance to elevate this deen?"

37.     On or about July 06, 2016, BAPTISTE and UCE had contact via Social Media Account 2 instant message feature where BAPTISTE explained, "Plus Im not a basic thinker and

nor can I waste my life as the average civilian. I want to make a difference and leave behind a legacy. Not fight ignorantly or die as such. I want the firdaus not first level of jannah. I have too much sins to place my faith lightly by aiming low. Gots to shoot high. I want to be in the ranks of the Sahabah. I don't want to be a lion, I'm a wolf. It's easy to hunt a lion because they all present themselves as mighty and majestic. It's difficult to hunt the lonesome, alpha, noble elusive wolf who leads a pack and can strike as one. And wolves are better hunters any day."

38. On or about July 08, 2016, BAPTISTE and UCE had contact via Social Media Account 2 instant message feature where BAPTISTE explained his visions of a successful terrorist attack on the United States. BAPTISTE wrote, "If one could conquer a portion of Darul-Kufr [referring to the United States] and raise flag of Islam here do you know that such conquerer would be greatest Muslim of our times? Even if they have control of such portion for only a week. It will be like when we struck Constantinople after several attempts of failure. That would be the greatest service a muwahid could do to the khilafah and ummah." Baptiste additionally wrote, "Imagine let's say 15 Muslims take over 6 buildings on one block and cordoned off exits. What is that? Hostage situation. If they last for 2 weeks til last man and black flag raised in heart of kafir then that is something major."

39. On August 26, 2016 BAPTISTE and UCE had contact via Social Media Account 2 audio call where BAPTISTE discussed previous possession of firearms and desire to go to a shooting range. Specifically, BAPTISTE indicated that when he was "on the run" in 2013, he had "two firearms, like I had a knife for myself and my ex-wife had like a 22." At the time, BAPTISTE had a friend that often went to the shooting range and who assured him that they only check ID, but BAPTISTE ultimately did not go. However, BAPTISTE told UCE that he recently made plans with another individual who offered to take him to the range, but that BAPTISTE was hesitant because he had just gotten out of prison and he could be watched.

12

307

BAPTISTE described discussing the matter with another associate who told him not to take the risk of going shooting.  BAPTISTE told UCE that he would cancel the plans to go shooting, considering that he was probably being watched by the kuffar [U.S. law enforcement].  However, BAPTISTE indicated that he would "hit up" some felons he knows and see what shooting range they go to, then he would be willing to go to a shooting range like that.  Regarding firearms, BAPTISTE said that he could easily get a gun in someone else's name, but could not get one in his own name because of his criminal record.  BAPTISTE said that it was not difficult to get a weapon in the U.S. and that he knew people that sold "stuff like that".

40.     On or about August 28, 2016, BAPTISTE and UCE had contact via Social Media Account 2 audio call where BAPTISTE described his close relationship with Abu Daim, a prison inmate with whom BAPTISTE was previously incarcerated.  BAPTISTE discussed writing letters to and receiving letters from Abu Daim.  BAPTISTE described writing Abu Daim a letter a few weeks ago wherein he told Abu Daim that "the caravans are gone" [believed to be a reference to joining the mujahideen].  In response, Abu Daim wrote BAPTISTE a letter, which BAPTISTE had in his car during conversation with UCE.  BAPTISTE read from the letter, which asked "You still here? Or you gone!".  Abu Daim wrote that he understood that the caravans were gone, but "I still feel the urge for battle, I don't read too many articles anymore, just enough to stay abreast, as it stirs inside of me a feeling I can't get rid of unless I talk about it and get my frustrations out but once again there is no one to talk to so I just keep my feeling in check for the time being."  BAPTISTE told UCE that he wanted to print some Islamic reading material in order to send them to Abu Daim.

41.     Personnel at the Dade Correctional Institution advised that on September 30, 2016, five separate envelopes were intercepted from inmate Deven Cooper, aka Abu Daim.  The envelopes contained ISIL propaganda.  All of the envelopes bore the return address of "Your

Companion, 950 NW 95th Street, Apt #204, Miami, FL 33150", which is the residence of BAPTISTE (the Target Premises).

42.   BAPTISTE is the user of Messaging Application 1 account @khilafahaiti.   On or about September 19, 2016, BAPTISTE sent UCE a message from his Messaging Application 1 @khilafahaiti which was forwarded from Messaging Application 1 channel "Inspire the Believers". The message was an FBI "seeking information" poster regarding Ahmad Khan Rahami, who is believed to be the person responsible for setting multiple bombs in New York and New Jersey on September 17 and 18, 2016.  The message from Inspire the Believers stated "This is our brother Ahmad, Suspected of 2 Blasts inside the US, and reportedly injured 2 NYPD dudes! Alhamdulillah "Yuqatiloona fee sabilillah…"

43.   On or about September 20, 2016, BAPTISTE sent UCE a message from his Messaging Application 1 @khilafahaiti.   BAPTISTE forwarded a post from "Diary of a Muhajirah" titled "virtues of the martyrs" which glorified martyrdom.

44.   On or about September 21, 2016, BAPTISTE spoke on the telephone with UCE. BAPTISTE stated that his sister recently said she was going to call the FBI about BAPTISTE. He said that his sister claimed to have overhead BAPTISTE on the phone saying that more people should have died and that the guy did not execute the plan correctly.  The FBI believes that this is a reference to the September 2016 terror attacks in New York City.   Further, BAPTISTE said that his sister claimed that BAPTISTE was making bombs in the house.

45.   On September 22, 2016, UCE spoke with BAPTISTE on the phone.  BAPTISTE stated that he just created his own Messaging Application 1 channel named Dhikrul-jihad wal-qasas ["remembering jihad and punishment"].   BAPTISTE told UCE that he added UCE as a member.

46.     Using UCE's membership, the FBI reviewed the Messaging Application 1 channel Dhikrul-jihad wal-qasas on or about September 22, 2016, revealing that it was created on September 21, 2016. The channel includes content previously posted on BAPTISTE's Social Media Account 1 Khilafahaiti. BAPTISTE also forwarded content from Messaging Application 1 channel named "Diary of a Muhajirah", including a post titled "JIHAD and HIJRAH", which stated [in part] "...regardless of where you are, know that pledging allegiance is an obligation upon you, as is listening to your leader, the Caliph, and obeying his command." It also advises that anyone who is capable should make hijrah to the Islamic State, but if one is not capable they should wage jihad behind enemy lines. Further, it states "the blood of the disbelievers is obligatory to spill by default. The command is clear. Kill the disbelievers... if the tawaghit have shut the door of hijrah in your faces, then open the door of jihad in theirs..."

47.     FBI review of the Messaging Application 1 channel Dhikrul-jihad wal-qasas on or about September 24, 2016, revealed that on or about September 23, 2016, BAPTISTE posted an extensive discussion of the "lone wolf". The post includes, "[w]hen a wolf is outside by himself and sees some prey, he will try to attack it. Then he will return home; victorious, injured or killed. The results with be that other wolves will be inspired by him...The lone wolf believer is always looking for an opportunity to get hold of something to use to attack his enemy severely. He ideally will use a weapon, but if he cannot — he will use something like a knife or a car to crash into the enemy... A few minutes before carrying out his attack, the lone wolf will claim responsibility for the attack on social media (saying his group did it, and showing what his claim of allegiance is to, i.e. the Caliphate)... Small cells [or 'wolf packs'] (of 1 to 5 individuals who trust each other) will do 'hit and run' tactics against the police enemy.  If many independent small cells form, an insurgency can begin...before any insurgency begins, it starts off with small attacks. Lone wolf attacks and Small cell attacks is how it all begins. These attacks can include

15

310

soft targets to 'steal' money or get weapons. Once these become the norm, a gradual insurgency will begin." The post then goes on to provide links to the "best guide available on this topic" called "MujSecurity".

48.     On or about October 5, 2016, BAPTISTE told UCE that he got a new phone and "switched from Cricket to Metro". BAPTISTE told UCE that he has started using Virtual Private Networks for security purposes, noting that he doesn't use his regular browser anymore on his phone and his laptop. BAPTISTE said that he downloaded an application called "Chat Secure" and that, from now on, they will be using Chat Secure and Messaging Application 1 for anything important. Later, via Messaging Application 1, BAPTISTE told UCE that he kept his old phone and can still access Messaging Application 1 on that one with wifi. BAPTISTE added that he hasn't allowed Google to sync his contacts to his new phone because the kuffar can infiltrate his phone through Google.

49.     On or about October 10, 2016, BAPTISTE and the UCE spoke on the phone about an Imam from Haiti, subsequently identified as "Abdul Jabar", true name Jose Noel (Noel), whom BAPTISTE has known since 2013. UCE asked whether BAPTISTE and Noel had spoken about dawah efforts in Haiti. BAPTISTE responded, "yeah, we've talked about that... but we've talked about you know, there's some other stuff that the type of stuff we usually talk about but I have to wait until we are on Telly and what not to talk about but you know inshaAllah Taala we are on the same page."

50.     On October 18, 2016 BAPTISTE sent UCE $50 to hold for him via Western Union. BAPTISTE provided his address on the Western Union receipt as 950 NW 95th Street, Apt 204, Miami Florida 33150. His cell phone was listed as 305-793-2397, a known phone number of BAPTISTE.

51. On or about October 23, 2016, BAPTISTE told UCE that he was nervous because Noel wanted to go to a range to shoot guns with another individual, who unbeknownst to BAPTISTE is an FBI confidential human source (CHS). BAPTISTE was not sure he wanted to do this, saying he trusted Noel but was unsure if he could trust the other individual. BAPTISTE told UCE that he had called a brother of his that works for an airline to check if BAPTISTE was on the No-Fly list. Shortly thereafter, BAPTISTE indicated that his source at the airline indicated BAPTISTE was not on the list. As a result, BAPTISTE left UCE a message on Messaging Application 1 indicating that he would go to the range and asked that UCE "make duaa for me, lots and lots of duaa." Later on October 23, 2016, BAPTISTE sent UCE a series of pictures of himself loading a gun, pointing two handguns, as well as a video of himself shooting. BAPTISTE indicated that he did not have any problems at the range and promised to teach UCE how to shoot.

52. On October 23, 2016, during a secure chat with UCE on Messaging Application 1, BAPTISTE indicated that he was laying foundations for future plans that he could not discuss with UCE. He stated, "this doesn't only involve me but the fate of other people... And I can't betray the trust of others. No excuse. Only if you were my zawjah [wife] would there be an exception."

53. On or about October 27, 2016, BAPTISTE and UCE spoke by phone. BAPTISTE said that he was sitting in the car in the parking lot at his residence. When UCE asked BAPTISTE why he was sitting in his car, he said "I've got some work, I'm, I'm checking, just checking a couple of stuff on line." UCE asked BAPTISTE if he could do that at home and he said "Yes I could . . . ." UCE commented that he/she found it strange that BAPTISTE was sitting in his car in front of his house to which he replied "I do that a lot . . . ." During earlier contact on same day, BAPTISTE commented that he had spent three hours in his car the evening

17

312

before "because I was doing stuff on the phone". The FBI believes that BAPTISTE was referring to the Target Automobile.

### Contacts With FBI Confidential Source

54.     In mid-October 2016, agents with the Federal Bureau of Investigation launched an investigation of Noel based on information provided by a FBI Miami Confidential Human Source (CHS). The CHS was first introduced to Noel through his associate, BAPTISTE, on or about October 10, 2016. On October 11, 2016, in a meeting, Noel told the CHS about a security company he was trying to establish in Haiti and his desire to obtain guns for this company. Noel told the CHS he would like to obtain a T-56 rifle which Noel explained was similar to an AR-15 assault rifle. Noel told the CHS that he had previously obtained illegal guns from family members in Pompano, Florida and further claimed to have transported concealed weapons to Haiti in the past. Noel then described how he had concealed weapons in the past by secreting them in CD players, radios, and cars, which were then exported to Haiti. During this meeting, Noel further explained his plans to marry a U.S. citizen for the sole purpose of obtaining legal status in the U.S., as well as revealed his ideological support for the killing of attendees at a LGBT (Lesbian, Gay, Bisexual, and Transgender) parade in Haiti.

55.     On October 20, 2016, the CHS, in a conversation that was audio recorded, had a separate discussion with BAPTISTE about going to a gun range. The CHS informed BAPTISTE that Noel has indicated to him that he wanted to go to a gun range. BAPTISTE then told the CHS that he did not know of a gun range that did not require ID or report to the police, but asked the CHS if he knew of any gun ranges that did not run records checks, or where they could just go and show ID, as BAPTISTE wanted to go there.

56.     On October 23, 2016, Baptiste was observed by FBI surveillance departing his apartment building at 950 NW 95th Street, Miami Florida 33150 in a white Crown Victoria,

known by the FBI from previous surveillance and meetings with CHS as a white Crown Victoria

bearing Florida license plate GTCL21 (Target Automobile). He traveled to the residence of Noel

and then on to the Florida Gun Center in Hialeah, Florida.

57.     Later on October 23, 2016, Noel, BAPTISTE, and the CHS entered the Florida

Gun Center located at 1770 West 38th Place, Hialeah, Florida 33012.  Once inside, BAPTISTE,

Noel, and the CHS were captured on video surveillance by the Florida Gun Center as well as by

members of the FBI Miami JTTF, renting, possessing, and thereafter shooting multiple firearms

inside the facility.

58.     Later that day, an employee of the Florida Gun Center provided the FBI with the

original liability form signed by BAPTISTE as well as a copy BAPTISTE's identification

presented to employees.  This liability form, signed by Noel and BAPTISTE indicated the use of

two boxes of 9mm ammunition and two boxes of .223 ammunition as well as the rental of

various firearms: "1 Sig 320", "1 M9", "1 Sig 229", and "1 AR15".  The Florida Gun Center

thereafter voluntarily turned over the weapons utilized by and BAPTISTE and Noel which were

formally identified by the FBI Miami JTTF as follows:

> 1 Sig Sauer 320 9mm pistol with serial number 58A070264
> 1 Beretta 9mm M9 pistol with serial number M9-183745
> 1 Sig Sauer P226 9mm pistol with serial number 47A169579
> 1 Smith & Wesson Sport M&P Sport rifle with serial number SX01461

59.     Moreover, agents received a purchase receipt obtained from the Florida Gun

Center bearing customer name SAMUEL BAPTISTE, home phone 305-793-2397, and displays

in part the rental of one Sig Sauer P320, one Sig Sauer P226, one Beretta M9, and one Smith and

Wesson M&P Sport as well as ammunition and targets.

## Use of Computers in Terror Related Offenses

60.    Based on your affiant's training and experience and discussions with other law enforcement officers, persons committing or intending to commit terrorism related offenses often utilize computers, data storage devices (*e.g.*, external storage devices, ZIP disks, and CD-ROMs), and other electronic communications equipment. These persons often use computers and peripheral devices to search the internet and communicate with co-conspirators or other sympathizers in terrorism related activities.

## Seizure of Computers and Computer-Related Equipment

61.    Based on my training, experience, and my own personal knowledge and use of computers, your affiant knows the following:

a.    Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units and self-contained "laptop" or "notebook computers); internal and peripheral storage devices (such as fixed disks, floppy disks, external hard disks, floppy disk drives and diskettes, tape drives and optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical lock and keys).

b.    Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic,

magnetic, optical or other digital form. It commonly includes programs to run operating systems, applications, utilities, compilers, interpreters, and communications programs.

      c.      Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

      d.      Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (which is a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

      e.      Computer hardware and computer software may be utilized to store information or data in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer related equipment including visual depictions. This media includes but is not limited to fixed hard drives and removable hard drive cartridges, laser disks, tapes, floppy disks, CD ROMs and any other media capable of storing magnetic coding.

      f.      Searching and seizing information from computers often requires agents to seize most or all electronic storage devices, along with related peripherals, to be searched later by a qualified expert in a laboratory or other controlled environment. This is true because of the following:

(1)   The volume of evidence.  Computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of thousands of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he might store it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime.  This sorting process can take weeks, depending on the volume data stored, and it would be impractical to attempt this kind of data search on site.  However, an attempt by a qualified expert will be made on site to create an "image" of the computers to be searched in order to lessen the impact on the subject business.  If the computer expert is unable to create the image onsite, the computer will be seized and imaged in a laboratory or other controlled environment.  In this instance, every effort will be made to return the computers as soon as possible.

(2)   Technical Requirements.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

g.   Searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the computer's data in a laboratory or other controlled environment.  This is true because of the following:

22

317

(1)     The peripheral devices which allow the users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.   Many systems storage devices require particular input/output devices in order to read the data on the system.   It is important that the analyst be able to properly re-configure the computer as it now operates in order to accurately retrieve the evidence.

(2)     In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on drives or on external media), as well as all related instruction manuals, or other documentation and data security devices.

### CONCLUSION

62.     Based on the forgoing facts, I respectfully submit that there is probable cause to believe that at 950 NW 95th Street apartment #204 Miami, FL 33150 (Target Premises), the residence of BAPTISTE, there exists evidence, contraband, fruits, and instrumentalities of violations of:   Title 18, United States Code, Section 2339B, Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person.   These facts also establish probable cause to believe that in a white Ford Crown Victoria with Florida license GTCL21 (Target Automobile) registered to BAPTISTE there exists evidence, contraband, fruits, and instrumentalities relating to violations of: Title 18, United States Code, Section 2339B, Providing or Attempting or Conspiring to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Prohibited Person.   I am hereby requesting authority to search the entire Target Premises and Target Automobile for the items specified in Attachment

C, which constitute evidence, contraband, fruits, and instrumentalities of the foregoing violations.

## REQUEST FOR SEALING

63.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.   These documents discuss an ongoing criminal investigation that is neither public nor known to the targets of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

*FURTHER YOUR AFFIANT SAYETH NAUGHT.*

TIMOTHY DIETZ, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed to and sworn before me in
Miami, Florida this _____ day
of November, 2016.

Honorable William C. Turnoff
U.S. Magistrate Judge

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____

Date _____  Deputy Clerk

24

## ATTACHMENT A

### Target Residence

950 N.W. 95th Street, Apartment #204, Miami, Florida 33150

The residence of Samuel Baptiste, **950 N.W. 95th Street, Apartment #204, Miami, Florida 33150,** is an apartment on the second floor of a circular shaped apartment building.

Photographs of the premises are below:





320

## ATTACHMENT C

### DESCRIPTION OF THE ITEMS TO BE SEIZED

All evidence, contraband, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2339B, Providing or Attempting to Provide Material Support to a Foreign Terrorist Organization; and Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Convicted Felon, including:

A.      Documents pertaining to the purchase, sale, or possession of firearms and/or ammunition;

B.      Handwritten items, contact lists, letters from prisoners relating to the violations listed above;

C.      All publications regarding jihad, martyrdom, ISIL, explosives, tactical guides

D.      Photographs/videos of firearms and/or ammunition, including photographs/videos of BAPTISTE posing with firearms and/or ammunition;

E.      Any and all firearms, as well as and any and all frames, receivers, silencers, magazines, speed loaders, or other firearm components and accessories, other weapons, knives, crossbows, arrows or machetes;

F.      Any and all holsters, boxes, or containers utilized to contain and/or transport firearms and/or ammunition;

G.      Ammunition;

H.      Weapons of mass destruction and any components thereof, including any videos or other instructional materials or manuals.

I.      Evidence, to include correspondence, writings, manuals, books, instruction pamphlets, manuscripts, receipts, or other writings, papers, and evidence that relate to the use,

321

manufacture, production, dissemination, purchase, sale, or otherwise relate to a weapon of mass destruction.

J.      Any and all documents or materials, including magazines, in either electronic or hard copy printed format, related to ISIL, Al-Qaida, or other known terrorist organizations, as well as any other documents, materials, newspapers, web pages, or magazines dealing with firearms, weapons of mass destruction, or the reporting of or the advocacy of violence.

K.      Indicia of occupancy, residency, use or ownership of the Target Premises or Target Auto identified in Attachments A and B, including wallets, drivers licenses, address books, car registrations, receipts, handwritten notes, bank statements, credit card statements, correspondence, utility and telephone bills, delivered mail, keys, financial documents and records, maps, GPS devices, and other electronic devices including computers, iPads, and other electronic devices located within the Target Premises described in Attachment A.

L.      Computer equipment, digital storage devices, any magnetic, electronic and optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROM's, CD-R, CD-RW's, DVD's, optical disks, printers, or memory buffers, zip drives, smart cards, PC cards, memory calculators, other memory devices, as well as electronic dialers, electronic notebooks, cell phones, iPods, iPads, and other personal digital assistants which could contain data, information, records, or documents identified in this Attachment.

M.      Computer equipment and digital media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, routers, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

N.      Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, software or hardware;

O.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

P.   Electronic data, including call logs, contacts and their associated names and phone numbers, all stored videos and photographs, all metadata associated with the above, GPS location data, text messaging data and associated messaging applications, and any other records and data tending to show not only dominion and control over the target items listed in Attachment C, but all evidence, contraband, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 2339B, Providing or Attempting to Provide Material Support to a Foreign Terrorist Organization; or Title 18, United States Code, Section 922(g)(1), relating to the crime of Possession of a Firearm by a Convicted Felon.