# EXHIBIT 8

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 2 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 1 of 53

1

```
 1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                  CASE NO. 16-03532-CRIMINAL-TURNOFF
 3

 4   UNITED STATES OF AMERICA,           Miami, Florida

 5                 Plaintiff,            November 16, 2016

 6          vs.                         10:36 a.m.

 7   SAMUEL BAPTISTE and
     JOSE NOEL,
 8
                  Defendants.           Pages 1 to 53
 9   _____

10

11                      DETENTION HEARINGS
            BEFORE THE HONORABLE ANDREA M. SIMONTON,
12              UNITED STATES MAGISTRATE JUDGE
             (TRANSCRIBED FROM THE DIGITAL AUDIO RECORDING)

13

14   APPEARANCES:

15
     FOR THE GOVERNMENT:       MARC ANTON, ESQ.
16                             ASSISTANT UNITED STATES ATTORNEY
                               99 Northeast Fourth Street
17                             Miami, Florida 33132

18

19   FOR THE DEFENDANT         IAN McDONALD, ESQ.
                 BAPTISTE:     ASSISTANT FEDERAL PUBLIC DEFENDER
20                             150 West Flagler Street
                               Miami, Florida 33130
21

22
     FOR THE DEFENDANT         MANUEL L. CASABIELLE, ESQ.
23               NOEL:         MANUEL L. CASABIELLE, P.A.
                               2525 Ponce de Leon Boulevard
24                             Suite 300
                               Coral Gables, Florida 33134
25
```

```
 1   TRANSCRIBED BY:              LISA EDWARDS, RDR, CRR
                                  Official Court Reporter
 2                                United States District Court
                                  400 North Miami Avenue
 3                                Twelfth Floor
                                  Miami, Florida 33128
 4                                (305) 523-5499

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2                                   Direct   Cross   Red.

 3        WITNESSES FOR THE GOVERNMENT:

 4        Barbara Collazo                14

 5                                       34      40

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 5 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 4 of 53

4

```
 1          THE COURT:  We've already handled Page 6 of the
 2   calendar.
 3          So turning now to Page 7, we have United States versus
 4   Samuel Baptiste and Jose Noel.  Since this is the last case on
 5   the calendar, even if I were setting it to the end, we would be
 6   handling this.  Case No. 16-3532.
 7          MR. ANTON:  Good morning, your Honor.  Marc Anton on
 8   behalf of the United States.
 9          MR. McDONALD:  Good morning, your Honor.  Ian McDonald,
10   assistant federal public defender, here on behalf of
11   Mr. Baptiste.
12          THE COURT:  Okay.  Mr. Baptiste, could you state your
13   name and age, please.
14          DEFENDANT BAPTISTE:  Samuel Baptiste, age 24, ma'am.
15          THE COURT:  Thank you, sir.
16          And on behalf of Mr. Noel?
17          MR. CASABIELLE:  Good morning, your Honor.  Manny
18   Casabielle on behalf of Jose Noel.
19          THE COURT:  Thank you.
20          Mr. Noel, would you state your name and age, please.
21          DEFENDANT NOEL:  (Through the Creole interpreter) My
22   name is Noel Jose.  I'm 30 years old.
23          THE COURT:  Okay.  We're here today for detention
24   hearings for both Mr. Baptiste and Mr. Noel.
25          Are these contested detention hearings or is there a
```

```
 1   stipulation?

 2          MR. ANTON:  Judge, they're contested.

 3          THE COURT:  They're contested?

 4          MR. ANTON:  Yes, your Honor.

 5          THE COURT:  Okay.  As to both?

 6          MR. ANTON:  Well, I believe it's -- it's contested as

 7   to Mr. Baptiste.  But because it's going forward on

 8   Mr. Baptiste, Mr. Noel said, "I might as well listen."  So

 9   essentially, it's --

10          THE COURT:  Well, the short answer is yes?

11          MR. ANTON:  Yes.

12          THE COURT:  Okay.  Let me get my computer set up here

13   so that I can take notes.

14          I will proceed in this case in the same way that I

15   proceed in all detention cases.  I'll let the Government

16   proceed by way of proffer and I'll have the Government provide

17   an agent in the event that the defense attorneys want to

18   conduct a brief direct examination, not for the purpose of

19   taking a discovery deposition -- and I say that for the benefit

20   of the Defendants.  I know counsel is well aware of it.  But in

21   case they're wondering why their counsel doesn't go into every

22   detail and try to learn the identity of confidential informants

23   and the full, you know, evidence against them, it's really an

24   abbreviated proceeding where you can inquire regarding the

25   strength of the evidence that the Government is relying on.
```

```
 1   But it's not a discovery deposition to learn every detail of

 2   the Government's case.

 3          So, Mr. Anton, do you want to call your -- call an

 4   agent to be available in the event that there is some

 5   examination that is desired?

 6          MR. ANTON:  Yes, Judge.  We have FBI Special Agent

 7   Barbara Collazo available for cross-examination today.

 8          THE COURT:  It will actually be direct examination,

 9   unless you're going to call her --

10          MR. ANTON:  Well --

11          THE COURT:  -- by the Defendants.

12          MR. ANTON:  Judge, I could certainly call her.  But our

13   factual presentation in this case is laid out in the criminal

14   complaint that was signed by --

15          THE COURT:  No.  I'm just saying, when you say

16   "available for cross-examination," it would be --

17          MR. ANTON:  Yes.

18          THE COURT:  -- it would actually be a direct

19   examination by the defense if they elect to do so, which has

20   certain implications in terms of the Jencks Act.

21          MR. ANTON:  Yes, Judge.

22          THE COURT:  So if she'll come forward and be sworn,

23   please.

24          BARBARA COLLAZO, GOVERNMENT WITNESS, SWORN.

25          THE WITNESS:  Special Agent Barbara Collazo,
```

```
1    B-A-R-B-A-R-A C-O-L-L-A-Z-O.  And I'm employed at the FBI Miami

2    division for the joint terrorism task force.

3             THE COURT:  Okay.  Let me just finish getting my notes

4    together here.

5             If you can begin by telling me the basis on which

6    you're seeking detention and whether there is -- as to each

7    Defendant and whether there is any statutory presumption, any

8    potential maximum sentence, as well as any guidelines.  And I

9    will permit you to incorporate by reference the averments in

10   the criminal complaint, and then you can highlight any salient

11   facts for me, Mr. Anton.

12            MR. ANTON:  Judge, as to Mr. Noel, the Government is

13   proceeding under the theory of risk of flight.

14            And as to Mr. Baptiste, it would be both danger to the

15   community and risk of flight as well.

16            THE COURT:  Are there any statutory presumptions that

17   are --

18            MR. ANTON:  There are no statutory presumptions that

19   apply in this case.

20            THE COURT:  Okay.

21            MR. ANTON:  The statutory maximum as to each count is

22   ten years' imprisonment.

23            THE COURT:  And what are the estimated guidelines?

24            MR. ANTON:  As to Mr. Baptiste, the estimated

25   guidelines would appear to be approximately 78 to 97 months.
```

```
 1              And as to Mr. Noel, it would be approximately three

 2    years.

 3              THE COURT:  Okay.  I'll let you proceed by way of

 4    proffer.

 5              MR. ANTON:  Judge, by way of proffer, as indicated

 6    earlier, we would be adopting the complaint as sworn to before

 7    Judge Turnoff.  And I will reserve at this point any additional

 8    highlights for the Court for --

 9              THE COURT:  Well, why don't you go through, because I

10    skimmed it briefly.  But why don't you go through and give me a

11    little summary of each Defendant's role and then your argument

12    with respect to why that Defendant should be detained.  And you

13    can do them in whatever order that you want.

14              MR. ANTON:  Okay, Judge.

15              As to Mr. Baptiste, the FBI investigation began in

16    approximately April of 2014 because Mr. Baptiste had social

17    media accounts that contained extensive radical content,

18    including support for violent jihad, admiration for ISIL or

19    ISIS, Al-Qaeda, Anwar Awlaki, Osama bin Laden, as well as

20    previous terrorist events like September 11th, 2001.

21              He also was promoting travel to Syria for jihad.  He

22    was providing updates on the status of ISIS battles.  He was

23    providing justification for the killing of women and children.

24    He was indicating that -- or documenting the glorification of

25    martyrdom and he had indications of a desire to die as a
```

1   martyr.

2          So the FBI began an investigation wherein, as indicated

3   in the complaint, an undercover confidential source was

4   inserted.  The conversations between this source and Samuel

5   Baptiste for a while discussed Mr. Baptiste's jihadi background

6   or support for jihad, but then quickly turned to Mr. Baptiste's

7   desire to possess and shoot firearms.

8          More specifically, the conversations turned in

9   approximately mid-October.  These conversations were all

10  audio-recorded.  And the conversations ultimately led to Samuel

11  Baptiste, the confidential source and an individual by the name

12  of Jose Noel going to a shooting range where they provided

13  their identifications and rented numerous weapons.

14         They then shot over a course of a couple hours or so

15  multiple firearms.  They rented these guns.  They possessed

16  these guns.  They rented and also possessed ammunition as well.

17         Mr. Baptiste is a convicted felon, having been

18  convicted multiple times.  And I'll go into that in a little

19  more detail later.  But he had his -- at least six prior felony

20  convictions.  So therefore, he is a prohibited person.

21         The conversations between Mr. Baptiste and the

22  confidential source also included Jose Noel, who indicated that

23  he had a desire to not only shoot weapons, but to obtain at

24  least two AR-15 assault rifle-type -- style weapons for

25  smuggling and export out to Haiti.

1          So the conversations that were audio-recorded between

2     the individuals discussed how Mr. Noel could obtain these

3     weapons and then smuggle them in a shipping container out to

4     Haiti.

5          I would also note that Mr. Noel, who is here on a

6     visitor visa, is an alien who is prohibited from possessing a

7     firearm.  And he, too, went to the shooting range with

8     Mr. Baptiste and the confidential source in this particular

9     case.

10          After the two individuals had conducted their shooting

11    activities at the shooting range, the FBI arranged for the

12    delivery of two AR-15 assault-type rifles that Mr. Noel had

13    indicated he wanted to smuggle out to Haiti.  They took safety

14    precautions to ensure that they could not fire.  But

15    nonetheless, Mr. Noel paid approximately $300 to the source for

16    the provision of these two weapons.

17          And then in the -- in the presence of Mr. Baptiste and

18    the source in late October, Mr. Noel took possession of these

19    weapons and all three of them attempted to hide these weapons

20    inside and actually did hide these weapons inside a shipping

21    container, which the FBI portrayed was bound to Haiti.

22          So those are the general summary of the facts as

23    contained within the complaint affidavit.

24          THE COURT:  Okay.  And I'll hear argument on detention.

25          MR. ANTON:  Judge, as to Mr. Noel, he is a risk of

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 12 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 11 of 53

11

1   flight in this particular case.  He has absolutely no ties to

2   the United States.  His entire family is in Haiti.  He is here

3   on a visitor's visa.  Immigration and Customs Enforcement has

4   lodged a detainer against this individual.

5          I would point out that he arrived in the United States

6   on September 22nd of 2016; and already by the beginning of

7   October, he was allegedly committing the above-referenced

8   crimes by attempting to smuggle guns back to Haiti and

9   possessed firearms as an alien who was ineligible to possess

10  firearms in this particular case.

11         So the Government feels that he is certainly a risk of

12  flight in light of the fact that he has no legal status here in

13  the country.

14         As to Mr. Baptiste, he has an extensive criminal

15  history that starts as early as November of 2009, where he was

16  convicted of the sale of marijuana and carrying a concealed

17  firearm.

18         In February of 2010, he was convicted of possessing a

19  controlled substance.

20         In January of 2011, he was convicted of attempted

21  murder with a firearm, armed robbery with a firearm and the

22  possession of a firearm by a convicted felon.

23         In December of 2011, he was convicted of strong-arm

24  robbery.

25         He's been to prison on two separate occasions.  He's

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 13 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 12 of 53

12

1   violated his probation on two separate occasions.  While he was

2   out on conditional release in one of his underlying state

3   convictions, he violated the terms of his conditional release

4   by possessing weapons.  He was put back into custody and he was

5   ultimately released on March 24th of 2016.  And this new

6   offense conduct occurred only about seven months later.

7          According to his probation records, they indicate that

8   he has previously lied about his residence and failed to remain

9   confined as directed by the probation office.  And in fact, in

10  September of 2013, while being monitored by electronic

11  monitoring, he was accused of and ultimately admitted to

12  cutting off his GPS monitor and was essentially a fugitive for

13  quite some time.

14         The guidelines in this offense are probably an offense

15  level 26, for an estimated guideline range of 78 to 97 months,

16  assuming a Category III.  There's a ten-year statutory maximum

17  on each count.

18         The facts in this case are extremely strong, as there

19  is both audio and video surveillance of the gun possession as

20  well as the smuggling attempts in this case.

21         The Defendant has previously used at least three alias

22  names.  And as indicated at the beginning of the Government's

23  presentation, as far back as 2013 the Defendant has promoted

24  violent jihad, admiration for ISIS, Al-Qaeda, their leaders as

25  well as terrorist attacks on this country.

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 14 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 13 of 53

13

1        So for those reasons, your Honor, the Government feels

2   that Mr. Baptiste is not only a risk of flight, but a danger to

3   the community, and both individuals should be held in pretrial

4   detention pending trial.

5        THE COURT:  Okay.  And pardon me if I missed this.  Did

6   you say the activities at the gun range were also taped?

7        MR. ANTON:  Yes, Judge.  They were both audio and

8   videotaped not only by the CHS in this case, but there is

9   surveillance video from the actual gun range itself as well as

10  the fact that Mr. Baptiste and Mr. Noel ultimately posted on

11  social media themselves posing with the firearms that they were

12  using at the gun range.

13       THE COURT:  Okay.  I'll hear from Mr. McDonald with

14  respect to Mr. Baptiste first.  And let me ask you first if you

15  have any additions or corrections to the pretrial services

16  report.  If you do not, I will assume that I can rely on what

17  is set forth in that report.

18       Mr. McDonald?

19       MR. McDONALD:  Oh, you're asking me.  I'm sorry, your

20  Honor.  Yes.

21       THE COURT:  Well, yes.  You would be the one that --

22       MR. McDONALD:  I apologize.

23       THE COURT:  -- would be making corrections.

24       MR. McDONALD:  I apologize.

25       No, your Honor.  No, your Honor.

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 15 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 14 of 53
Collazo - DIRECT - By Mr. McDonald                    14

 1          THE COURT:  No corrections or additions at this point?

 2          MR. McDONALD:  No.  None at this point, your Honor.

 3          THE COURT:  Okay.  Did you have any questions you

 4  wished to ask the agent or do you just wish to make argument?

 5          MR. McDONALD:  I wish to question the agent, with the

 6  Court's permission, your Honor.

 7          THE COURT:  Okay.

 8                      DIRECT EXAMINATION

 9  BY MR. McDONALD:

10  Q.   Good morning, Special Agent.

11  A.   Good morning.

12  Q.   You were present for the Government's proffer here in

13  court.  Correct?

14  A.   Yes.

15  Q.   And you adopt it in full as if it were your own testimony?

16  A.   Correct.

17  Q.   And the Government in the proffer adopted the complaint in

18  full and to the proffer.  Did you hear that?

19  A.   Yes.

20  Q.   So do you adopt what -- the allegations of the complaint in

21  full as if it were your own testimony?

22  A.   I do.

23  Q.   Thank you.

24       Now, Mr. Baptiste is not charged here with any kind of

25  terrorism offense.  Correct?

Case 1:18-cr-20613-JEM  Document 82-8  Entered on FLSD Docket 08/28/2019  Page 16 of 54
Case 1:16-mj-03532-WCT  Document 17  Entered on FLSD Docket 12/27/2016  Page 15 of 53
Collazo - DIRECT - By Mr. McDonald                    15

1    A.   Correct.

2    Q.   He's only charged with conspiracy to smuggle goods and

3    felon in possession.   Right?

4    A.   Correct.

5    Q.   There's no evidence that Mr. Baptiste has ever committed

6    any act of violence in furtherance of terrorism.   Right?

7    A.   There is indication that he is inciting the behavior.

8    Q.   The question was:   There's no evidence that he's ever

9    actually committed any act of violence in further [sic] of

10   terrorism.   Correct?

11   A.   I think that would be left to interpretation.

12   Q.   Well, what act has he committed?

13   A.   I mean, right now on this complaint, as it's articulated in

14   the complaint, all the terrorism indicators there of his

15   activities and his behavior.

16   Q.   There's some -- there's an allegation in the complaint that

17   he committed an act of violence?

18   A.   Based on terrorism -- terrorist acts?

19   Q.   Yes.

20   A.   Not in the complaint, no.

21   Q.   So there's no allegation that he's done that.   Right?

22   A.   In the compliant, no.

23   Q.   Okay.

24   A.   What he's being charged with in the complaint is

25   articulated right on the front page.

Collazo - DIRECT - By Mr. McDonald                16

1   Q.   Right.  Okay.

2        Now, the FBI launched an investigation into him because of

3   his online postings on social media?

4   A.   What's that?

5   Q.   The FBI launched an investigation into Mr. Baptiste because

6   of online postings on social media that he made?

7   A.   FBI had launched an investigation based on his social media

8   dissemination of extremist propaganda.  Correct.

9   Q.   So let's turn to that.

10       The investigation was -- was initiated in April 2014?

11  Maybe Paragraph 4.

12  A.   Paragraph 4?  Yeah.  April of 2014.

13  Q.   And Mr. Baptiste was incarcerated during that time, wasn't

14  he?

15  A.   I do not know if he was incarcerated at that particular

16  time.

17  Q.   So you don't know whether he was --

18  A.   I don't know.

19  Q.   -- out posting at that time?

20  A.   Not at that time.

21  Q.   Okay.  Now, the complaint mentions, Paragraph 4 again,

22  Mr. Baptiste using social media to disseminate extremist

23  propaganda and promote trips to Syria.  Right?

24  A.   For jihad.

25  Q.   For jihad.

Collazo - DIRECT - By Mr. McDonald                17

1    A.    Uh-huh.

2    Q.    Right?

3          That's what the complaint says.

4    A.    Correct.

5    Q.    Yeah.

6          And there's no indication that Mr. Baptiste ever traveled

7    to Syria himself.  Right?

8    A.    Correct.

9    Q.    Okay.  Now, at some point, an FBI undercover employee makes

10   contact with Mr. Baptiste?

11   A.    That is correct.

12   Q.    And when did that occur?  When did the first contact occur?

13   A.    I do not know.

14   Q.    Do you have even a rough approximation?

15   A.    I do not.

16   Q.    Okay.  Well, in, I guess, April 26 of 2016, there was a

17   recorded phone call that's referenced here?

18   A.    Correct.

19   Q.    And that was that FBI undercover employee that was on the

20   call with Mr. Baptiste?

21   A.    Uh-huh.  Yes.

22   Q.    Who initiated that phone call?

23   A.    I don't know.

24   Q.    You don't know who called whom?

25   A.    I don't know.

Collazo - DIRECT - By Mr. McDonald                18

1   Q.   Okay.

2   A.   It was just an audio-recorded call.  And I don't have that

3   information.

4   Q.   You've listened -- you've heard the call?

5   A.   Have I listened to the call?

6   Q.   Yes.

7   A.   No, I have not.

8   Q.   You have not.

9        So do you have knowledge of the content of the call, aside

10   from what's just laid out here in the complaint?

11   A.   I do have some knowledge of communication with the case

12   agent.  Correct.

13   Q.   Let's see.  And in that call, at least according to the

14   complaint, Mr. Baptiste said that he used to own firearms.  I

15   believe it's Paragraph 5 of the complaint, if you want to

16   reference it.

17   A.   That's what he was saying.  Correct.

18   Q.   And he said that his ex-wife had a .22-caliber firearm.  Is

19   that correct?

20   A.   Correct.

21   Q.   Now, has Mr. Baptiste, to your knowledge, ever been

22   married?

23   A.   To my knowledge, he has been married.

24   Q.   To whom would that have been?

25   A.   I don't know.

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 20 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 19 of 53
Collazo - DIRECT - By Mr. McDonald                19

1   Q.   So have you seen the pretrial services report in this case?

2   A.   I have not.

3   Q.   Would it surprise you to say [sic] that the pretrial

4   services report says that he hasn't been married?

5   A.   No.   That would not surprise me, based on --

6   Q.   Even though you believe that he's been married?

7   A.   Correct.

8   Q.   Okay.

9   A.   My testimony is to what -- to the complaint.

10  Q.   So your only basis for thinking that he's married, then, is

11  what you see in the complaint saying that his ex-wife had a

12  .22-caliber?

13  A.   That's my knowledge, as articulated in the complaint.

14  Q.   Right.

15  A.   Correct.

16  Q.   Okay.   And also in that same call, at least according to

17  the complaint, Mr. Baptiste supposedly said that it's not

18  difficult to get a firearm in the United States.   Right?

19  A.   Yes, he does.

20  Q.   And he explained, though, that he was a convicted felon,

21  didn't he?

22  A.   On this call, yeah.

23  Q.   Yeah.   And he couldn't lawfully possess a firearm?

24  A.   He did.

25  Q.   And he said he wasn't going to take the chance of having a

Collazo - DIRECT - By Mr. McDonald                20

1  gun on him or in his car?

2  A.   Unless he was going to use it.

3  Q.   Yeah.

4      Let's turn to the shooting range that was mentioned

5  earlier.

6      The complaint says that a confidential human source,

7  Mr. Noel and Mr. Baptiste went to a shooting range in October.

8  Right?

9  A.   What paragraph are you on?

10  Q.   It would be -- well, let me just ask you, without referring

11  to the document, is that what occurred?  Is that your

12  testimony?

13  A.   Can you say the date again?

14  Q.   October 23rd, 2016.

15  A.   Correct.

16  Q.   Okay.  Now, there's no evidence that the trip to the gun

17  range was Mr. Baptiste's idea, is there?

18  A.   There were conversations prior to them going to the gun

19  range where they were both interested in shooting.

20  Q.   So there's a conversation where Mr. Baptiste raised the

21  idea of going to the shooting range?

22  A.   I do not know if Mr. Baptiste raised it.  But I believe

23  that Mr. Noel definitely raised the idea.

24  Q.   Okay.  So there's no evidence that Mr. Baptiste raised the

25  idea of going to the shooting range.  Right?

Collazo - DIRECT - By Mr. McDonald                       21

1   A.   I don't know if there's no evidence.   It's just not

2   articulated in the complaint.

3   Q.   No evidence that you're aware of here testifying?

4   A.   That I'm aware of, correct.

5   Q.   Now, who -- the call -- I mean, the complaint references a

6   phone call about going to the gun range with Mr. Baptiste and

7   the confidential source that took place on October 20th.   Do

8   you know what I'm talking about there?

9   A.   Paragraph 12?   Yes.

10  Q.   Now, who initiated that call?

11  A.   That I don't know.

12  Q.   So we don't know if the confidential source called

13  Mr. Baptiste; we don't know if Mr. Baptiste called the

14  confidential source?

15  A.   I do not.

16  Q.   That call was audio-recorded?

17  A.   Correct.

18  Q.   You listened to that audio recording?

19  A.   I did not listen to that audio recording.

20  Q.   You don't have anything that you can provide other than

21  what's in the complaint about that?

22  A.   I cannot.

23  Q.   Now, also another call is referenced here on October 22nd.

24  Are you familiar with that call, also about the shooting range?

25  A.   Yes.   I'm familiar with that.

Collazo - DIRECT - By Mr. McDonald                22

 1   Q.   Who initiated that call?

 2   A.   That I don't know.

 3   Q.   So again, we don't know who it was that made the call about

 4   going to the shooting range and whose idea it was?

 5   A.   I do not know.

 6   Q.   Okay.  So then, you know, Baptiste, Noel and the

 7   confidential source, you know, allegedly go to this gun range

 8   on the 23rd of October.  Right?

 9   A.   Correct.

10   Q.   And is there surveillance footage from the gun range you

11   mentioned?

12   A.   There is.

13   Q.   And there's also -- is there also additional video footage

14   that was taken by the confidential source?

15   A.   I believe --

16   Q.   I believe that was -- go ahead.  Sorry.  I don't mean to

17   interrupt.

18   A.   I do believe there is.

19   Q.   So you believe there is or do you know there is?

20   A.   I believe there is.

21   Q.   Was that -- would that have been taken with a body camera

22   or how would that -- what is that?

23   A.   That I don't know.

24   Q.   So you don't -- you haven't seen any of this footage, then?

25   A.   I have not.

Collazo - DIRECT - By Mr. McDonald                   23

1   Q.   Does the -- is there any footage that exists of

2   Mr. Baptiste actually holding a gun at the shooting range?

3   A.   Is there any footage?

4   Q.   Correct.

5   A.   You mean video?

6   Q.   Yes.

7   A.   I believe there is.

8   Q.   What is it?  What does it show?

9   A.   What does it show?  Him holding the actual guns they're

10  going to rent.

11  Q.   Which ones?

12  A.   It describes it here.  If you want to go through them, we

13  can.

14  Q.   Have you seen it?  Have you seen this footage?

15  A.   I have not seen the footage.

16  Q.   So you're --

17  A.   But I believe there is --

18  Q.   All you can say is what you see --

19  A.   -- of the recording.

20  Q.   -- written in these allegations in the complaint?

21  A.   Correct.

22  Q.   So you don't know anything about which gun it is or

23  anything?

24  A.   I do not.

25  Q.   Okay.  Now, the complaint also mentions -- well, let me

                    Collazo - DIRECT - By Mr. McDonald        24

 1    back up.
 2        Were Mr. -- the firearms were later acquired by the FBI.
 3    Correct?
 4    A.   From the gun range?
 5    Q.   Yes.
 6    A.   Correct.
 7    Q.   Now, were those -- those firearms fingerprinted or swabbed
 8    for DNA?
 9    A.   That I do not know.
10    Q.   So we don't even know if Mr. Baptiste's fingerprints or DNA
11    are on the guns?
12    A.   I do not know that answer.
13    Q.   The complaint mentions that liability forms were signed by
14    Mr. Baptiste and Mr. Noel.  Right?
15    A.   That's correct.
16    Q.   Indicating that four boxes of ammunition were used.  Right?
17    A.   Correct.
18    Q.   Any evidence of -- to who actually used the ammunition that
19    was in those boxes?  To put it another way, who fired those --
20    those rounds?
21    A.   The rounds that were purchased?
22    Q.   Correct.
23    A.   Who fired them?
24    Q.   Yes.
25    A.   I don't have that information.

Collazo - DIRECT - By Mr. McDonald                25

1    Q.   Okay.   Did the confidential human source fire any of the

2    weapons at the shooting range?

3    A.   That I do not know.

4    Q.   So as far as you know, the confidential source could have

5    fired all the ammunition that was in those boxes?

6    A.   I suppose that is possible.

7    Q.   Who paid to rent the weapons?

8    A.   There was a receipt found or provided from the gun range

9    that had Samuel Baptiste on it who paid for it.

10   Q.   Which weapons did he rent specifically?

11   A.   Specifically on that receipt?   I don't have it in front of

12   me, so --

13   Q.   And that receipt evidences in your view that Baptiste was

14   the one that paid for all the guns?

15   A.   I did see that, yes.

16   Q.   So to turn -- fast-forward a little bit again now to this

17   shipping container that we talked about or that was talked

18   about in the proffer, that container was scheduled to be

19   shipped to Haiti on November 7th?   That may be Complaint 21, if

20   you want to reference it.

21        Do you have any independent knowledge of the shipping

22   container aside from what you see here in the complaint?

23   A.   No, I do not.

24   Q.   All right.   So at least according to these allegations, the

25   shipping container was acquired by -- it wasn't leased by

Collazo - DIRECT - By Mr. McDonald                26

 1   Mr. Baptiste or owned by Mr. Baptiste.   Right?

 2   A.   The shipping container?

 3   Q.   Right.

 4   A.   It was not.

 5   Q.   It was acquired by, quote-unquote, "the confidential human

 6   source"?

 7   A.   That's correct.

 8   Q.   And the two rifles that were allegedly in the shipping

 9   container weren't brought there by Mr. Baptiste, were they?

10   A.   No, they were not.

11   Q.   They were brought there by the FBI's confidential human

12   source?

13   A.   Correct.

14   Q.   And they were placed in the shipping container by the FBI's

15   confidential human source?

16   A.   Correct.

17   Q.   They were provided to the confidential human source by the

18   FBI, the two rifles?

19   A.   Yes.

20   Q.   Mr. Baptiste never -- there's no allegation here in the

21   complaint that Mr. Baptiste himself ever asked the confidential

22   human source to acquire those rifles, is there?

23   A.   Not Mr. Baptiste.   Not in the complaint, no.

24   Q.   There's no evidence that Mr. Baptiste ever asked the

25   confidential human source to acquire those rifles, is there?

Collazo - DIRECT - By Mr. McDonald                    27

```
 1   A.   Not that I'm aware of.

 2   Q.   The only allegation is that it was Mr. Noel that allegedly

 3   asked to get these rifles?

 4   A.   Correct.

 5   Q.   Now, to go inside the container, on November 5th,

 6   Mr. Baptiste and Mr. Noel and the confidential source

 7   supposedly went to that container.   Right?

 8   A.   That's correct.

 9   Q.   And this confidential source then revealed the weapons that

10   he placed in the container?

11   A.   He did.

12   Q.   And then the complaint mentions Mr. Baptiste and Mr. Noel

13   taking photos with the weapons.

14   A.   Correct.

15   Q.   Does the FBI have those photos?

16   A.   Yes.   I believe they do.

17   Q.   What device --

18   A.   But I have not seen them.

19   Q.   What device were they taken on?

20   A.   You mean Noel's device or Baptiste's device?

21   Q.   Yeah.   I'm asking.

22   A.   Which phone was it?

23   Q.   Yeah.

24   A.   I don't have that knowledge.

25   Q.   Was it a phone?   Was it -- I'm sorry.   I didn't mean to cut
```

Collazo - DIRECT - By Mr. McDonald          28

 1  you off.

 2  A.   So I don't have that knowledge, which phone or which device

 3  it was that took them.

 4  Q.   So there's photos, but you have no idea how they were even

 5  taken?

 6  A.   Correct.

 7  Q.   Now, have you seen those images?

 8  A.   I have not seen those images, no.

 9  Q.   So you don't know right now whether there's -- you have not

10  seen an image of Mr. Baptiste holding one of those rifles?

11  A.   From this container, no.

12  Q.   The meeting in the container was supposedly consensually

13  monitored, according to the complaint.  Right?

14  A.   Correct.

15  Q.   Now, how was that monitored?

16  A.   The confidential informant had a device on him to monitor

17  the conversation.

18  Q.   Yeah.  So what kind of device?  Video?  Audio?

19  A.   I don't know.

20  Q.   You don't know?

21  A.   I don't know.

22  Q.   So we don't know if there's any video recording that was

23  taken inside that container?

24  A.   I can't say with 100 percent surety if there was video.

25  Q.   Okay.  And finally, a couple -- just a couple other areas.

Collazo - DIRECT - By Mr. McDonald          29

1      I'll be quick.

2          Now, this -- the complaint also mentions the confidential

3      source asking Mr. Baptiste and Mr. Noel about how to conceal

4      these rifles.  Right?

5      A.  Say that again.

6      Q.  The complaint mentions that the confidential source asked

7      Mr. Baptiste and Mr. Noel how to conceal the weapons within the

8      shipping container.

9      A.  Mr. Noel had actually explained on several occasions how he

10     does conceal weapons.

11     Q.  So the answer to my question, then, is that the

12     confidential source didn't ask them in there how to -- how to

13     conceal the weapons?

14     A.  I think there were discussions between them of how to

15     conceal it.  But you're asking me who initiated it?

16     Q.  Yes.

17     A.  I don't understand what you're asking.

18     Q.  Did the confidential source ask them how to conceal the

19     weapons?

20     A.  In this particular container?

21     Q.  Yes.

22     A.  I think there he made a suggestion.

23     Q.  So Mr. Baptiste's answer to that inquiry was that they

24     could watch a YouTube video.  Right?

25     A.  Well, to break it down.

Collazo - DIRECT - By Mr. McDonald                30

1    Q.   About how to break down the firearms.  Is that right?

2    A.   Correct.

3    Q.   So Mr. Baptiste didn't have -- appear to have any

4    independent knowledge of how to break down an AR-15.  Right?

5    A.   Prior independent knowledge of how to do that?

6    Q.   Right.

7    A.   Oh, I don't know.

8    Q.   He referred them and said:  Hey, you can watch a YouTube

9    video on how to do it.  Right?

10   A.   That's what he told them.  Correct.

11   Q.   Right.  Okay.

12        And then according to the confidential source, they

13   planned -- the three of them planned to return to the container

14   on November 6th to further conceal the weapons?

15   A.   Correct.

16   Q.   They never went back to the container, though, did they?

17   A.   No, they did not.

18   Q.   Now, the FBI launched its investigation into Mr. Noel in

19   October 2016.  Right?

20   A.   Correct.

21   Q.   And that was based on information provided by a

22   confidential human source, the same source?

23   A.   Correct.

24   Q.   Any evidence of when Mr. Baptiste even first came to know

25   Mr. Noel?

Collazo - DIRECT - By Mr. McDonald                    31

1    A.   The confidential informant was introduced as a mutual

2    associate to -- by Baptiste to Mr. Noel.

3    Q.   But what about when Mr. Baptiste first came to know

4    Mr. Noel?

5    A.   When he first came to know him?

6    Q.   That's the question.

7    A.   Know Mr. Noel prior to the CHS?

8    Q.   Yes.

9    A.   I don't know.

10   Q.   You don't know when he --

11   A.   I don't.

12   Q.   -- first came into contact with him at all?

13   A.   I do not.

14   Q.   And it was Mr. Noel that talked to the confidential source

15   about this plan to attack Guantanamo that's set forth in the

16   complaint.   Right?

17   A.   Correct.

18   Q.   Now, there's no -- no allegation that Mr. Baptiste ever

19   said anything about this plan, is there?   It was just Mr. Noel?

20   A.   Which paragraph are you referring to?

21        MR. CASABIELLE:   Your Honor, I believe counsel -- his

22   client wants to speak to him.   I'm just bringing it to his

23   attention.

24        THE COURT:   Okay.

25        MR. McDONALD:   Should I do it after I finish up my

Collazo - DIRECT - By Mr. McDonald                32

1    questions or would the Court prefer that I -- I'll speak with

2    him for just one moment, your Honor, with the Court's

3    permission.

4              THE COURT:  Okay.  I'm sure you're about to wrap it up

5    anyway.

6              MR. McDONALD:  Yeah.  Just a couple more questions.

7    Yes, your Honor.

8              (Pause in the proceedings.)

9              MR. McDONALD:  Okay, your Honor.  Just a couple more

10   questions.  I'm almost -- almost finished.

11   BY MR. McDONALD:

12   Q.   Okay.  So there's no -- no allegation anywhere in the

13   complaint that Mr. Baptiste had, you know, talked about this

14   idea of attacking Guantanamo, is there?

15   A.   In the complaint, no.

16   Q.   Yeah.

17        And you're not aware of any evidence of Mr. Baptiste

18   advocating this plan, are you?

19   A.   Advocating the plan?  No.

20   Q.   And this was a plan to attack Guantanamo from Haiti.  Is

21   that right?

22   A.   Correct.

23   Q.   Okay.  And just to also -- you know, to quickly turn now to

24   the social media posts of Mr. Baptiste from October 26th that

25   were referenced in the complaint --

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 34 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 33 of 53
Collazo - DIRECT - By Mr. McDonald                    33

```
 1   A.   Oh --

 2   Q.   -- he posted some -- just reposted some YouTube videos on a

 3   social media account around the 26th of October.  Is that

 4   right?  It looks like it's maybe Paragraph 18, is probably

 5   where these are laid out.

 6   A.   Correct.

 7   Q.   Right?

 8        And so some of these videos -- one was how to make a smoke

 9   bomb from Coca-Cola.

10   A.   Correct.

11   Q.   And then how to make a small and insanely loud Airsoft

12   grenade.  Right?  Those are the titles of some of these videos?

13   A.   Yes.

14   Q.   Okay.

15           MR. McDONALD:  No further questions.  Thank you, your

16   Honor.

17           Thank you very much, Special Agent.

18           THE COURT:  Mr. Casabielle, do you want to question the

19   agent?  And then I'll come back to the arguments by counsel

20   after --

21           MR. CASABIELLE:  Thank you, your Honor.

22           THE COURT:  -- we finish.

23           And before you begin, let me ask you, do you have any

24   additions or corrections to the pretrial services report?

25           MR. CASABIELLE:  No, your Honor.
```

Collazo - DIRECT - By Mr. Casabielle                34

1           THE COURT:  Okay.

2           MR. CASABIELLE:  May I proceed?

3           THE COURT:  Yes.

4           MR. CASABIELLE:  Thank you.

5                          DIRECT EXAMINATION

6    BY MR. CASABIELLE:

7    Q.  Agent Collazo --

8           THE COURT:  And just so that your clients are aware,

9    we're not going to go over everything that's already been gone

10   over before.  You can focus it on Mr. Noel.

11          MR. CASABIELLE:  Right.  Actually, a lot of the

12   questions I was going to ask have already been asked.  I just

13   want to clarify how they pertain to my client.

14          THE COURT:  That's fine.

15   BY MR. CASABIELLE:

16   Q.  Agent Collazo, reading the complaint, it seems that this

17   investigation had been ongoing for approximately two years

18   before my client's name surfaces.  Is that a fair

19   characterization?

20   A.  That's fair.

21   Q.  And the reason that my client's name surfaces is because he

22   was introduced to your informant by Mr. Baptiste?

23   A.  That is correct.

24   Q.  Do you know the context in which that occurred or why or

25   what was said during the introduction?

1  A.   I do not know the context.  But I believe it had the same

2  idealogical basis, beliefs.

3  Q.   Well, what I'm asking clarification on, if you can, is

4  whether this is -- the introduction involved introducing a

5  friend, involved introducing an accomplice, involved

6  introducing --

7  A.   I just think an associate.

8  Q.   Okay.  Is that a term of art or -- when you say

9  "associate," sometimes I think it's a term of art.  Are we

10 talking about a friend?

11 A.   A friend has a broad meaning.  So I don't -- to get into

12 the details of --

13 Q.   So does associate.

14        THE COURT:  Okay.  Associate doesn't have a broad

15 meaning?

16        THE WITNESS:  Well, it does.  But a friend?  Good

17 friend, best friend.  You know, I can't -- I don't know that

18 answer.  I do know that he was a mutual associate of Baptiste

19 and that's how he was introduced.

20 BY MR. CASABIELLE:

21 Q.   Okay.  Now, prior to that meeting, that introduction, you

22 had no indication that Mr. Noel was involved in any type of

23 illegal activity.  Is that fair?

24 A.   I'm sorry.  Could you repeat that?

25 Q.   Prior to that introduction --

Collazo - DIRECT - By Mr. Casabielle          36

1   A.   Yeah.

2   Q.   -- which occurred in 2016, you had no indication that

3   Mr. Noel was involved in anything illegal?

4   A.   That's correct.

5   Q.   Now, let's go to the gun range.  I know questions have been

6   asked as they pertain to Mr. Baptiste.  I want to ask you the

7   same line of questioning as they pertain to Mr. Noel.

8       You've already indicated you did not review the video.  But

9   do you have any information which guns, specifically guns,

10  Mr. Noel handled?

11  A.   No.

12  Q.   The videotape that you describe exists --

13  A.   Correct.

14  Q.   -- one came from the gun shop or the gun store or the gun

15  range?

16  A.   Correct.

17  Q.   And you haven't looked at it, so you can't add anything to

18  the complaint?

19  A.   I cannot.

20  Q.   The other -- I noticed that there was another video done by

21  the informant or agents.  I don't know which one.

22  A.   The informant.

23  Q.   Okay.

24  A.   The confidential informant.

25  Q.   Were there agents as backup inside of the gun range?

Collazo - DIRECT - By Mr. Casabielle                    37

1    A.   There were members of the joint terrorism task force inside

2    the range, yes.

3    Q.   Okay.   To your knowledge, did any of those agents actually

4    observe Mr. Noel handle a gun?

5    A.   To my knowledge, I believe they did witness that.

6    Q.   Okay.   Was that recorded in any way, that actual handling?

7    A.   I have not reviewed the video.

8    Q.   Okay.   Let's move on, then.

9        There were, I think, four guns mentioned in the complaint,

10   three .9-millimeters and an assault-type weapon?

11   A.   Yes.

12   Q.   You cannot tell us which one Mr. Noel handled, right?

13   A.   No.

14   Q.   Okay.   The guns that were -- well, let me just backtrack.

15       These guns, the ones that were used or  apparently used at

16   the gun range, those were manufactured outside the state of

17   Florida?

18   A.   That is correct.

19   Q.   Okay.   How about the two guns that were provided by the FBI

20   for the container?   Do you know where they were manufactured?

21   A.   I do not.

22   Q.   Okay.   Do you know what kind of weapons they were?

23   A.   AR-15s.

24   Q.   All right.   Do you know where Mr. Noel was living while he

25   was in Florida?

Collazo - DIRECT - By Mr. Casabielle          38

 1   A.   I cannot articulate the exact address, but I knew that he

 2   was living in a rental, renting a room from someone, I believe,

 3   a home.

 4   Q.   Do you know who that someone is?  A family member?

 5   A.   I do not.

 6   Q.   Okay.  Do you know the terms of that rental agreement or --

 7   A.   I have not seen the terms of that rental agreement.

 8   Q.   You don't know if it was long-term or short-term?

 9   A.   I do not know.

10   Q.   All right.  Were you able to ascertain what Mr. Noel was

11   doing here other than what is contained in these allegations?

12   By "here," I mean the South Florida area.

13   A.   No.  I have no knowledge of that.

14   Q.   The complaint indicates that $300 was paid by Noel to the

15   informant.  Can you tell us what the purchase price allegedly

16   is for these two guns that the FBI provided?

17   A.   Are you talking retail?  Black market?

18   Q.   Well, whatever was being offered to Noel, Mr. Noel.  I

19   mean, how much -- what was the agreement?

20   A.   It's going to be a guess.  I'm sorry.  What was --

21   Q.   What was the agreement between the informant and Mr. Noel

22   with regard to the purchase of these guns?

23   A.   That I don't know.

24   Q.   Okay.

25   A.   What the price was?

Collazo - DIRECT - By Mr. Casabielle                39

 1   Q.   Yes.

 2   A.   No.   But I know that he did pay $300 for one of them.

 3   Q.   How do you know that he was paying for a rifle?

 4   A.   Because that's what was stated.

 5   Q.   By whom?

 6   A.   The confidential informant.

 7   Q.   Okay.   Is that recorded -- is there any recording of

 8   Mr. Noel negotiating the purchase of firearms?

 9   A.   That I'm not -- I'm not sure if there is an audio of that

10   or not.   I don't know.

11   Q.   Okay.   To your knowledge -- and this will be the last area;

12   I want to wrap up.

13       To your knowledge, were there any conversations between the

14   informant and Mr. Noel that were not recorded?

15   A.   I believe so, yes.

16   Q.   Can you give us an idea so we have an idea of how many

17   conversations took place and how many were recorded?

18   A.   I don't know the numbers.   I'm just -- I know there could

19   have been some, it is possible, that were not recorded.

20   Q.   How would that have happened?

21   A.   It could have happened where there was -- you know, I don't

22   know for sure.   But it can happen, you know.   That does happen

23   from time to time, you know, based on the life of a battery,

24   the pushing of a button, the device, the technology.   It's

25   possible.

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 41 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 40 of 53
Collazo - CROSS - By Mr. Anton                    40

1   Q.   Okay.  So what you're saying is if it wasn't recorded, it

2   was not because the informant chose not to record it; it --

3   A.   Oh, correct.

4   Q.   -- would have been some kind of technical defect?

5   A.   Correct.

6   Q.   Okay.

7        MR. CASABIELLE:  Thank you.  I have no further

8   questions, your Honor.

9        THE COURT:  Okay.  Let me ask you, Mr. Anton, do you

10  wish to clarify any of the facts in this case?

11       MR. ANTON:  Judge, just very briefly.

12                    CROSS-EXAMINATION

13  BY MR. ANTON:

14  Q.   Ma'am, regardless of whose idea it was to go to the range

15  and who called who, are you aware that Samuel Baptiste

16  ultimately did, in fact, go to a gun range?

17  A.   Correct.

18  Q.   And he knew that risk and possessed the firearms

19  nonetheless?

20  A.   He was very aware of that risk.

21  Q.   And there is certainly video surveillance that documents

22  Mr. Baptiste renting, possessing and shooting these weapons?

23  A.   Correct.

24  Q.   As to Mr. Noel, same thing?  There is video recordings of

25  these individuals both possessing and shooting weapons?

Collazo - CROSS - By Mr. Anton                    41

1    A.   Yes, sir.

2    Q.   As to the shipping container, was Mr. Baptiste aware of

3    Mr. Noel's plan to smuggle the weapons to Haiti?

4    A.   Yes.

5    Q.   And did in fact in a recorded conversation the two of them

6    discuss that it was for a later use to free the brothers in

7    Guantanamo Bay?

8    A.   Yes.

9    Q.   Was Mr. Baptiste present during the time when Mr. Noel was

10   secreting the weapons in the container?

11   A.   Yes.

12   Q.   Did he provide any kind of advice or assistance?

13   A.   He did.

14   Q.   And did Mr. Noel indicate in previous recorded

15   conversations whether or not he had in fact done this before?

16   A.   He indicated he had.

17   Q.   Smuggled weapons to Haiti?

18   A.   Correct.

19        MR. ANTON:  Nothing further, Judge.  Thank you.

20        THE COURT:  Okay.  Let me turn now back to

21   Mr. McDonald.  And I'll hear argument regarding Mr. Baptiste.

22        And you can begin by telling me the bond that you

23   believe is appropriate in this case.

24        MR. McDONALD:  Your Honor, in terms of a bond, I think

25   that the family -- I've been in contact with them.  They don't

1    have a lot of money.

2           I would say, you know, a $50,000 5 percent is what I'd

3    propose, you know, with cosigners, electronic home monitoring.

4    That's what I would propose as a bond, if the Court were

5    willing to grant a bond.

6           THE COURT:  You said a $50,000 --

7           MR. McDONALD:  5 percent.

8           THE COURT:  -- 5 percent?

9           MR. McDONALD:  Yeah.

10          THE COURT:  Okay.

11          MR. McDONALD:  With a right to revisit if -- you know.

12          THE COURT:  Well, I'm asking what you're proposing.

13          MR. McDONALD:  Yes.  That's my proposed bond.  Yes.

14          THE COURT:  Okay.  So I'll hear argument from you.

15          MR. McDONALD:  Thank you, your Honor.

16          I think that what we've seen today is that, you know,

17   we really didn't have a witness on the stand that was able to

18   really testify about any of the allegations in the complaint

19   with any personal knowledge.

20          We're left with simply the allegations in the

21   complaint.

22          The Government hasn't met its burden that Mr. Baptiste

23   poses a danger to the community.

24          I think it's interesting that the Government with

25   respect to Mr. Noel is seeking pretrial detention only on

1   flight risk.  He is the guy that -- Noel was the guy that

2   allegedly sought the weapons and was planning to ship them to

3   Haiti, you know.

4          But they're only saying flight risk on him, not danger

5   to the community.

6          On Mr. Baptiste, they're saying danger to the community

7   and flight risk.

8          And I think that what the -- what -- even just taking

9   what's in the complaint and the Government's inability and

10  their witness's inability to elaborate on that, I think what we

11  see here is that everything that Mr. Baptiste did here was

12  initiated by the FBI.  They, you know, wanted to go to the

13  shooting range, got him captured on film with these guns,

14  allegedly, took -- you know, they rented the -- their

15  confidential source rented the shipping container.  They

16  provided the rifles.  They put them in there.

17         Mr. Baptiste was, you know, invited to go into the

18  shipping container.

19         And I think, you know, this -- everything was sort of,

20  you know, the idea of the Government.  And Mr. Baptiste -- I

21  mean, according to the allegations, I mean, he was someone who

22  was posting on social media.  Maybe the content is certainly

23  not something that is very palatable content, you know, if what

24  the allegations are are true.

25         But, you know, this is a kid just getting online,

1   posting on social media.  He gets wrapped up in an FBI

2   investigation.  He has a prior felony conviction, so if he's

3   found with a gun, you know, he's facing a lot of time.

4          And these -- there's no allegation that Mr. Baptiste

5   had a gun, you know, in his own home or car or anything like

6   that.  I mean, even the weapons that he allegedly is, you know,

7   in a video shooting were rented at a shooting range, never left

8   the shooting range.  There's no indication that he ever had a

9   weapon that -- and tried to do any harm to anyone with it in

10  relation to any of this.

11         So I think that -- and there's no evidence that he

12  actually was trying to, you know, make actual contact with

13  anyone in ISIS or any of these terrorist organizations.

14         So I think, your Honor, that the Government, you know,

15  simply has not, you know, put forth enough evidence in this

16  hearing, particularly when we have no -- nothing else really to

17  go by than what's in the complaint.  The agent was not really

18  able to elaborate on anything with any personal knowledge.  And

19  I think the Government has failed to carry its burden.

20         With respect to flight risk, I mean, Mr. Baptiste is --

21  has strong ties to the community.  He was born and raised here,

22  lives with his mother.  He's had no foreign travel, according

23  to the pretrial services report, since 2007.  He can be placed

24  on electronic home monitoring.

25         And I think that that would -- should -- I would submit

1    that that would be sufficient to alleviate any concern the

2    Court might have about flight risk.

3                Thank you, your Honor.

4                THE COURT:  Okay.  Let me hear from you,

5    Mr. Casabielle, regarding Mr. Noel.  And again, you can begin

6    by telling me what bond you believe is appropriate in this

7    case.

8                MR. CASABIELLE:  Thank you, your Honor.

9                Your Honor, Mr. Noel is not going to make any kind of

10   monetary bond.

11               What I would respectfully suggest is that a personal

12   surety with home detention would address the concerns of the

13   Government, which is that he is a risk of flight.

14               And that is what I would recommend and propose.

15               THE COURT:  Okay.  And I'll hear argument.

16               MR. CASABIELLE:  Your Honor, very briefly:  I think

17   after this hearing, what we have is more questions perhaps than

18   answers.

19               This event at this gun range remains unclear.  We know

20   that four guns were rented.  We know that ammunition was

21   purchased.  We know that a receipt was signed.  But we don't

22   have certainty as to who did what with those guns.

23               And with regard to the weapons that were placed in the

24   container, I don't think it's even been established that

25   there's federal jurisdiction, since we don't know where they

1    were manufactured or if they crossed state lines.  We --

2          THE COURT:  I don't believe that those are the guns

3    that are the subject of the complaint, are they, Mr. Anton?

4    It's the guns at the shooting range.

5          MR. ANTON:  The guns at the shooting range are the

6    subject of the possession charges, yes.

7          THE COURT:  Okay.

8          MR. ANTON:  The other guns referenced illegal export.

9          THE COURT:  Okay.

10         MR. CASABIELLE:  That was my understanding as well.

11         THE COURT:  Okay.  I just wanted to make sure that I

12   wasn't missing something.  You don't need to argue that,

13   because it's not part of the alien in possession of a firearm

14   charge.

15         I do have one question.  What is his status as a --

16   since you are relying on the fact that he is an alien who is

17   not entitled to possess a firearm, what was his immigration

18   status, Mr. Anton?

19         MR. ANTON:  He was simply on a visitor visa.

20         THE COURT:  What kind of a visitor visa?

21         MR. ANTON:  B1/B2 visitor visa.

22         THE COURT:  Okay.

23         MR. ANTON:  Whereas outlined in the complaint, ICE has

24   confirmed he had no legal right to possess firearms.  And as I

25   previously mentioned, there is an immigration detainer in

1    place.

2            THE COURT:  Okay.

3            MR. CASABIELLE:  I have nothing further, your Honor.

4            THE COURT:  Okay.  Thank you.

5            MR. CASABIELLE:  Thank you.

6            THE COURT:  Mr. Anton, do you have any response?

7            MR. ANTON:  Judge, as to Mr. Noel, the Defendant has no

8    permanent residence here in the US.  His entire family history

9    and ties -- family ties all reside currently in Haiti.  He was

10   here only on a visitor visa.  He has a detainer in place with

11   Immigration.

12           And, Judge, for those reasons, because he has no legal

13   status here, any type of release at this point would be

14   inappropriate, as he is deportable and has no status here.

15           As to Mr. Baptiste, the defense's request of a $50,000

16   5 percent bond is wholly inadequate in this case.  The

17   Defendant has an extensive criminal history involving violence,

18   including but not limited to, attempted murder with a firearm.

19   He has no travel because he's been in prison.  And when he's

20   not been in prison, he's been out conducting the activities

21   that have been alleged in the complaint.

22           They also sought an electronic monitor, which has been

23   utilized once in the past.  And when it was placed on

24   Mr. Baptiste's leg, he cut it off and fled.

25           So releasing this Defendant back into the community

1    based on these particular charges, based on the Defendant's

2    criminal history and based upon his previous actions of

3    violating the terms and conditions of not only his conditional

4    release, but of probationary terms, of cutting off electronic

5    monitors and the like, based on the seriousness of this

6    particular offense, there are no combinations of any conditions

7    that would reasonably assure the safety of the community and

8    assure that he would not flee.

9         So for those reasons, we ask that he be held in

10   pretrial detention.

11        THE COURT:  Okay.  Thank you.

12        I will note at the outset it probably would have been a

13   little more useful to have an agent who had some knowledge of

14   the case other than what was in the complaint testify.  It

15   really was not particularly helpful to have somebody who didn't

16   even know who placed a phone call, who didn't know whether

17   there were unrecorded conversations and really had very limited

18   knowledge of the investigation.

19        But fortunately, the complaint was very, very detailed.

20   And so it provides a significant amount of detail with respect

21   to the events that form the basis for this case.

22        It certainly establishes probable cause, which is of

23   course one of the requirements in order to hold somebody in

24   detention.

25        So as to Mr. Noel, who I'll handle first, I find there

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 50 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 49 of 53

49

1    are no conditions of release that would reasonably assure his

2    appearance in court as required.

3         He has very limited ties to this country.  He is no

4    longer here lawfully because there is a detainer placed against

5    him.  All of his family ties, his employment and any

6    significant ties are to Haiti.  And he has also traveled to

7    Saudi Arabia, Turkey and the Dominican Republic in the past ten

8    years.

9         And so I just find that there really are no conditions

10   that would reasonably assure his appearance in court if he is

11   released on bond.

12        I note that he is facing a certain period of time in

13   custody as a result of this offense, approximately three years,

14   which is not unduly long.  But on the other hand, it is a

15   significant period of time.  And so -- and he has -- there are

16   no conditions that have been suggested by the Defendant that I

17   think would assure his appearance.

18        So I am going to hold him in detention, based on risk

19   of flight.

20        As to Mr. Baptiste, I note that he does have -- he

21   certainly has ties to this community, although he does have

22   past travel to Haiti.  But, you know, with respect to

23   Mr. Baptiste, as Mr. Noel, I think the evidence against him is

24   strong.  I think it certainly establishes probable cause to

25   believe he committed the offenses charged, particularly the

1    firearms offense.

2           And he has not done well when he has been released

3    before, either on probation or under supervision.  As noted by

4    the Government, there was an incident where he cut off his

5    electronic monitoring device.  And he is looking at a

6    significant period of time in prison if he's convicted on these

7    offenses.  And I think that there is a strong likelihood that

8    he will be, based upon the fact that everything was video- and

9    audio-recorded.

10          So I find that he is a risk of flight.

11          With respect to a danger to the community, he has an

12   extensive criminal record.  I mean, it dates back to, you know,

13   in terms of actual convictions, you know, to when he was 16.

14   And that was, you know, not the most serious offense in the

15   record at that point, which was sale, delivery and possession

16   of cannabis.

17          Nevertheless, he also was convicted of carrying a

18   concealed firearm and marijuana possession on another date when

19   he was 16.

20          And when he was 18 -- 17, he had another possession of

21   a controlled substance where he was sentenced to 364 days,

22   which was a felony offense.

23          In addition, when he was 18, he was convicted of

24   attempted murder with a firearm, armed robbery, and put on

25   probation, which he violated.

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 52 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 51 of 53

51

1        He then was released sometime thereafter and was

2    apparently placed on probation, which was revoked, it appears,

3    in 2015.

4        So, I mean, he just does not have a good -- a good

5    history in terms of the safety of the community.  He's a repeat

6    offender.

7        And based upon the circumstances and the nature of

8    these offenses, where he is, you know, a felon in possession of

9    a firearm, he clearly knows he's not allowed to be shooting at

10   the range, and then combined with his involvement in the

11   smuggling venture and assisting in the -- with the provision of

12   rifles to be smuggled to Haiti for the purpose of an armed

13   takeover of Guantanamo, even if he was not the driving force

14   behind it, it doesn't speak well of his law-abiding nature.

15       And I understand he's laughing at the counsel table

16   there and shaking his head, which is not -- does not bespeak a

17   knowledge of the seriousness of these offenses.  But I'm not

18   really even taking that into account.  I'll just note that his

19   counsel might want to talk to him about that in the future.

20       But I do find, really, based upon his criminal history,

21   his involvement in this offense, that he does pose a danger to

22   the community as well.  And I think the evidence that supports

23   that finding was presented by clear and convincing evidence.

24       And so I'm going to hold him in detention on that basis

25   as well.

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 53 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 52 of 53

52

 1          Now, you know, as these cases go along, sometimes the

 2   audios and videos don't show what the Government says they say.

 3   You can always appeal this decision or seek reconsideration if

 4   the Government's evidence does not support what they've alleged

 5   in the complaint, you know, with respect to these offenses.

 6   And so, you know, that's something that I am aware of.

 7          But as it stands right now, with respect to the very

 8   detailed evidence contained in the complaint, I find that

 9   Mr. Baptiste is both a risk of flight and a danger to the

10   community, and I'll hold him in detention on both bases.

11          So I'll ask the Government to prepare a detention

12   order, you know, within a week.

13          And this case is not indicted yet.  I believe that the

14   preliminary hearing or arraignment date is November the 28th,

15   at which time you will have a district judge assigned to the

16   case.

17          Is there anything further, Mr. McDonald?

18          MR. McDONALD:  No.  Thank you, your Honor.

19          THE COURT:  Mr. Casabielle?

20          MR. CASABIELLE:  No, your Honor.  Thank you.

21          THE COURT:  Mr. Anton?

22          MR. ANTON:  No, your Honor.  Thank you.

23          THE COURT:  Thank you.

24          And you can step down.

25          THE WITNESS:  Thank you.

Case 1:18-cr-20613-JEM   Document 82-8   Entered on FLSD Docket 08/28/2019   Page 54 of 54
Case 1:16-mj-03532-WCT   Document 17   Entered on FLSD Docket 12/27/2016   Page 53 of 53

53

```
 1              (Proceedings concluded.)

 2                          C E R T I F I C A T E

 3

 4         I hereby certify that the foregoing is an

 5   accurate transcription of the proceedings in the

 6   above-entitled matter to the best of my ability.

 7

 8

 9   _____    /s/Lisa Edwards
          DATE          LISA EDWARDS, RDR, CRR
10                      Official Court Reporter
                        United States District Court
11                      400 North Miami Avenue, Twelfth Floor
                        Miami, Florida 33128
12                      (305) 523-5499

13

14

15

16

17

18

19

20

21

22

23

24

25
```